**KESSLER TOPAZ MELTZER**
   **& CHECK, LLP**
JENNIFER L. JOOST (Bar No. 296164)
(jjoost@ktmc.com)
STACEY M. KAPLAN (Bar No. 241989)
(skaplan@ktmc.com)
One Sansome Street, Suite 1850
San Francisco, CA 94104
Tel:    (415) 400-3000
Fax:   (415) 400-3001

*Counsel for SEB Investment Management AB and*
*Lead Counsel for the Putative Class*

[*Additional counsel on signature page.*]

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| SEB INVESTMENT MANAGEMENT AB, and WEST PALM BEACH FIREFIGHTERS' PENSION FUND, Individually and On Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> WELLS FARGO & COMPANY, CHARLES W. SCHARF, KLEBER R. SANTOS, and CARLY SANCHEZ, <br><br> Defendants. | Case No. 3:22-cv-03811-TLT <br><br> **COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** <br><br> <u>CLASS ACTION</u> <br><br> DEMAND FOR JURY TRIAL <br><br> Judge:  Hon. Trina L. Thompson |

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ..................................................................................................1

II.     JURISDICTION AND VENUE ...........................................................................8

III.    PARTIES ..............................................................................................................9

    A.      Plaintiffs ....................................................................................................9

    B.      Defendants .................................................................................................9

    C.      Relevant Non-Parties—Former Wells Fargo Employees ........................11

IV.     FACTUAL ALLEGATIONS ..............................................................................12

    A.      Company Background ...............................................................................12

    B.      Years Of Scandals Lead To Dire Consequences For Wells Fargo's Business ................13

        1.      Wells Fargo's Long History Of Discriminatory Conduct.....................14

        2.      Wells Fargo's Scandals Result In Significant Negative Consequences, Including A Devastating Asset Cap .................15

    C.      Wells Fargo's Management Highlights The Importance Of Fixing Its Regulatory Compliance Issues But Fails To Make Meaningful Progress ...........................................18

    D.      Wells Fargo Hires Scharf As CEO And Assures Investors It Is Committed To Reforming Its Compliance And Rehabilitating Its Reputation .........................................20

    E.      Investors Remain Focused On When Wells Fargo Can Rectify Its Compliance Issues ....................22

    F.      Leading Up To The Class Period, Wells Fargo Repeatedly Touts Its Purported Focus On Improving Diversity ..........................24

    G.      Scharf Tries To Walk Back His Comments About A Lack of Black Talent....................25

    H.      Investors Focus On DE&I And Demand Additional Disclosures Regarding Wells Fargo's Diverse Hiring Policies..........................27

    I.      Defendants Mislead Investors About Wells Fargo's Diverse Search Requirement .........32

    J.      Wells Fargo Conducts Widespread "Fake" Interviews Of Diverse Candidates Solely To Claim Adherence To The Diverse Search Requirement ...................34

    K.      The Company Denies Early Reports About Its Hiring Policies .....................41

    L.      The Relevant Truth Is Revealed .........................................43

    M.      Relevant Post-Class Period Developments.........................................44

V.      DEFENDANTS' MATERIALLY FALSE OR MISLEADING STATEMENTS AND
        OMISSIONS ................................................................................................................51

VI.     ADDITIONAL ALLEGATIONS OF DEFENDANTS' SCIENTER ...........................55

        A.      Defendants Had Unfettered Access To Information About Wells Fargo's Diverse
                Hiring Initiatives ...............................................................................................56

        B.      Defendants Repeatedly Spoke About The Diverse Search Requirement .........................59

        C.      Implementing Adequate Controls And Resolving The Company's Myriad
                Regulatory Issues Was A Key Priority ...............................................................60

        D.      Wells Fargo's Statements After The New York Times' May 19 Article And The
                Temporal Proximity Of Those Statements To The Announcement That The
                Diverse Search Requirement Would Be Paused And Revelation Of The Relevant
                Truth Further Support Scienter ........................................................................62

VII.    LOSS CAUSATION............................................................................................................64

VIII.   CLASS ACTION ALLEGATIONS ...................................................................................67

IX.     A PRESUMPTION OF RELIANCE APPLIES .................................................................69

X.      THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE ARE
        INAPPLICABLE .................................................................................................................70

XI.     CAUSES OF ACTION ........................................................................................................71

COUNT ONE  VIOLATION OF SECTION 10(B) OF THE EXCHANGE ACT AND RULE
        10B-5 PROMULGATED THEREUNDER AGAINST DEFENDANTS ...................................71

COUNT TWO  VIOLATION OF SECTION 20(A) OF THE EXCHANGE ACT AGAINST
        DEFENDANT SCHARF ......................................................................................................72

XII.    PRAYER FOR RELIEF ......................................................................................................73

XIII.   DEMAND FOR JURY TRIAL ...........................................................................................73

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Court-appointed Lead Plaintiff SEB Investment Management AB ("Lead Plaintiff" or "SEB") and additional plaintiff West Palm Beach Firefighters' Pension Fund ("WPB Fire," and together with SEB, "Plaintiffs"), by and through their undersigned counsel, bring this action individually and on behalf of all other persons and entities who purchased or otherwise acquired the common stock of Wells Fargo & Company ("Wells Fargo" or the "Company") between February 24, 2021, and June 9, 2022, both dates inclusive (the "Class Period"), and who were damaged thereby. Plaintiffs assert claims for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), respectively, and the rules and regulations promulgated thereunder, including United States Securities and Exchange Commission ("SEC") Rule 10b-5, 17 C.F.R. § 240.10b-5, against Defendants (defined below).

Plaintiffs allege the following upon personal knowledge as to Plaintiffs and their own acts, and upon information and belief as to all other matters. Plaintiffs' information and belief is based upon the investigation conducted by and through their attorneys, which included the review and analysis of, among other things: (i) Wells Fargo's filings with the SEC; (ii) transcripts of Wells Fargo's conference calls with analysts and investors; (iii) reports, presentations, wire and press releases, and other information published by Wells Fargo; (iv) securities and financial analyst reports and advisories about the Company; (v) news and media reports concerning Wells Fargo; (vi) interviews with former Wells Fargo employees; (vii) price and volume data for Wells Fargo's securities; (viii) consultation with relevant consultants; and (ix) other publicly obtainable information. Plaintiffs' counsel's investigation into the factual allegations continues, and many of the relevant facts are known only by Defendants or are exclusively within their custody or control. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.    <u>INTRODUCTION</u>

1.    This securities fraud class action arises from Defendants' material misrepresentations and omissions about Wells Fargo's all-important hiring initiative, the Diverse Search Requirement. This initiative was purportedly implemented to increase diversity in the Company's senior ranks and to enable the Company to regain investor trust following a spate of costly corporate scandals, including repeated discriminatory conduct. The Diverse Search Requirement mandated that for virtually all United States job

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

openings that paid $100,000 a year or more, at least half of the candidates interviewed for each position had to be diverse (which, by Wells Fargo's definition, meant individuals representing underrepresented racial or ethnic groups, women, veterans, LGBTQ individuals, and those with disabilities). Yet, for years—both prior to and throughout the Class Period—diverse candidate interviews were shams, conducted despite the fact that another candidate already had been selected for the job. These "fake" interviews were rampant and allowed Wells Fargo to claim that it complied with the Diverse Search Requirement.

2.     Wells Fargo is one of the largest banking institutions in the United States. For the better part of the past decade, the Company has been embroiled in one corporate scandal after another, time and again demonstrating its lack of adequate risk management and internal controls, and poor corporate culture.

3.     The scope of Wells Fargo's misconduct has been sprawling. Among other things, the Company has defrauded mortgage holders and mortgage bond investors, overcharged consumers for auto insurance, and violated the Sarbanes-Oxley Act of 2002, safeguards to prevent money laundering, and several of its internal governance and risk management obligations. Most notoriously, Wells Fargo created 3.5 million unauthorized consumer accounts to boost its profits by falsifying records and forging customer signatures. The persistent malfeasance ruined Wells Fargo's reputation and its relationship with investors, regulators, and consumers. It has also resulted in substantial regulatory penalties; most notably, in the wake of the "fake account" scandal, the Federal Reserve took the unprecedented step of capping Wells Fargo's assets at roughly $1.9 trillion until the Company could demonstrate that it had sufficiently resolved its myriad risk and control failures (the "Asset Cap"). The Asset Cap has weighed heavily on Wells Fargo, limiting its revenue and growth, and hampering its ability to compete against other large banks.

4.     At the same time, Wells Fargo also has earned a reputation for discrimination, racking up a laundry list of regulatory actions and lawsuits for its discriminatory conduct. These violations were wide ranging. For example, in 2012, the Company entered into a historic settlement with the United States Department of Justice ("DOJ") to resolve allegations that it discriminated against African-American and Hispanic borrowers in its mortgage lending practices. In 2016, the Company settled with a class of Wells Fargo's African-American financial advisors to resolve claims that the Company effectively "segregate[d] [its] workforce by race" and did not provide African-American financial advisors the same opportunities as their white counterparts. In 2017, Wells Fargo settled allegations that it overcharged military veterans

for refinance loans, and in 2019, entered into a Conciliation Agreement following a Department of Labor ("DOL") investigation which concluded that the Company discriminated against 2,066 female job applicants and 282 African-American job applicants in 2014.

5.      As the scandals continued, Wells Fargo quickly churned through two CEOs. Then, in late 2019, Wells Fargo hired Defendant Charlie Scharf ("Scharf") to serve as its third CEO in as many years, and tasked him with turning the Company around and resolving its myriad regulatory failures. Defendants knew that remedying these pervasive problems was critical to shedding the Asset Cap, which was the topic of intense investor focus given its significant impact on Wells Fargo's business. To that end, Scharf quickly implemented organizational changes, which he and others told the market provided him, the Company's Operating Committee (comprised of Wells Fargo's highest-ranking executives), and the Board of Directors ("Board") with deep and consistent insight into all significant matters affecting the Company.

6.      Significantly, in light of Wells Fargo's track record of discrimination, a central part of the Company's rehabilitation campaign was to assure the market that it cared deeply about diversity, equity, and inclusion ("DE&I"), and, in particular, was striving to increase diverse representation within Wells Fargo's senior management levels. As a result, in March 2020, Wells Fargo publicly announced the Diverse Search Requirement, stating, "[u]nder the leadership of our CEO, Charlie Scharf . . . [w]e are requiring diverse candidate slates and interview teams for all roles at Wells Fargo with total direct compensation of more than $100,000." Thus, the Diverse Search Requirement was implemented, run, and overseen by the Company's most senior officers, who themselves pledged to ensure that Wells Fargo followed the initiative's mandate.

7.      Thereafter, Defendants continued to impress upon the market that Wells Fargo was focused on, and dedicated to, DE&I. Indeed, as social unrest swept across the United States after the killing of George Floyd in May 2020, Scharf said that, "as the CEO of Wells Fargo, I can commit that our company will do all we can to support our diverse communities and foster a company culture that deeply values and respects diversity and inclusion." But less than a month later, during a Zoom meeting with Wells Fargo employees and in an internal memo, Scharf blamed the Company's lack of senior-level Black employees on a supposedly limited talent pool, stating, "[w]hile it might sound like an excuse, the unfortunate reality is that there is a very limited pool of Black talent to recruit from."

8.      In addition to the considerable public backlash, shareholders seized on Scharf's remarks to demand further disclosure regarding the Company's DE&I initiatives. Specifically, several institutional Wells Fargo shareholders cited Scharf's comments in connection with a proposal for a diverse hiring protocol that would have mandated at least one woman and one ethnically or racially diverse person be included in the initial candidate pool for all of Wells Fargo's United States-based job openings. The shareholders submitted that proposal to Wells Fargo and asked that it be included in the Company's forthcoming proxy statement and presented for consideration and a vote during the Company's forthcoming annual shareholder meeting. Wells Fargo vehemently opposed this proposal, and after discussions with the shareholders, agreed to disclose significantly more detail about the Diverse Search Requirement in exchange for the shareholders withdrawing the proposal.

9.      In response to shareholder pressure, Defendants made a plethora of statements to investors throughout the Class Period touting Wells Fargo's Diverse Search Requirement. For example, in the Company's 2020 Annual Report published on February 23, 2021, Scharf represented that, "*[i]n the U.S., we are requiring a diverse slate of candidates . . . for most roles with total direct compensation of more than $100,000 per year*."[1] On May 26, 2021, Scharf again highlighted the Diverse Search Requirement while testifying under oath before the United States Senate Committee on Banking, Housing, and Urban Affairs, assuring that "*for the hiring of many senior roles, we have implemented guidelines that require a diverse slate of candidates (at least 50 percent)*."

10.      Similarly, in Wells Fargo's report entitled, *2020 Social Impact and Sustainability Highlights*, published in April 2021, Defendants assured the market that "*[o]ur Diverse Search Requirement requires that for most U.S. roles with total direct compensation greater than $100,000, at least 50% of interview candidates must be diverse with respect to at least one diversity dimension*," and boasted that, as of December 31, 2020, "*91% of applicable requisitions had a diverse interview slate*." During an October 7, 2021 virtual interview with the Institute for Corporate Productivity ("i4cp"), Defendant Carly Sanchez ("Sanchez") again highlighted Wells Fargo's "*candidate slate requirement for roles $100K and above*," explaining that "*50% of the slate -- of the candidate slate that will be interviewed*

---

[1] All emphasis is added and all original emphasis and internal citations are omitted unless otherwise noted.

***needs to be diverse in one dimension or another***." Defendants' representations were critical to investors, who were not only focused on DE&I initiatives in general, but particularly for Wells Fargo in light of its history of discriminatory conduct and the fact that the Company could not get the Asset Cap lifted until it remedied its compliance and risk management issues.

11.    However, despite publicly lauding the Diverse Search Requirement, in reality, Wells Fargo was conducting "fake" interviews of diverse candidates simply to claim compliance with the Diverse Search Requirement when, in truth, another candidate was already selected for the position. These fake interviews were systemic, and occurred across many of Wells Fargo's business lines both prior to and throughout the Class Period. These facts rendered Defendants' statements materially false and misleading when made.

12.    Cracks in Wells Fargo's DE&I façade first appeared on May 19, 2022, when The New York Times published an article detailing the accounts of a whistleblower, Joe Bruno ("Bruno"), and several other then-current and former employees in Wells Fargo's Wealth Management division about the Company's practice of conducting "fake" interviews. Wells Fargo tried to neutralize and discredit these claims. For example, a Company spokesperson told The Wall Street Journal that "[t]here is absolutely no reason why anyone would conduct a fake interview." Wells Fargo also painted any "fake" interviews as isolated acts of rogue employees, claiming, "[t]o the extent that individual employees are engaging in the behavior as described by The New York Times, we do not tolerate it." In several statements after The New York Times' May 19 article, Wells Fargo stated that it had researched all of the specific claims The New York Times shared with the Company before the article was published, but could not corroborate them as factual.

13.    Then, less than two weeks after The New York Times' May 19 article, in Wells Fargo's June 1, 2022 report entitled, *Diversity, Equity, and Inclusion at Wells Fargo* ("2022 DE&I Report"), Defendants once again touted the Diverse Search Requirement, assuring the market that, "[f]or most posted roles in the U.S. with total direct compensation greater than $100,000 per year, ***Wells Fargo requires that at least 50% of the interview candidates must represent a historically underrepresented group with respect to at least one diversity dimension***." Two days later, Defendant Kleber Santos ("Santos") defended the Diverse Search Requirement to Business Insider, categorically stating, "***[t]he rule is working***."

14.     Despite assuring investors that the Diverse Search Requirement was purportedly working as intended, just a few days later, on June 6, 2022, Wells Fargo abruptly suspended the Diverse Search Requirement so that the Company's leaders could "study its use and make changes," "gain confidence that 'the guidelines live[d] up to their promise,'" and ensure "hiring managers, senior leaders and recruiters fully underst[oo]d how the guidelines should work."

15.     On June 9, 2022, the relevant truth was revealed. The New York Times published an article disclosing that Wells Fargo's prior efforts to paint any "fake" interviews as isolated incidents conducted by a few rogue employees did not reflect reality. Indeed, The New York Times reported that, since its May 19 article, it had spoken with ten additional current and former Wells Fargo employees who confirmed that "fake" interviews were prevalent throughout the Company, and also occurred in many of the Company's other business lines, including the mortgage servicing, home lending, and retail banking businesses. The New York Times also revealed the United States Attorney's Office for the Southern District of New York had opened a criminal investigation into whether Wells Fargo violated federal law by conducting sham interviews of minority and female job candidates.

16.     In response to these revelations, Wells Fargo's common stock price fell more than 10% over two days, declining from a close of $44.63 per share on June 8, 2022, to a close of $40.08 on June 10, 2022—wiping out an astonishing $17 billion in market capitalization.

17.     Market commentators seized on the revelations in The New York Times' June 9, 2022 article as driving the Company's share price decline, and indicated that the scandal posed yet another significant roadblock in the Company's turnaround efforts and progress toward lifting the Asset Cap. For example, Fortune wrote on June 9, 2022, that Wells Fargo's "share decline accelerated after the paper's report," and noted that "[t]he probe [wa]s the latest potential blow to Wells Fargo's public image" as it continued to grapple with its years of scandals, regulatory issues, and the Asset Cap.

18.     As a result of Defendants' fraudulent acts and omissions, and the resulting declines in the market value of Wells Fargo's common stock, Plaintiffs and the Class suffered significant damages.

19.     The fallout from Defendants' fraud continued well after the Class Period. For example, several members of both houses of Congress have excoriated Wells Fargo over the fake interview scandal, citing it as another example of the Company's corporate malfeasance. Indeed, Maxine Waters,

Chairwoman of the United States House of Representatives Financial Services Committee, released a letter on June 28, 2022, concerning Wells Fargo's "fake" interviews, stating that "commitments to diversity, equity, and inclusion are not stunts to be taken advantage of by megabanks; diversity, equity, and inclusion encompass aspects of both moral and legal obligations that financial institutions hold. ***It is unacceptable that Wells Fargo would mislead applicants and the public***." Chairwoman Waters also lamented that the "asset cap imposed by now-Treasury Secretary Janet Yellen has failed to force the bank to change its behavior. Despite Mr. Scharf's leadership, Wells Fargo continues to display a troubling pattern of bad behavior with an inability to competently redress such patterns."

20.     Members of the United States Senate's Banking, Housing, and Urban Affairs Committee piled on. In September 2022, Senators Bob Menendez, Sherrod Brown, and Elizabeth Warren sent a letter to Scharf and Wells Fargo's Senior Vice President and Head of Human Resources ("HR"), Bei Ling, noting their "deep concern regarding recent reports that Wells Fargo conducts 'fake interviews' with women and minority candidates for positions that ha[d] already been filled." The Senators further stated that the Company's fake interview practices were "not only highly offensive and suggestive of systemic bias and discrimination at the bank, ***but also may represent a pattern of misleading shareholders***."

21.     Similarly, Scharf testified before the House Financial Services Committee in September 2022, where he was grilled by Chairwoman Waters, who asked Scharf, "[i]s it true that you interviewed an African-American employee for a position after you had already hired a white employee? Is that true?" In response, Scharf did not deny that "fake" interviews occurred. Instead, he deflected, stating, "[w]e are in the middle of continuing an investigation to make sure that we understand every instance where people felt as if they were not treated fairly, and if we have findings, we will take appropriate action."

22.     Moreover, on August 1, 2022, Defendants effectively admitted that Wells Fargo had abused the Diverse Search Requirement during the Class Period. On this date, the Company announced that it was "reinstating its diverse candidate slate guidelines," but with significant modifications. Moreover, The New York Times reported that in an internal memo announcing the reinstatement, Wells Fargo revealed that after "talking to employees" it had "[o]verwhelmingly [] heard the need to improve the candidate and manager experience." As a result, Wells Fargo conceded that it needed to add "new features" to the policy "***to prevent abuse***." This included, among other changes, "increased training for managers" and "an easier

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

approval process for exemptions to the diverse slate requirement." Moreover, rather than a hard rule of requiring a 50% diverse candidate slate for positions with compensation over $100,000, it now became much more vague and amorphous. The Diverse Search Requirement would now apply to roles that were "in-scope" based on unspecified job levels, not compensation.

23.    Then, on October 31, 2022, Wells Fargo disclosed in its October 31, 2022 Form 10-Q for the third quarter of 2022 that, in addition to the DOJ, the SEC was also investigating the Company's hiring practices related to diversity. Analysts latched onto this disclosure and linked the fake hiring scandal to the Company's ability to finally shed the Asset Cap. Writing about the SEC's and other investigations into Wells Fargo, Deutsche Bank noted in a November 6, 2022 analyst report that "[i]t seems logical (to us, at least) that the above issues need to be resolved before the Fed lifts the asset cap."

24.    Through this action, Plaintiffs seek to recover losses on behalf of themselves and the Class.

## II.    JURISDICTION AND VENUE

25.    The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b), 78t(a), respectively, and the rules and regulations promulgated thereunder, including SEC Rule 10b-5, 17 C.F.R. § 240.10b-5.

26.    This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and under 28 U.S.C. § 1331, because this is a civil action arising under the laws of the United States.

27.    Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b) because Defendant Wells Fargo's headquarters are located within this District, the Company conducts substantial business in this District, and many of the acts and practices complained of herein occurred in substantial part in this District.

28.    In connection with the acts, conduct, and other wrongs alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

III.    **PARTIES**

A.    **Plaintiffs**

29.    Lead Plaintiff SEB is one of the largest asset managers in Northern Europe. Headquartered in Stockholm, Sweden (corporate identity number 556197-3719), SEB offers a broad range of funds and tailored portfolios for institutional investors, as well as for retail and private banking clients. SEB purchased Wells Fargo common stock during the Class Period, as described in SEB's certification pursuant to the Private Securities Litigation Reform Act of 1995 ("PSLRA"), attached hereto as Exhibit A, at artificially inflated prices and suffered substantial damages as a result of the misconduct alleged herein.

30.    Additional plaintiff WPB Fire is a pension fund based in West Palm Beach, Florida that provides retirement benefits for firefighters. As of September 30, 2021, WPB Fire managed total assets in excess of $300 million on behalf of approximately 460 current employees, retirees, and beneficiaries. WPB Fire purchased Wells Fargo common stock during the Class Period, as described in WPB Fire's certification pursuant to the PSLRA, attached hereto as Exhibit B, at artificially inflated prices and suffered substantial damages as a result of the misconduct alleged herein.

B.    **Defendants**

31.    Defendant Wells Fargo is a Delaware corporation headquartered at 420 Montgomery Street, San Francisco, California 94104. Wells Fargo is a diversified financial services company that provides banking investment, and mortgage products and services, as well as consumer and commercial finance, through banking locations and offices, the internet, and other distribution channels in the United States and internationally. Wells Fargo is currently the fourth largest bank in the United States. The Company's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "WFC."

32.    Defendant Charles W. Scharf is, and throughout the Class Period was, Wells Fargo's CEO and President, a member of the Company's Operating Committee, and a member of the Company's Board. As CEO, Scharf was responsible for all strategic and business aspects of the Company during the Class Period. Scharf was purportedly "committed to deep and systemic change to increase diversity," was "accountable for continuing to attract diverse candidates to all levels of [Wells Fargo's] organization," and chaired the Company's Enterprise Diversity & Inclusion Council, which was composed of leaders from

across Wells Fargo. During the Class Period, one of Scharf's stated goals was to progress diverse representation and develop programs to foster inclusion of underrepresented groups at the Company.

33.    Defendant Kleber R. Santos served as the Head of Diverse Segments, Representation, and Inclusion ("DSRI") and a member of the Company's Operating Committee throughout the Class Period. As Head of DSRI, Santos reported directly to Scharf and "was responsible for leading efforts to make the company a place where diversity was reflected at all levels and in every facet of the company's operations, processes, and programs." Additionally, Santos' work as Head of DSRI was "focused on creating a more diverse and inclusive working environment and partnering with Wells Fargo's business leaders to deliver products and services designed to meet the needs of diverse customer segments." Each line of business at the Company had a Diverse Segment Leader who reported to Santos. Santos also served as interim Head of Human Resources from April 23, 2021, to October 1, 2021, with responsibility for building and implementing the strategies, programs, and infrastructure to develop, engage, and retain talent for the Company.

34.    Defendant Carly Sanchez served as Wells Fargo's EVP, Talent Acquisition, Affirmative Action/Equal Employment Opportunity, Diversity Recruiting throughout the Class Period. In this role, Sanchez led a team that conducted hiring globally for all levels of the Company, with a special emphasis on targeted recruiting for diverse segments.

35.    Collectively, Scharf, Santos, and Sanchez are referred to as the "Individual Defendants." Wells Fargo and the Individual Defendants are collectively referred to as "Defendants."

36.    During the Class Period, the Individual Defendants, as senior executive officers and/or directors of Wells Fargo, were privy to confidential, proprietary, and material adverse non-public information concerning Wells Fargo, its operations, finances, financial condition, and present and future business prospects via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or Board meetings and committees thereof, and via reports and other information provided to them in connection therewith.

37.    Because of their possession of such information, the Individual Defendants knew or deliberately recklessly disregarded that the adverse facts specified herein had not been disclosed to, and

were being concealed from, the investing public. The Individual Defendants are liable as direct participants in the wrongs complained of herein.

38.     The Individual Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of its public statements, reports, press releases, and presentations to securities analysts, and through them, to the investing public. The Individual Defendants were provided with copies of the Company's reports and publicly disseminated documents alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Thus, the Individual Defendants had the opportunity to commit the fraudulent acts alleged herein.

39.     As senior executive officers, directors, and/or controlling persons of a publicly traded company whose securities were, and are, registered with the SEC pursuant to the Exchange Act, and were traded on the NYSE and governed by the federal securities laws, the Individual Defendants had a duty to disseminate promptly accurate and truthful information with respect to Wells Fargo's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings, and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so the market price of Wells Fargo's common stock would be based on truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

## C.    Relevant Non-Parties—Former Wells Fargo Employees[2]

40.     Joe Bruno is a former Wells Fargo employee who worked at Wells Fargo from 2000 to August 2021 in various positions. Most recently Bruno served as a Senior Vice President-Market Leader in Jacksonville, Florida. In that role, Bruno oversaw 14 branches of Wells Fargo's Wealth Management business.

41.     FE-1 worked in various roles in Wells Fargo's HR Department from late 2012 to early 2022. FE-1 most recently served as a Military Acquisition Talent Liaison for the Wealth Management division

---

[2] All former Wells Fargo employees and contractors ("FE") are defined using masculine pronouns to protect their anonymity.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

from 2019 until early 2022. In this role, FE-1 supported hiring managers with filling jobs and reported to Lisa Young, Military Talent Liaison Manager.

42.     FE-2 was a contractor at Wells Fargo from early 2019 to early 2020 who held the title of Corporate Recruiter. In this position, FE-2 supported Wells Fargo's Wealth Management division and reported to Jeff Taylor, Talent Acquisition HR Manager.

## IV.    FACTUAL ALLEGATIONS

### A.    Company Background

43.     Wells Fargo provides banking, investment, and mortgage products and services, and consumer and commercial finance through physical banking locations, the internet, and other distribution channels in the United States and abroad. With approximately $1.9 trillion in balance sheet assets, the Company is the fourth largest bank holding company in the United States. As of December 31, 2021, Wells Fargo employed over 247,000 people.

44.     Beginning in January of 2021 and throughout the Class Period, Wells Fargo had four distinct operating segments: (i) Consumer Banking and Lending; (ii) Commercial Banking; (iii) Corporate and Investment Banking; and (iv) Wealth and Investment Management ("Wealth Management"). A fifth segment, referred to as "Corporate," contained the Company's enterprise functions, non-core businesses, and its corporate treasury and staff functions.

45.     The Consumer Banking and Lending segment "offer[ed] diversified financial products and services for consumers and small businesses with annual sales generally up to $5 million." This "include[d] checking and savings accounts, credit and debit cards, as well as home, auto, personal, and small business lending." The Commercial Banking segment "provide[d] financial solutions to private, family owned and certain public companies." The Corporate and Investment Banking segment "deliver[ed] a suite of capital markets, banking and financial products and services to corporate, commercial real estate, government and institutional clients globally." The Wealth Management segment "provide[d] personalized wealth management, investment and retirement products and services to clients across U.S.-based businesses . . . ."

**B.    Years Of Scandals Lead To Dire Consequences For Wells Fargo's Business**

46.    For the past decade, Wells Fargo has repeatedly engaged in abusive practices that have caused significant harm to its customers, employees, and shareholders, and subjected it to intense scrutiny from regulators. As a result of this myriad and egregious misconduct, Wells Fargo's business has suffered significant negative consequences.

47.    For example, in 2013, accusations surfaced in the Los Angeles Times that Wells Fargo was duping its customers by creating unauthorized customer accounts. Initially, the Company tried to downplay the news by attributing it to a few rogue employees. But, ultimately, it came to light that Wells Fargo had created 3.5 million unauthorized consumer accounts to boost profits, including by "falsif[ying] records and forg[ing] customer signatures." Moreover, top Wells Fargo executives, including then-CEO John Stumpf, "were aware of the 'unlawful and unethical' practices as early as 2002" and promoted the behavior. Ultimately, Wells Fargo paid out more than $4 billion in settlements, fines, and penalties related to the scandal, including a $3 billion settlement to the DOJ.

48.    In 2016 and 2017, Wells Fargo paid a total of $30 million in fines to the DOJ and OCC and restitution to customers for improperly repossessing the cars of members of the military. The scandals continued unabated. In an August 1, 2017 article entitled, *Give Wells Fargo the Corporate Death Penalty*, The New Republic wrote that:

> In the past month, Wells has also been accused of secretly changing the loan terms of mortgage borrowers in bankruptcy, falsifying records to charge mortgage applicants for its own delays in application processing, and stealing from mortgage bond investors to pay legal fees in lawsuits filed by those very same investors.
>
> If Wells Fargo wanted to rehabilitate its image, it failed miserably.

49.    Then, in 2018, Wells Fargo reached a $1 billion settlement with regulators for charging people with car loans for auto insurance without their knowledge, even when they already had insurance. That same year, Wells Fargo paid a $2.09 billion fine to the DOJ to settle allegations that it had misrepresented the types of mortgages it had sold to investors during the 2008 financial crisis. During the past ten years, Wells Fargo also has engaged in other, less-publicized violations of anti-money laundering provisions, the Sarbanes-Oxley Act of 2002, and governance and risk management obligations.

**1.     Wells Fargo's Long History Of Discriminatory Conduct**

50.     Throughout this period of regulatory misconduct, which continues to this day, another constant has been Wells Fargo's repeated violations of laws prohibiting discriminatory conduct in hiring and lending. Indeed, over the past decade Wells Fargo repeatedly has been accused of discriminating against people of color, women, people with disabilities, and veterans.

51.     For example, following the financial crisis in 2008, multiple major United States cities, including Los Angeles, Miami, Philadelphia, Baltimore, Oakland, and Sacramento sued Wells Fargo, accusing the Company of engaging in discriminatory lending practices, including giving unfavorable mortgage terms to African-American and Hispanic homebuyers.

52.     In 2011, Wells Fargo paid $32 million to approximately 1,200 female financial advisors who claimed they were paid less than men and denied promotions because of their gender. The terms of the settlement called for internal changes aimed at promoting female advisers.

53.     In 2012, Wells Fargo settled the second largest fair lending claim in the DOJ's history to "resolve allegations that [it] . . . engaged in a pattern or practice of discrimination against qualified African-American and Hispanic borrowers in its mortgage lending [practices] from 2004 through 2009." Under the terms of the settlement, Wells Fargo agreed to pay over $184 million to affected borrowers that the Company "steered into subprime mortgages or who paid higher fees and rates than white borrowers because of their race or national origin."

54.     In 2013, a class of Wells Fargo's African-American financial advisors sued the Company (the "*Slaughter* Action"), alleging that they were denied the same opportunities as their white counterparts. The complaint alleged that Wells Fargo effectively "segregate[d] [its] workforce by race" by intentionally placing African-American financial advisors in neighborhoods that generated less revenue, keeping them away from lucrative clients, separating them internally from white financial advisors, and "limiting their . . . advancement opportunities." In December 2016, Wells Fargo settled the *Slaughter* Action for $36 million and agreed to take a number of preventative measures to improve its treatment of African-American financial advisors going forward, including "***encourag[ing] a diverse pool of applicants*** . . . ***and a diverse slate of evaluators***" ***for job openings***. As a result of the *Slaughter* Action, Wells Fargo put in

place an informal, unwritten policy requiring that at least one woman or person of color be interviewed for certain open senior positions.

55.     In 2015, Wells Fargo entered into a Conciliation Agreement with the DOL arising out of the DOL's findings that Wells Fargo had failed to provide disabled employees adequate accommodations in 2014. In 2017, Wells Fargo announced that it agreed to pay $108 million to the federal government to settle allegations that the Company overcharged military veterans to refinance loans and concealed its conduct from the government.

56.     In 2019, a DOL investigation found that in 2014, Wells Fargo had discriminated against 2,066 female job applicants and 282 African-American job applicants. As part of a Conciliation Agreement with the DOL arising from that conduct, Wells Fargo agreed to pay affected applicants back wages and to "review and revise its selection process and provide better training to its hiring managers to eliminate [the] practices that resulted in the violations."

57.     In 2020, Wells Fargo entered into a $7.8 million Conciliation Agreement with the DOL stemming from an investigation into the Company's alleged discrimination against 34,193 African-American job applicants and 308 female job applicants across the country. In addition, Wells Fargo agreed to "proactively" "enhance future compliance" with federal anti-discrimination laws by "tak[ing] steps to ensure its personnel practices comply with federal requirements."

**2.      Wells Fargo's Scandals Result In Significant Negative Consequences, Including A Devastating Asset Cap**

58.     The fallout from this repeated misconduct has been devastating to Wells Fargo's business, reputation, and ultimately its stock price. As analyst DA Davidson summed it up, "[i]t has been a five-year nightmare for [Wells Fargo]" and its "stock has been a massive under performer."

59.     To start, the continuous scandals have resulted in substantial damage to Wells Fargo's reputation. As analyst Morningstar noted, "[b]anking is a business of trust, and damage to the bank's brand could result in the permanent loss of customers or force the bank to compete harder on price." In the years leading up to the Class Period, multiple market commentators reported that Wells Fargo's brand had been eroded by the Company's misconduct. In a 2017 article, The New Republic wrote that "[t]he bank is a serial corporate criminal that has screwed over millions of Americans." In 2019, Reuters reported that

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

"***Wells Fargo is operating under a regulatory microscope, as it tries to rebuild its reputation*** with customers, investors and politicians after employee whistleblowers revealed in 2016 that the bank had opened potentially millions of unauthorized accounts." Moreover, "[s]ince then, internal and regulatory probes have discovered other issues in the bank's businesses, resulting in billions of dollars in fines and penalties. ***Its core businesses and shares have lagged***." The Los Angeles Times reported in January 2020 that Wells Fargo had suffered "catastrophic reputational damage."

60.     In a 2020 article entitled, *How Wells Fargo Became Synonymous With Scandal*, Slate wrote:

> For 160 years, Wells Fargo was a feel-good brand name. . . . From its beginnings as a cross-country express service in 1852, the company evolved into a regional powerhouse, and from there, to one of the biggest retail banks in the world. But ***today, for many people, the name Wells Fargo stands for scandal***.

61.     Analyst DA Davidson bemoaned "[t]he damage to the firm's reputation with both the public and the regulators" and reported that "[t]he pain has not eased thus far in 2020." Analyst Morningstar wrote in 2020 that "the reputation of Wells Fargo has been tarnished recently, and the bank has been on defense trying to fix these issues" and noted that "the longer it takes the bank to right the ship, the more likely it is that these franchises could deteriorate to a point where permanent structural damage has occurred."

62.     Moreover, the Company's serial transgressions have resulted in an unprecedented level of government scrutiny, penalties, and mandates. In fact, by the end of 2021, Wells Fargo was subject to a whopping 12 separate consent orders with federal agencies, including three from the Federal Reserve, three from the Consumer Financial Protection Bureau (the "CFPB"), and six from the Office of the Comptroller of Currency (the "OCC").

63.     These consent orders resulted not only in substantial financial penalties, but also imposed expensive and restrictive constraints on Wells Fargo which required it to remediate the internal failures that led to its misdeeds. Indeed, by the end of 2020, analyst JP Morgan reported that "remediation and legal costs continued to creep up and now total $13.6 [billion] since year end 2016 with continued additions in some matters."

64.     Deutsche Bank similarly reported that the increased expenses had negatively impacted Wells Fargo's ability to cut costs and improve its bottom line: "WFC has been in the process of cutting costs in several areas over the past 2-3 years, but this has been masked by increased expenses related to

investment in controls, compliance, and risk mgmt." Indeed, analysts reported that the regulatory oversight was preventing Wells Fargo from focusing on its core business. For example, in 2020, Berenberg wrote that "we believe the market underestimates the extent to which regulatory actions currently taking place at Wells Fargo will have a disruptive effect on the business." Analyst Morningstar wrote that "[o]nce the regulatory bulls-eye is off Wells, the bank can finally concentrate fully on improving its underlying operations" and that "the longer it takes to turn things around the more investors will lose money simply due to opportunity cost and the time value of money."

65.     The most suffocating and costly of Wells Fargo's many consent orders was the Asset Cap, put in place by the Federal Reserve in February 2018 as a result of the fake accounts scandal, through which the Federal Reserve took the unprecedented step of preventing Wells Fargo from growing its balance sheet until it corrected its internal controls and risk management practices. In particular, the Asset Cap required Wells Fargo to keep its total assets below $1.95 trillion—the amount of its total consolidated assets as of December 31, 2017. The Federal Reserve made clear that it would not lift the Asset Cap until Wells Fargo: (i) "submit[ted] a written plan" to "improve its firmwide compliance and operational risk management" and "enhance" its Board's "effectiveness in carrying out its oversight and governance" responsibilities; (ii) secured approval of such a plan by the Federal Reserve Board; (iii) implemented the plan; (iv) had a "third party . . . review its implementation"; and (v) got the Federal Reserve Board's "vote to lift the asset cap."

66.     The Asset Cap has had and continues to have a substantial negative impact on Wells Fargo's business. More specifically, as analyst RBC noted, the Asset Cap "limit[ed] the company's ability to grow by putting an asset cap on the size of its balance sheet." This, in turn, was "limiting revenue opportunities" for the Company, as Deutsche Bank noted. RBC reported that "a 'vice-like' grip on revenues due to the asset cap limit" "ha[d] [Wells Fargo] in a very difficult position." Piper Sandler wrote that "the cap definitely shuts off a volume avenue that others have as a means to generate growth."

67.     In fact, as the Motley Fool reported, the Asset Cap "has cost Wells Fargo immensely -- Bloomberg in August of 2020 estimated that the cap had cost the bank at least $4 billion in profits." The article further reported that Wells Fargo had lost over $200 billion in market value since the Asset Cap took effect.

68.     The Asset Cap also has impacted Wells Fargo's ability to compete with its peers. Morningstar explained that "Wells has been on defense while its peers have been on offense, potentially damaging the positioning of Wells' franchises over the long term." UBS reported that "[t]here are really three national banks: Chase, Wells, and Bank of America. Chase and Bank of America have been doing extremely well. Wells Fargo has struggled some because of the reputational and regulatory challenges they're faced with." Barclays wrote that "from 3Q16 when its sales practice issues 1st came to light to 2Q20, every name under coverage besides [Wells Fargo] has increased revenues, with our composite up over 20%. [Wells Fargo] is down over 20% . . . ." CNN reported that "[s]ince the scandals began in September 2016, Wells Fargo's stock is down 5%, while over the same period the S&P 500 has soared 55%. Banking rivals JPMorgan Chase (JPM) and Bank of America (BAC) have more than doubled in value."

69.     Wells Fargo's constant scandals also resulted in significant management turnover at the Company. In October 2016, then-CEO John Stumpf resigned in the wake of the fake accounts scandal. Ultimately, the federal government ordered Stumpf to pay $17.5 million for his role in the scandals and barred him from ever working at a bank again. Wells Fargo replaced him as CEO that same month with Tim Sloan, who had previously served as the Company's Chief Operating Officer and Chief Financial Officer. Moreover, as detailed below, Sloan resigned suddenly in March 2019 after, as the Los Angeles Times reported, he failed to "stop the tide of troubles" for Wells Fargo.

### C.     Wells Fargo's Management Highlights The Importance Of Fixing Its Regulatory Compliance Issues But Fails To Make Meaningful Progress

70.     As a result of the Asset Cap's severe negative impact on Wells Fargo's business, investors and the Company's management alike have been focused intently on getting the Asset Cap quickly lifted. In a 2018 internal email, Betsy Duke ("Duke"), then-Chairwoman of Wells Fargo's Board, outlined the dire straits into which Wells Fargo's numerous regulatory investigations had placed the Company, stating, "I believe our credibility and perhaps even viability as a company is dependent on successfully exiting these consent orders." Publicly, Wells Fargo shared a similar view with investors, indicating that resolving the problems underlying the Asset Cap was a priority and that it could be lifted by the end of 2018.

71.     However, in late 2018, then-CEO Tim Sloan told investors at a presentation in Charlotte, North Carolina, "that the cap w[ould] probably remain in place in early 2019." Even at this early stage of the Asset Cap's existence, analysts did not respond positively to the news. Ken Leon, an analyst for CFRA, stated that "[t]here is a disappointment that this will go into 2019, and we don't know for how long." In his view, "the longer the cap remains in place, the tougher it w[ould] be for Wells Fargo to manage it."

72.     In March 2019, Sloan was grilled by the United States House of Representatives Financial Services Committee, including Chairwoman Maxine Waters, about what progress Wells Fargo's management had made to fix the Company's compliance and risk management issues. Following the hearing, Chairwoman Waters issued a statement that "[i]t was very clear from Mr. Sloan's testimony that Wells Fargo has failed to clean up its act," and called for Sloan to "be shown the door." Moreover, the OCC took the rare step of issuing a statement on Sloan's testimony, making clear that it was "disappointed with [Wells Fargo's] performance under our consent orders and its inability to execute effective corporate governance and a successful risk management program." Within weeks of testifying, Sloan abruptly resigned.

73.     Thereafter, Wells Fargo announced that it was looking for an external candidate for CEO. On a conference call following the announcement of Sloan's resignation, Duke stated that "seeking someone from outside is the most effective way to complete the transformation" and acknowledged Wells Fargo has "a lot more work to do." The following month, in April 2019, Wells Fargo told investors that "they w[ould] no longer provide guidance on when the shackles affixed by the Federal Reserve are likely to be removed." This news again frustrated analysts. CFRA analyst Ken Leon specifically attributed Wells Fargo's "underperform[ance]" compared to "peers" in the period since the Asset Cap was put in place to the Company's "entire management team [being] distracted by compliance and risk issues."

74.     In mid-2019, shortly after Wells Fargo's Board began the process of looking for a new CEO, numerous analysts highlighted the potential positive impact the change could have on resolving the Company's ongoing regulatory issues. Morningstar analysts told investors that that Wells Fargo's ability to find a leader "who can step in and bring some trust and positive momentum back to the Wells franchise w[ould] be a key next step" for the Company. More specifically, Morningstar pointed directly to the ability to solve Wells Fargo's regulatory woes as a key factor in choosing a new CEO, stating that "[t]he main

thing the market want[ed]" was a leader that would be able "to get the regulators off [the Company's] back[] and also take care of the asset cap pretty quickly."

**D.** **Wells Fargo Hires Scharf As CEO And Assures Investors It Is Committed To Reforming Its Compliance And Rehabilitating Its Reputation**

75.    In September 2019, Wells Fargo announced that it had hired Defendant Scharf as its new CEO, effective October 21, 2019. In reporting on the hire, Reuters wrote in a September 27, 2019 article entitled, *Wells Fargo taps one-time Dimon protégé Scharf to lead turnaround*, that Wells Fargo's Board "initially looked [at] the possibility of hiring a diverse candidate, especially a woman" but ultimately "realized that they needed a competent CEO who could handle the issues at Wells and the regulators, and it didn't matter – race, gender, those things were secondary."

76.    Following his appointment, Scharf stressed that solving Wells Fargo's regulatory compliance and internal controls issues was "clearly the first priority." In a January 2020 press release filed with the SEC on Form 8-K, Scharf stated, "[d]uring my first three months at Wells Fargo my primary focus has been on advancing our required regulatory work with a different sense of urgency and resolve." He added that Wells Fargo "has made some serious mistakes, and my mandate is to make the fundamental changes necessary to regain the full trust and respect of all stakeholders" and noted that "we know that ultimately our actions and results will dictate when that trust is fully regained."

77.    Thereafter, in January 2020, Scharf stated, "[a]t the time of the sales practices issues, the company did not have in place the appropriate people, structure, processes, controls, or culture to prevent the inappropriate conduct." In February 2020, he stated, "[w]e are committing all necessary resources to ensure that nothing like this happens again, while also driving Wells Fargo forward." That same month, analyst Piper Sandler wrote that "[n]ew CEO Charlie Scharf has made it clear that resolving the company's myriad regulatory issues is among his top priorities." R. Scott Siefers, an analyst at Sandler O'Neill & Partners, stated that dealing with regulators would "be job No. 1, 2 and 3" for Scharf.

78.    In March 2020, an internal "Inside the Stagecoach" article posted to Wells Fargo's website entitled, *Wells Fargo's new CEO: 'We will get it done'*, reported that "Scharf has stressed urgency, accountability, and execution as what will drive the company forward. He has acknowledged the mistakes that were made in the past and has made addressing Wells Fargo's regulatory requirements his top priority."

In March 2020, JP Morgan wrote that Scharf "said he is spending 70-80% of his time on regulatory matters" and that he "reiterated that regulatory requests and consent orders take priority over everything else."

79.    Scharf also told the market that Wells Fargo was implementing significant changes to its structure and processes in order to drive internal changes. To that end, in early 2020, Scharf reorganized Wells Fargo into five operating business lines (Consumer & Small Business Banking, Consumer Lending, Commercial Banking, Corporate & Investment Banking, and Wealth Management), each with a CEO that reported directly to him and sat on the Company's Operating Committee. Scharf's reorganization purportedly created "a flatter line-of-business organizational structure and provide[d] leaders with clear authority, accountability, and responsibility." As Wells Fargo summed it up in its 2019 Annual Report published in February 2020, "[w]e changed the organizational structure of Wells Fargo from a decentralized to a centralized model."

80.    Moreover, "[a]s part of the reorganization, Scharf aligned control executives with each of the company's businesses who will have a dual line of reporting to their respective CEOs and up through a separate operations team." Wells Fargo said that the "design[]" was "to enable the lines of business to work more collaboratively and consistently across the company while ensuring the right level of oversight." Scharf also appointed a Chief Risk Officer for each business line who reported to Wells Fargo's Chief Risk Officer and a new head of the Operational Risk Management Team, in order to make risk management purportedly centralized and independent. At the time, Scharf said that "[t]hese changes create the right structure to build our businesses over the long term and increase our ability to successfully execute on our top priority, which is the risk, regulatory, and control work." Wells Fargo also represented that the changes would "provide [it] greater oversight of all risk-taking activities and a more comprehensive view of risk across the company."

81.    In discussing the changes in Wells Fargo's 2020 Annual Report, Scharf clarified that he had made the changes necessary to ensure that he was managing the Company at the proper level of granularity:

> One of my early observations when I joined the company was that we were not managing the company at the level of granularity necessary. As a result, we made changes to the management structure — most notably having more of our businesses report directly to me. That change drove us to completely change our internal reporting to provide us with more transparency into our performance and underlying business drivers and give us the information necessary to create plans to improve our performance. This is now how we manage the company . . . .

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

82.     Scharf further explained that Wells Fargo had implemented policies and procedures to ensure that information was flowing up the chain:

> We have introduced monthly business reviews where we review financial and operational performance in a regular, disciplined way. In addition to the core financial results, these reviews include sections on risk and control deliverables, human capital, diversity, strategy, and progress on large projects. We work as a team to ensure we are moving forward in a disciplined way, using all of the facts available to us, and taking a holistic approach to issues across the entire company.

83.     Moreover, Scharf noted that "[t]he Operating Committee meets multiple times per week and discusses all important issues across the company." Scharf further explained that "[w]e have formal processes throughout the company to manage the work that is required, and this all feeds into regular Operating Committee reviews. Any issues requiring management attention are reviewed formally multiple times weekly at regularly scheduled meetings and we review all work streams at least monthly in detail."

### E.     Investors Remain Focused On When Wells Fargo Can Rectify Its Compliance Issues

84.     Analysts reacted positively to Scharf's hiring and the changes he claimed to have implemented at Wells Fargo. Morningstar wrote that "with Charles Scharf as the new CEO of Wells, we believe he will bring a much-needed set of new eyes to Wells' problems and will improve the bank's operational execution." RBC wrote that "Charlie Scharf joined WFC in late October 2019" and "Mr. Scharf has made no bones about it.....they know what is required and will get it done—the only question for investors is how long will it take." (alteration in original). DA Davidson likewise wrote:

> Following the exit of two CEOs owing to the bank's regulatory issues, in our view, we are constructive on the recent CEO hire, Charlie Scharf, given his strong background working as head of Chase Retail Financial Services and CEO of both Visa and BNY Mellon. We believe new management will bring a greater sense of urgency and discipline to WFC.

85.     By December 2020, Morningstar was reporting that "[w]e do think things are fundamentally changing with new CEO Charles Scharf, and some positive momentum could finally start to build for Wells during 2021 and into 2022."

86.     Given the purported positive changes that Wells Fargo had made, analysts expressed optimism that the Company would soon be out from under the Asset Cap. For example, in July 2020, Deutsche Bank wrote that "[w]e still think it's possible that the asset cap is lifted by year end . . . but do think it should be lifted within the next 12 months." Wolfe similarly wrote in September 2020, that

"messaging on recent conference calls has been that WFC remains on track to comply with regulatory demands, and that management is pleased with the firm's progress. Our current operating assumption is that the asset cap will be lifted by mid-2021."

87.    Analysts also noted that Wells Fargo's stock was particularly sensitive to developments regarding its regulatory compliance issues. For example, in June 2020, analyst Deutsche Bank wrote that "the key to WFC shares is a lifting of the asset cap as this would allow a return to growth and beginning of optimizing the cost base." Credit Suisse further reported that "[t]here should be upside over time, as earnings increase. The latter is dependent in part on asset cap relief--a material catalyst for the shares. . . . In the interim, the cost of the asset cap will continue to weigh on earning power." Additionally, BMO wrote that Wells Fargo's "shares should prove particularly valuation sensitive to asset cap relief . . . ."

88.    Indeed, both before and during the Class Period, anytime Wells Fargo was associated with any new regulatory scandal, analysts and investors worried that the news would lead to delays in having the Asset Cap lifted. For example, in March 2021, after investors learned that Wells Fargo had a "prime brokerage relationship" with a capital management firm, Archegos Capital, which had to be liquidated after suffering massive losses from a set of leveraged swaps, analysts stated that Wells Fargo's involvement in the scandal "c[a]me[] as a surprise and carrie[d]" with it possible "reputational risk." Specifically, analysts at JP Morgan stated that the "key concern[] for Wells Fargo" arising out of the news was "whether [it] would increase regulatory scrutiny or delay its asset cap being lifted."

89.    On September 27, 2021, when the DOJ reported that Wells Fargo agreed to pay $72.6 million to "settle claims that it overcharged commercial customers for forex services," Deutsche Bank analysts stated that a subsequent "sell off" in the Company's stock "reflect[ed] concerns that regulatory issues w[ould] linger, pushing out the lifting of the asset cap . . . and therefore delaying a widely expected pickup in earnings once the asset cap is lifted." The reason for this was clear. As Scharf summed it up on an October 14, 2020 earnings conference call, "it is fair to say we will not be able to extract the full potential out of the [Wells Fargo] franchise until after the asset cap has gone."

90.    Against this backdrop, Defendants continued to assure investors that they were laser-focused on ensuring that Wells Fargo avoided further misconduct and scandals. In its 2020 Form 10-Qs and 2020 Annual Report, the Company repeatedly reiterated that:

Wells Fargo's top priority remains meeting its regulatory requirements in order to build the right foundation for all that lies ahead. To do that, the Company is committing the resources necessary to ensure that we operate with the strongest business practices and controls, maintain the highest level of integrity, and have an appropriate culture in place.

91.    In an August 2020 Environmental, Social, and Governance ("ESG") Report ("2020 ESG Report"), Wells Fargo similarly stated, "[u]nder the oversight of our Board, our CEO and management are focused on moving with a sense of urgency to strengthen our risk and control foundation and address outstanding regulatory matters."

92.    Further, during an October 14, 2020 earnings conference call, Scharf stated:

The regulatory work, as you mentioned, again, I said it in my remarks. I can't stress it enough. It's a gating factor for us to be able to take advantage of all the opportunities that we have in the franchise. We're putting a tremendous amount of time and attention and effort towards this.

93.    Thereafter, in January 2021, Scharf reiterated that "[b]uilding the right risk and control infrastructure and remediating our legacy issues remain our top priority." And in January 2021, Bloomberg quoted Jon Weiss, Wells Fargo's head of corporate and investment-banking, as saying "[a]ll other priorities have taken a back seat to risk and regulatory over the last four years . . . ." Additionally, in the Company's 2021 Annual Report, Scharf stated, "I can't say it enough – job one has been and will continue to be building and implementing an appropriate risk and control infrastructure across the company, embedding changes in our culture, and doing the work with urgency."

F.    **Leading Up To The Class Period, Wells Fargo Repeatedly Touts Its Purported Focus On Improving Diversity**

94.    In light of Wells Fargo's significant and repeated discriminatory misconduct (discussed *supra* Section IV.B.1.), a key piece of its rehabilitation efforts involved reassuring investors, regulators, and customers of the Company's purported commitment to, and the importance of, diversity and inclusion initiatives at Wells Fargo. Indeed, within months of his arrival, Scharf was touting his (and the Company's) efforts to improve diversity and inclusion at Wells Fargo.

95.    For example, in its 2019 Annual Report published in February 2020, Scharf stated that "I will be personally chairing our Enterprise Diversity & Inclusion Council." He further explained:

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

This group, composed of leaders from across the organization, meets monthly and is charged with driving the education and change necessary for making meaningful progress against our objectives. We are setting clear, specific, and measurable goals and will be holding people accountable to advancing our diversity and inclusion efforts at all levels.

96.    In addition to the Enterprise-level Diversity and Inclusion Council, Wells Fargo also created "Diversity and Inclusion Councils . . . at the business levels of the organization to embed diversity into business strategies and provide development and visibility to leaders, supported through council member rotations." These councils, according to the Company, were "aligned around the enterprise diversity and inclusion framework focused on employee outcomes, marketplace (including customers and suppliers), and advocacy (external relationships, community, and reputation efforts)."

97.    Diverse hiring initiatives were of particular importance to Wells Fargo. Historically, positions at Wells Fargo that paid more than $100,000 reflected less diversity than positions that paid less than $100,000. As a result, in its Notice of Annual Meeting and Proxy Statement filed with the SEC on Form DEF 14A on March 16, 2020 ("March 2020 Proxy"), Wells Fargo announced a set of diversity initiatives, which included programs to increase diverse representation in senior-level roles. In the March 2020 Proxy, Wells Fargo highlighted that it was "dedicated to recruitment and career development practices that support our employees and promote diversity in our workforce at *all levels of our Company, including leadership positions*."

98.    Wells Fargo also provided limited detail on the initiatives it was purportedly taking to increase diversity at more senior levels of the Company. More specifically, in a section of the March 2020 Proxy entitled, *Our Commitment to Do More to Increase Diversity in More Senior Roles*, Wells Fargo represented that "[u]nder the leadership of our CEO, Charlie Scharf, the following are some specific actions we are taking . . . . We are *requiring* diverse candidate slates and interview teams for all roles at Wells Fargo with total direct compensation of more than $100,000," a reference to the Diverse Search Requirement. This formal requirement replaced the informal policy that Wells Fargo had put in place in the wake of the *Slaughter* Action (discussed in *supra* Section IV.B.1.).

## G.    Scharf Tries To Walk Back His Comments About A Lack of Black Talent

99.    Following the murder of George Floyd at the hands of police officers in Minneapolis, Minnesota in May 2020, a wave of social unrest swept across the United States, drawing enhanced attention

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

to systemic racism as a barrier to social progress in the United States. This included highlighting continued barriers to advancement for diverse individuals in corporations across the United States. As a result, hiring practices drew increased attention at large banks like Wells Fargo. In response, Wells Fargo again emphasized the importance of, and its commitment to, issues related to DE&I initiatives and practices. For example, in a May 29, 2020 email Scharf sent to Wells Fargo employees that was later published on the Company's website, Scharf stated, among other things, "as the CEO of Wells Fargo, I can commit that our company will do all we can to support our diverse communities and foster a company culture that deeply values and respects diversity and inclusion."

100.    However, ***less than a month later***, in an internal June 18, 2020 Company-wide memo entitled, *Our commitment to change*, Scharf blamed a lack of Black employees at Wells Fargo on a supposedly limited talent pool. Specifically, Scharf stated, "[w]e need more diverse representation on our operating committee," referring to the Company's top executives. But he then went on to say "[w]hile it might sound like an excuse, the unfortunate reality is that there is a very limited pool of Black talent to recruit from." Scharf also made similar comments during an internal Zoom meeting in the summer of 2020, blaming Wells Fargo's failure to reach its diversity goals on the fact that there was not enough qualified minority talent.

101.    On September 22, 2020, Reuters publicly reported Scharf's comments in the June memo and during the conference call, generating immediate backlash. For instance, The Huffington Post reported that, "[i]n June, at the height of a reckoning over race and police killings in the U.S., Wells Fargo CEO Charles Scharf tried to blame his bank's failure to hire and promote Black people on Black people themselves." It noted, however, that "[t]he bank has been poorly run by white people for more than a decade, and it has repeatedly been accused of racial discrimination in hiring and lending, paying out millions in claims." Similarly, AdAge wrote that "Wells Fargo is in hot water again. The bank, which is still managing brand damage caused by its 2016 fraudulent account scandal, is facing a growing public backlash following recently reported remarks by CEO Charles Scharf about a dearth of Black talent."

102.    American Banker likewise wrote that "Wells Fargo has taken a series of steps to increase workforce diversity, but blowback over CEO Charlie Scharf's comment that there is 'a very limited pool of Black talent' for key jobs has raised questions about whether those initiatives have been dealt a serious

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

blow." And Business Insider called Scharf's attitude "pervasive and harmful to workers" and "false and damaging to the Black community," and reported that "[p]eople have begun to call for a boycott of Wells Fargo after it was revealed that the bank's CEO claimed multiple times that the bank's difficulty in hiring diverse employees was due to a lack of qualified Black talent."

103.    The day after Reuters published its article, Scharf sent a message to Wells Fargo employees (that also was posted on the Company's website), entitled, *CEO Charlie Scharf Reinforces Commitment to Diversity and Inclusion*. In the September 23, 2020 message, Scharf apologized for his "insensitive comment," stating "[t]here are many talented diverse individuals working at Wells Fargo and throughout the financial services industry and I never meant to imply otherwise." Scharf also once again highlighted the importance of the Company's DE&I initiatives, stating that Wells Fargo needed to drive meaningful change. He further pointed to the purported "progress" Wells Fargo was making on its DE&I initiatives, and explicitly highlighted the Diverse Search Requirement, stating, "we are requiring diverse candidate slates for key roles with compensation of more than $100,000."

104.    Shortly thereafter, in November 2020, Wells Fargo announced that it had hired Defendant Santos as "head of the newly created Diverse Segments, Representation and Inclusion group, elevating the company's internal and external diversity efforts," and that Santos would report to Scharf and serve on Wells Fargo's Operating Committee. The press release noted that "Santos will be responsible for leading efforts to make the company a place where diversity is reflected at all levels and in every facet of the company's operations, processes, and programs."

## H.    Investors Focus On DE&I And Demand Additional Disclosures Regarding Wells Fargo's Diverse Hiring Policies

105.    Leading into and during the Class Period, investors also were keenly focused on DE&I. For instance, a July 9, 2021 Pensions and Investments article entitled, *Investors press companies on DEI*, reported that "[i]nvestor demand for companies to commit to diversity, equity and inclusion was a highlight of the latest proxy season." The article quoted John Wilson, vice president and director of corporate engagement for Calvert Research and Management in New York, with $31.8 billion in assets under management, as saying that "'[s]ome of the biggest votes that we have seen' were for shareholder proposals on DEI." Moreover, the same article reported that:

According to proxy firm Institutional Shareholder Services Inc., activism for DEI in the form of shareholder proposals nearly doubled in just one year, with 143 proposals in 2021 compared with 74 in 2020. It also found record levels of support for those proposals, averaging 61.6% for ones addressing diversity and inclusion at the workforce level, and ones targeting board diversity averaging 62.6% shareholder support.

The article further noted that "[o]ne new category this season was proposals asking companies to undergo independent racial equity audits."

106.    Similarly, in a March 4, 2022 report, analyst RBC wrote regarding "Diversity, Equity, and Inclusion (DEI)" that "[w]e expect these topics to stay in focus in 2022. In our review of investors' 2022 ESG engagement priorities, further improving diversity at the board and workforce levels and expanding focus across diversity dimensions came up a number of times." RBC further reported that the "UN Principles of Responsible Investing (PRI) investor engagement group recently highlighted DEI as a priority, encouraging investors to look beyond diversity and address equity and inclusion as well." Moreover, according to RBC, "DEI was a top theme in last year's proxy season, with investors pushing for increased disclosures around workforce diversity metrics and policies, and improved board diversity (particularly for Tech). We also saw a number of proposals asking companies to conduct third-party racial equity audits (particularly for Financials)."

107.    Wells Fargo likewise acknowledged that DE&I were key areas of focus for its investors, as well as other stakeholders. For example, in Wells Fargo's 2020 ESG Report published in August 2020, the Company noted that "we interviewed internal and external stakeholders, including more than 30 Wells Fargo leaders and subject matter experts from across the company, and members of our external Stakeholder Advisory Council." The Stakeholder Advisory Council included, among others, Anne Sheehan, Director of Corporate Governance for the California State Teachers' Retirement System (CalSTRS).

108.    Wells Fargo further noted that it "also included content from stakeholders representing," among others, "ESG investors." Based on that feedback, it noted that the topics "most significant to our internal and external stakeholders" included "[d]iversity and inclusion."

109.    In its Notice of Annual Meeting and Proxy Statement filed with the SEC on Form DEF 14A on March 16, 2021 ("March 2021 Proxy"), Wells Fargo explained that "[s]ince 2010, we have had an investor engagement program with independent director participation to help us better understand the

views of our investors on key corporate governance and other topics." To that end, "[s]ince our 2020 annual meeting, we contacted institutional investors representing approximately 35% of our outstanding shares and engaged with a significant number of our investors and other stakeholders to provide updates on the Company, discuss governance and other matters, and hear their perspectives." Based on the feedback that Wells Fargo received from investors, its March 2021 Proxy noted that key shareholder engagement topics included "Board [c]omposition [and] diversity," "Board oversight of risk and diversity & inclusion initiatives," and "ESG disclosures and practices."

110.    In its 2021 ESG Report published in July 2021 ("2021 ESG Report"), Wells Fargo noted that "we interviewed internal and external stakeholders, including more than 30 Wells Fargo leaders and subject matter experts from across the company, and members of our external Stakeholder Advisory Council." Wells Fargo noted that it "also included input from stakeholders representing," among others, "ESG investors." Based on that feedback, Wells Fargo explained that the topics "most significant to our internal and external stakeholders" included "[d]iversity, equity, and inclusion."

111.    In its Notice of Annual Meeting and Proxy Statement filed with the SEC on Form DEF 14A on March 14, 2022 ("March 2022 Proxy"), Wells Fargo reported that "[s]ince our 2021 annual meeting, we contacted institutional investors representing approximately 47%, and engaged with 44%, of our outstanding shares," and that based on those meetings, 2021 "Key Shareholder Topics" included "Board composition, including Board diversity," "[d]iversity, equity and inclusion (DE&I) goals and metrics," and "Environmental, Social, and Governance (ESG) disclosures and practices."

112.    Moreover, following Scharf's incendiary remarks in the summer of 2020, Wells Fargo's diverse hiring practices were front and center for investors. On November 12, 2020, three institutional Wells Fargo shareholders—the Comptroller of the City of New York on behalf of the New York City Teachers' Retirement System and the Board of Education Retirement System, the AFL-CIO Reserve Fund, and the UAW Retiree Medical Benefits Trust (collectively, the "2021 Proxy Proposal Shareholders")— sent a shareholder proposal and supporting statements to the Company.

113.    Specifically, the 2021 Proxy Proposal Shareholders told Wells Fargo that they intended to present for a vote at its upcoming 2021 annual meeting the following proposal concerning diverse hiring ("2021 Proxy Proposal"):

RESOLVED: Shareholders request that the Board of Directors of Wells Fargo & Company (the "Company") adopt a policy for improving workforce diversity by requiring that the initial pool of candidates from which new employees are hired by the Company in the U.S. shall include at least one qualified woman and one ethnically or racially diverse candidate (a "Diverse Candidate Search Policy").

114.    In their statements in support of the 2021 Proxy Proposal, the 2021 Proxy Proposal Shareholders explicitly called out Scharf's comments about a supposed lack of Black talent just a few months prior.

115.    For instance, highlighting the importance of diverse hiring practices to Wells Fargo shareholders, the 2021 Proxy Proposal Shareholders further stated:

As long-term shareholders, we are concerned that the lack of racial and ethnic diversity among the most senior ranks of the Company's executive management not only harms its financial performance, but also sets a poor tone at the top for diverse hiring processes throughout the Company.

A diverse workforce at all levels of a company can enhance long-term company performance.

116.    Wells Fargo objected to the 2021 Proxy Proposal. On December 26, 2020, Wells Fargo filed a letter with the SEC pursuant to Rule 14a-8 of the Exchange Act seeking permission to omit the 2021 Proxy Proposal from the Company's forthcoming March 2021 Proxy. Therein, Wells Fargo purported to justify why it should be allowed to exclude the 2021 Proxy Proposal from the March 2021 Proxy. Primarily, Wells Fargo claimed that the 2021 Proxy Proposal should be excluded from the forthcoming March 2021 Proxy because it was already "substantially implemented" by the Diverse Search Requirement. Wells Fargo also claimed that the Diverse Search Requirement actually was stricter than the 2021 Proxy Proposal, stating that "The Diverse Search Requirement Is Comprehensive," and repeatedly assured the SEC that there only were "limited exceptions" to the policy.

117.    In this letter, Wells Fargo also confirmed that, "***due to the importance of the Diverse Search Requirement***, the Company has established governance processes relating to senior-level approval of any exception to the requirement for a specific role," again underscoring the crucial nature of these policies.

118.    Following its December 26, 2020 letter, Wells Fargo held discussions with the 2021 Proxy Proposal Shareholders. Those discussions culminated in a January 19, 2021 agreement between Wells Fargo and the 2021 Proxy Proposal Shareholders that the latter would withdraw the 2021 Proxy Proposal

in exchange for Wells Fargo's agreement to increase its public disclosures relating to the Diverse Search Requirement. Specifically, the 2021 Proxy Proposal Shareholders requested and Wells Fargo agreed to:

1.  Disclose that the Diverse Search Requirement requires at least 50% diverse candidates on the interview slate for covered roles in the United States.

2.  Clearly define the Company's definition of diverse candidates, which . . . includes race/ethnicity; gender; LGBTQ; veterans; and people with disabilities.

3.  Disclose (a) that the current Diverse Search Requirement applies to all operating committee executive positions (i.e., "level 2" positions) (b) the self-identified gender and race/ethnicity of the individual operating committee members.

4.  Disclose the governance processes relating to senior-level approval of any exception to the Diverse Search Requirement for a specific role.

5.  Disclose the applicability of the Diverse Search Requirements to internal hiring and promotions.

6.  Disclose the percentage of total positions of the entire workforce that are covered by the Diverse Search Requirement.

7.  Disclose that compliance with the Diverse Search Requirement is a performance criterion for senior executives.

8.  Provide more detailed disclosure on the link between progress against diversity initiatives, including with respect to the diverse search requirement, and executive compensation.

119.    On January 21, 2021, Wells Fargo sent a letter to the SEC informing it of the agreement with the 2021 Proxy Proposal Shareholders and the withdrawal of the 2021 Proxy Proposal, and formally withdrawing the Company's request to exclude the 2021 Proxy Proposal from Wells Fargo's March 2021 Proxy.

120.    Commenting on the Company's agreement to disclose that additional information, Wells Fargo's Enterprise Talent Head, Sharon Goodwine, was quoted in a January 26, 2021 article by The Wall Street Journal as stating that "[t]ransparency is important as we take actions to improve our workforce diversity." As discussed below in Section IV.I., Wells Fargo subsequently disclosed the information agreed to with the 2021 Proxy Proposal Shareholders during the Class Period.

121.    Also highlighting investors' laser-focus on Wells Fargo's DE&I initiatives, in 2021 and 2022, an institutional shareholder introduced proposals asking the Company to conduct a racial equity audit to analyze the Company's "adverse impacts on nonwhite stakeholders and communities of color."

122.    As it did with the 2021 Proxy Proposal, Wells Fargo pushed back, and its Board recommended the Company reject the racial equity audit proposal in both years. To justify rejecting the proposal, Wells Fargo pointed to the work it had purportedly done on DE&I issues. In 2021, for example, the Company specifically flagged its purported diverse hiring initiatives as a basis for rejecting a racial equity audit, stating:

> Wells Fargo has taken a number of actions to promote and enhance diversity, equity, and inclusion goals within the Company and externally that include a focus on diverse workforce representation (including significantly increasing Black leadership) [and], accountability of senior management for progress in improving diverse representation and inclusion . . . .

123.    In 2022, Wells Fargo again pointed to its diverse hiring practices to oppose an institutional shareholder's proposal that the Company conduct a racial equity audit, stating, "[i]n 2021, Wells Fargo added a new DE&I executive performance objective for senior leaders that is directly connected to increasing gender, racial/ethnic representation in our executive ranks." At the Company's urging, Wells Fargo shareholders voted against the racial equity audit proposals in both years.

## I.    Defendants Mislead Investors About Wells Fargo's Diverse Search Requirement

124.    Throughout the Class Period, and in response to the specific investor demands that they provide thorough and accurate disclosures regarding their diversity initiatives, Defendants misleadingly touted Wells Fargo's Diverse Search Requirement. For example, on February 23, 2021, in Wells Fargo's 2020 Annual Report, Defendants represented that, "*[i]n the U.S., we are requiring a diverse slate of candidates . . . for most roles with total direct compensation of more than $100,000 per year*."

125.    The Company made an identical statement in its March 2021 Proxy. Moreover, in the March 2021 Proxy, Wells Fargo also provided additional details regarding the Diverse Search Requirement that the 2021 Proxy Proposal Shareholders had demanded. For example, the Company represented that it defined its "diversity dimensions" as including race/ethnicity, gender, LGBTQ individuals, veterans, and people with disabilities. Wells Fargo also disclosed that the Diverse Search Requirement applied to virtually all United States job postings with direct compensation of at least $100,000. For example, in 2020,

the mandate applied to approximately 95% of United States roles with direct compensation of $100,000 or more (including to senior management roles reporting to Scharf), and applied to both internal and external job applicants. Moreover, Wells Fargo also explained that any exceptions to the Diverse Search Requirement required sign off from the highest levels of the Company. Specifically, an Operating Committee member or one of their direct reports (or their assigned delegates) had to approve all exception requests.

126.    In its report entitled, *2020 Social Impact and Sustainability Highlights*, published in April 2021, Wells Fargo again stated: "***Our Diverse Search Requirement requires that for most U.S. roles with total direct compensation greater than $100,000, at least 50% of interview candidates must be diverse with respect to at least one diversity dimension***." The report further claimed that, as of December 31, 2020, "***91% of applicable requisitions had a diverse interview slate***."

127.    On May 26, 2021, Scharf provided testimony during a hearing before the United States Senate Committee on Banking, Housing, and Urban Affairs, during which he testified under oath that "***for the hiring of many senior roles, we have implemented guidelines that require a diverse slate of candidates (at least 50 percent)***."

128.    On July 15, 2021, Wells Fargo published its 2021 ESG Report, which provided an "[u]pdate on Wells Fargo's DE&I commitments," stating that the Company "***[r]equire[s] diverse candidate slates*** and interview teams *for key roles with total direct compensation of more than $100,000*." In this same portion of the 2021 ESG Report, Wells Fargo also stated, "***[i]n the U.S., we now require that at least 50% of interview candidates identify with at least one diversity dimension* . . . *for most roles with total direct compensation of more than $100,000***."

129.    On October 7, 2021, during a virtual interview with i4cp, Defendant Sanchez responded to a question about "building diverse candidate slates," by discussing the "***candidate slate requirement for roles $100K and above***," explaining that "***50% of the slate -- of the candidate slate that will be interviewed needs to be diverse in one dimension or another***."

130.    In February 2022, in the Company's *Priority Recommendations of the Wells Fargo Human Rights Impact Assessment and Actions in Response* report, Defendants again assured the market that Wells Fargo had "***instituted diverse candidate slates* . . . *on most jobs of over $100,000 in total compensation***."

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Likewise, in its March 2022 Proxy, Wells Fargo stated it had "Diversity Sourcing and Interview Team Guidelines that ***require diverse candidate slates*** . . . for designated posted positions."

**J.     Wells Fargo Conducts Widespread "Fake" Interviews Of Diverse Candidates Solely To Claim Adherence To The Diverse Search Requirement**

131.    While Defendants lauded the Diverse Search Requirement to the market, in reality, as detailed below, Wells Fargo was engaging in widespread "sham" or "fake" interviews of diverse candidates. More specifically, Wells Fargo was "interviewing" diverse candidates simply to claim compliance with its Diverse Search Requirement when, in truth, another candidate was already selected for the position and the Company had no intention of hiring the diverse candidates it was interviewing.

132.    For example, The New York Times reported that, according to Bruno, a former Wells Fargo Senior Vice President-Market Leader who oversaw 14 branches in Wells Fargo's Wealth Management division, "[f]or many open positions, employees would interview a 'diverse' candidate" but "that often, the so-called diverse candidate would be interviewed for a job that had already been promised to someone else." In other words, as Bruno subsequently explained in an online post, Wells Fargo was conducting "fake interviews" with diverse candidates when "a determination ha[d] already been made by the hiring manager for the candidate that will receive the job." Bruno also said in his online post that "HR recruiters [] tell the managers that you have to conduct these interviews, even though you have clearly explained that a candidate has already been sourced and selected."

133.    Moreover, The New York Times reported that Bruno "said that he was often told to conduct interviews with Black candidates" and that in "most such cases, Wells had no intention of hiring those people because either he or his superiors had already picked someone for the job." It further reported that Bruno "eventually refused to conduct the interviews" and "told his bosses" that "'I got a Black person on the other side of the table who has no shot at getting the job.'"

134.    In his online post, Bruno provided numerous examples of the fake interviews. For example, Bruno discussed a job opening for a market leader position in South Florida. According to Bruno, Wells Fargo decided to combine "two large markets," "the Fort Lauderdale Market and the Miami Market," to create "a mega market, the biggest in the industry." Bruno said, however, that there was "[a] predetermined candidate from home office with no branch manager experience, no complex manager experience, no

market experience, and no recruiting experience interviews for the job." Bruno noted that he was "[a] white male from corporate who would like to move to Florida with his family who is well connected to the leadership chain at Wells Fargo" and that "he gets the job." Nevertheless, Bruno said that the job was "posted for anyone to apply." He said that "the current market leaders in Fort Lauderdale and Miami" both applied and interviewed and that both were "premier managers [who] have successfully driven recruiting, driven revenue and driven retention for the last ten plus years." Bruno noted that "[o]ne of these two candidates is Hispanic." Bruno thus said that "[f]ake interviews [were] conducted for this role." He further said that "the white male that received the market leader job in this fake interview" was "over his head" and "quit after two weeks on the job and went back to his old corporate job." Bruno also noted that "[a] text was sent to the hiring manager of the fake interview, calling him out in this inappropriate hire."

135.    In two additional instances, Bruno reported that "in 2021, two top WFA million-dollar teams at Wells Fargo needed to add a financial consultant to their respective teams." One team had "[s]omeone that they have already prescreened and chosen." In particular, "[a]n informal interview has been conducted and a decision to hire has been determined." The second team was "not adding a new member but just restructuring the team to change one member from a financial advisor status to a financial consultant status for purposes of compensation." But "[i]n both instances," Bruno said, "HR at Wells Fargo, backed up by senior leadership, requires that interviews be conducted. And as a best practice," according to Bruno, "one candidate needs to be diverse, preferably black or a woman. If these interviews are not conducted, the hiring manager cannot move forward with the hiring restructuring. No exceptions." Bruno said that "[e]ven though clearly an exception to not interview should have been granted, Wells Fargo requires the fake interviews to go forward."

136.    Bruno also recalled a fake interview taking place in 2021 with a lesbian woman interviewing for a job that was given to a white male and said that "[w]hen he got the role, everyone knew a fake interview had taken place." He noted that "a predetermined candidate [was] chosen" but that "[a] diversity candidate -- in this case, a woman -- is used in the pool to inflate the diversity activity numbers."

137.    Simply put, according to Bruno's online post, Wells Fargo would just "throw in some black and brown people and women into the pool so Wells Fargo can show activity towards their diversity goals."

Ultimately, Bruno explained in his online post, the conduct amounted to "wrong activity that inflates DEI metrics for affirmative action reports, regulatory briefings, and annual reports."

138.   Many current and former Wells Fargo employees have corroborated Bruno's accounts that the practice of fake interviews was widespread throughout Wells Fargo. For example, The New York Times reported that it had spoken to 22 former and current Wells Fargo employees, all of whom confirmed that they conducted fake interviews, helped arrange fake interviews, were aware of fake interviews, were subject to fake interviews, or saw paperwork documenting the fake interviews. Moreover, current and former employees indicated that Wells Fargo conducted the sham interviews across multiple business lines, including its Wealth Management, mortgage servicing, home lending, and retail banking operations.

139.   In particular, on May 19, 2022, The New York Times reported that 12 current and former Wells Fargo employees had confirmed that Wells Fargo had conducted "fake interviews" of diverse candidates in its Wealth Management division. The New York Times said that, in addition to Bruno, six other "current and former Wells Fargo employees . . . said that they were instructed by their direct bosses or human resources managers in the bank's wealth management unit to interview 'diverse' candidates — even though the decision had already been made to give the job to another candidate." Moreover, "[f]ive others said they were aware of the practice, or helped to arrange it."

140.   This practice existed throughout the Class Period. Indeed, The New York Times reported that "[t]hree current employees said they conducted fake job interviews or knew of them as recently as [2022]." It further reported that these former employees said that "[t]he interviews . . . seemed to be more about helping Wells Fargo record its diversity efforts on paper — partly in anticipation of possible regulatory audits — rather than hiring more women or people of color."

141.   Moreover, on June 9, 2022, The New York Times reported that 10 additional current and former Wells Fargo employees had confirmed that Wells Fargo conducted fake interviews of diverse candidates: "another 10 current and former employees have shared stories about how they were subject to fake interviews, or conducted them, or saw paperwork documenting the practice." It also reported that the fake interviews were not limited to Wells Fargo's Wealth Management division but instead, "sham interviews occurred across multiple business lines, including its mortgage servicing, home lending and retail banking operations."

142.    In addition, The New York Times reported that "[i]n some instances, there were written records of the practice of conducting fake interviews." For example, "[i]n late 2020, just days after Wells Fargo offered a job to a person who counted as 'diverse' by the bank's standards, a human resources employee asked that person to apply for a different job at the bank, according to an email reviewed by The Times." It further reported that "[t]he first offer was still on the table, the Wells Fargo employee explained, but the bank also wanted to show that it had 'qualified candidates' for both roles. 'Simply book keeping for us,' the employee wrote in the email."

143.    AdvisorHub, a financial advisor-focused news outlet, similarly reported on June 6, 2022, that, in addition to Bruno, a current Wells Fargo manager and a former Wells Fargo manager confirmed to the outlet that they either heard about or were instructed to interview diverse candidates for managerial roles despite the fact that a candidate had already been chosen.

144.    Comments in response to Bruno's June 14, 2022 online post also confirmed that these practices were occurring at Wells Fargo. For example, one YouTube commenter responded to Bruno's post, stating: "Thank you for speaking on this I was with Wells Fargo Advisors for 18 years, I can attest to these practices and am available for comments if needed." Another YouTube commenter stated, "I worked at Wells Fargo and Joe is correct about what's happening with interviews."

145.    In addition, FE-1, who worked in talent acquisition for the Wealth Management division, explained that there were individuals within the division called senior leads, who were above hiring managers. FE-1 learned from hiring manager colleagues that senior leads in Wealth Management would tell hiring managers which individuals they had "groomed" to take over a book of business and that these individuals were typically relatives, colleagues, or friends who were referred for the position. FE-1 said that nevertheless, the position would be posted and then a "slate" of three to four candidates would be interviewed in addition to the referral. FE-1 also learned from hiring managers in the Wealth Management division that, even though they had other candidates that were just as qualified and met the diverse policy and hiring criteria, the hiring managers were directed by the senior lead to hire the referral and that the hiring managers had to choose the non-diverse referral candidate. FE-1 understood that this process was really just "going through the motions."

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

146.    FE-1 believed, based on his conversations with his colleague, a Senior Talent Liaison, that the practice of hiring referrals in the Wealth Management division was fairly common and occurred from early 2019 through the end of his tenure in early 2022.

147.    Moreover, multiple sources have confirmed that conducting fake interviews of diverse candidates was a longstanding practice at Wells Fargo. As The New York Times reported, "[t]he practice [of conducting fake interviews] was tied to Wells Fargo's 'diverse slate' policy, which stipulated that at least half the candidates interviewed for jobs paying $100,000 or more needed to be 'diverse.' The rule was put in place in mid-2020. However, *the practice of conducting fake interviews existed long before then, because Wells Fargo had a similar unwritten policy*."

148.    For example, according to The New York Times, a former Wells Fargo manager recalled that Wells Fargo had conducted several "fake interviews" of Don Banks, a Black wealth manager in Monroe, Louisiana. In both instances, Wells Fargo "told Mr. Banks that he had advanced past an initial interview round for a financial adviser trainee position and would be getting a call from a manager" but "[b]oth times, no one called." The New York Times further reported that the former Wells Fargo manager, who "participated in the hiring process involving Mr. Banks's application," confirmed that his interviews were "fake interviews."

149.    In addition, FE-2, who worked as a Corporate Recruiter contractor in the Wealth Management division during the early 2019 to early 2020 timeframe, indicated that hiring managers often had a candidate in mind for a position. FE-2 said, for example, that if he hired for 20 roles, hiring managers had a candidate in mind before the job was posted for at least 13 of them. FE-2 said that he would consistently ask hiring managers if they had a candidate in mind; some would state that they did, while others denied it. But FE-2 said that even when hiring managers denied having a candidate in mind, he could always tell which candidates knew the hiring manager. FE-2 also indicated that there were complaints from hiring managers who did not want to go through with the process, but that the recruiters were told to "pick your battles." FE-2 noted that at the end of the process, the referral candidate was generally hired.

150.    Moreover, the practice of conducting fake interviews was reported up the chain to Wells Fargo's senior leadership. For example, Bruno said in his online post that the fake interviews were "an open secret at Wells Fargo, and it has gone on for years." He also said that "[t]he problem is systemic at

Wells Fargo. It can easily be identified and proven. Others and I have complained for years to HR, to our immediate managers, and to senior leaderships. Nothing has been done."

151.    Moreover, additional facts make clear that Defendants were, at the very least, deliberately reckless in not knowing that Wells Fargo was conducting fake interviews of diverse candidates to allow the Company to report that it was meeting its Diverse Search Requirement. To start, Wells Fargo kept a wealth of data on its interview processes and diversity initiatives. Indeed, a Wells Fargo spokesperson confirmed to The New York Times that "the bank kept records of every job interview. The record-keeping is necessary because the Office of the Comptroller of the Currency, the nation's top banking regulator, conducts periodic audits."

152.    Moreover, Wells Fargo's Board and most senior management regularly reviewed, monitored, and discussed its diversity initiatives. For example, in its March 2020 Proxy, March 2021 Proxy, and March 2022 Proxy, Wells Fargo admitted that it monitored its progress on enhancing diversity at all levels of the Company using numerous internal and external metrics. DE&I metrics and activities were also included in all regular business reviews to gauge whether the Company was meeting its DE&I goals. Moreover, Wells Fargo's Board and its HR Committee received regular reporting on the Company's DE&I initiatives, including updates on the Company's progress and accomplishments across its DE&I commitments and information related to talent acquisition and development and diversity reporting. And beginning in the fall of 2020, the full Board received DE&I updates at each regularly scheduled Board meeting, including regarding the Company's progress on its DE&I commitments. Indeed, Wells Fargo's then-Chairman of the Board, Charles H. Noski, stated in a signed letter at the front of Wells Fargo's March 2021 Proxy that "[t]he Board and its Human Resources Committee are fully engaged in overseeing Wells Fargo's diversity, equity, and inclusion initiatives and human capital management to support management in its efforts to drive meaningful change."

153.    Similarly, during Wells Fargo's annual proxy meeting in April 2021, then-Chairman Noski told investors that DE&I was a "key focus" for the Company's Board and management team. He also explained that "DEI is a topic that is regularly on our Board agenda. We discuss it with management and the responsible leaders, including Charlie at every one of our regularly scheduled meetings. It is frankly, right near the top of our agenda." Defendants Scharf, Santos, and the rest of the Operating Committee were

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

also intimately involved in the Company's diverse hiring initiatives throughout the Class Period, including being specifically focused on diverse workforce representation, significantly increasing the number of Black individuals in leadership roles, and holding senior management accountable for progress in improving diverse representation and inclusion initiatives.

154.    In addition, Defendant Sanchez participated in an "open positions meeting" every other week where she and all of her direct reports, delivery leaders, recruiting leaders, and talent acquisition operations leads, among others, took a deep dive into the data on what was working and what was not. Sanchez explained that the meeting was essential to stay on top of the data, to look at trends and capacity management, and to keep everyone in the loop. Sanchez also explained that the Company had a data lead who was particularly targeted and dedicated to the DSRI space who she and anyone at Wells Fargo who was focused on DE&I met with on a regular basis.

155.    Further underscoring the fact that the Company's senior executives and Board were regularly informed of and focused on diverse hiring, beginning in 2020, senior Wells Fargo executives' annual performance reviews and compensation were impacted by performance against the Diverse Search Requirement. For example, the Board approved performance goals for Scharf and the Operating Committee, which included the Diverse Search Requirement, in June and July 2020, respectively. Similarly, starting in 2020, numerous senior executives' compensation, including Scharf's, was impacted by progress against diversity initiatives, including the Diverse Search Requirement. Specifically, Wells Fargo's Human Resources Committee used progress on diversity initiatives as a modifier for variable compensation—failure to meet expectations resulted in a reduction; meeting expectations had no impact; and exceeding expectations resulted in an increase.

156.    In the end, as a result of the complaints up the chain about the practice of conducting fake interviews, the pervasive and widespread nature of the practice, and their constant review, oversight, and discussion of the initiative and the data flowing from it, Defendants knew, or at the very least were deliberately reckless in not knowing, that Wells Fargo was conducting fake interviews of diverse candidates to allow it to report that it was meeting its Diverse Search Requirement.

**K.    The Company Denies Early Reports About Its Hiring Policies**

157.    Notwithstanding Defendants' repeated assurances that Wells Fargo was committed to DE&I in its hiring, and their touting of the Diverse Search Requirement, on May 19, 2022, The New York Times reported that employees in Wells Fargo's Wealth Management division regularly conducted fake interviews of diverse candidates for positions that had already been filled to give the appearance of satisfying its stated DE&I commitments.

158.    More specifically, on May 19, 2022, The New York Times published an article entitled, *At Wells Fargo, a Quest to Increase Diversity Leads to Fake Job Interviews*. The article reported that, according to Bruno, for "many open positions" in Bruno's unit, "employees would interview a 'diverse' candidate — the bank's term for a woman or person of color — in keeping with the bank's yearslong informal policy" but that "often, the so-called diverse candidate would be interviewed for a job that had already been promised to someone else." The article reported that when Bruno "complained to his bosses," "[t]hey dismissed his claims" and that in August 2021, Bruno "was fired." The New York Times wrote that, "[i]n an interview, [Bruno] said Wells Fargo retaliated against him for telling his superiors that the 'fake interviews' were 'inappropriate, morally wrong, ethically wrong.'"

159.    The article further noted that Bruno was "one of seven current and former Wells Fargo employees who said that they were instructed by their direct bosses or human resources managers in the bank's wealth management unit to interview 'diverse' candidates — even though the decision had already been made to give the job to another candidate." Moreover, "six current and former Wells Fargo employees, including Mr. Bruno, said that fake interviews were conducted for many types of positions. Three current employees said they conducted fake job interviews or knew of them as recently as this year." In addition, "[f]ive others said they were aware of the practice, or helped to arrange it" and said that "[t]he interviews . . . seemed to be more about helping Wells Fargo record its diversity efforts on paper — partly in anticipation of possible regulatory audits — rather than hiring more women or people of color."

160.    At the same time, however, the article included multiple quotes from Wells Fargo spokespeople refuting or downplaying the conduct. For example, it reported that "Barry Sommers, the chief executive of Wells Fargo's wealth and investment management business, said that fake interviews wouldn't even have been necessary for the financial consultant positions that Mr. Bruno was hiring for."

That is because, according to Sommers, "[t]heir salaries . . . fell below the $100,000 threshold that required a diverse slate of candidates to be interviewed per Wells Fargo's 2020 policy." The New York Times further quoted Sommers as saying "[t]here is absolutely no reason why anyone would conduct a fake interview," and that "[r]ather than tracking the identities of interviewees, the bank focused on the results . . . ."

161.    The article also included a quote from a Wells Fargo spokesperson attributing any such conduct to "individual employees":

> In an emailed statement, Raschelle Burton, a Wells Fargo spokeswoman, said the bank expected all employees to follow its hiring policies and guidelines, which are communicated across the firm. "To the extent that individual employees are engaging in the behavior as described by The New York Times, we do not tolerate it," Ms. Burton said.

162.    Moreover, the very next day, on May 20, 2022, Wells Fargo issued a statement claiming that it had been unable to corroborate any of the story's claims, stating:

> Yesterday, The New York Times published a story alleging that a handful of Wells Fargo managers decided to hire a job candidate and then — after making this decision — interviewed diverse candidates knowing that the seat had already been filled. *We researched all specific claims the reporter shared with us in advance of the story's publication and could not corroborate the claims as factual*.

163.    Similarly, on May 27, 2022, in an article entitled, *Wells Fargo exec responds to reports that it denied mortgages to Black applicants and held sham job interviews*," Business Insider reported that "Insider spoke with Kleber Santos, Wells Fargo's head of diverse segments, representation, and inclusion, about the recent news reports . . . ." The article reported that "Wells Fargo is also dealing with the fallout from a New York Times report in which several current and former employees said that the bank conducted sham interviews to meet requirements for interviewing diverse job applicants." It then quoted Santos as responding:

> "We researched all the specific hiring-practice allegations the reporter shared prior to the story's publication and we could not corroborate these allegations as factual," and "[i]f we believe that any manager has conducted an interview with a predetermined outcome in mind, we believe we should investigate and punish if we find wrongdoing."

164.    Just days later, on June 1, 2022, Defendants were back to once again misleadingly touting Wells' Fargo's Diverse Search Requirement. In particular, in its 2022 DE&I Report, the Company again represented that "[f]or most posted roles in the U.S. with total direct compensation greater than $100,000

per year, ***Wells Fargo requires that at least 50% of the interview candidates must represent a historically underrepresented group with respect to at least one diversity dimension***."

165.    On June 3, 2022, Business Insider published an article entitled, *Wells Fargo's first diversity report shows progress but also that work remains to make Wall Street look more like Main Street*, which reported on the Company's 2022 DE&I Report published two days prior. The article reported that:

> Wells Fargo's Santos said the bank was focused on improving diversity among leaders. In 2020, the banking giant instituted a rule that for all posted roles in the US with annual compensation greater than $100,000, at least half of interview candidates must be from a historically underrepresented group.
>
> ***The rule is working***, Santos said.

166.    Three days later, however, on June 6, 2022, Defendant Scharf sent a letter to Wells Fargo employees announcing that the Company had temporarily suspended its "diverse slate" hiring policy and announced a plan to review its diverse slate hiring guidelines, with the intention of making adjustments to the program and relaunching it in July 2022.

167.    Indeed, that same day, in an article entitled, *Wells Fargo Announces 'Pause' of Policy That Led to Fake Job Interviews*, The New York Times reported that "[o]n Monday, Mr. Scharf told employees that the policy would be put on hold for several weeks to give the bank's leaders time to study its use and make changes." It further noted that "[t]he pause would allow the bank to gain confidence that 'the guidelines live up to their promise,' and that 'hiring managers, senior leaders and recruiters fully understand how the guidelines should work,' Mr. Scharf said in the letter."

### L.    The Relevant Truth Is Revealed

168.    On June 9, 2022, in an article entitled, *Federal Prosecutors Open Criminal Inquiry of Wells Fargo's Hiring Practices*, The New York Times reported that it had confirmed the fake interviews with 10 additional Wells Fargo employees: "another 10 current and former employees have shared stories about how they were subject to fake interviews, or conducted them, or saw paperwork documenting the practice." It also reported that the fake interviews were not limited to just a few employees in Wells Fargo's Wealth Management division but instead, "sham interviews occurred across multiple business lines, including its mortgage servicing, home lending and retail banking operations." The article also revealed that The New York Times had reviewed written evidence of the practice, noting that "there were written records of the

practice of conducting fake interviews." The article further reported that the United States Attorney's Office for the Southern District of New York had opened a criminal investigation into "whether Wells Fargo violated federal laws by conducting sham interviews of minority and female job candidates."

169.    That same day, in response to The New York Times article, Wells Fargo issued a press release acknowledging that "[n]o one should be put through an interview without a real chance of receiving an offer, period." Wells Fargo also explained that, while the Diverse Search Requirement had been paused, the Company was conducting a review "so that hiring managers, senior leaders and recruiters fully understand how the guidelines should be implemented – and so [Wells Fargo] can have confidence that [its] guidelines live up to their promise."

170.    On this news, the price of Wells Fargo common stock fell $4.55, or 10.2%, over two days, from a close of $44.63 per share on June 8, 2022, to a close of $40.08 on June 10, 2022.

171.    In a same-day article entitled, *Wells Fargo is under federal investigation for conducting fake job interviews of minority candidates, report says*, Fortune reported that Wells Fargo "is being investigated by the civil-rights unit of the Manhattan U.S. attorney's office, the New York Times reported . . . ." It further noted that on June 9, 2022, "[t]he stock fell 4.4% to $42.67." Fortune also reported that "[t]he probe is the latest potential blow to Wells Fargo's public image. The bank has been dealing with a series of scandals and regulatory issues for years, and is operating under a growth cap imposed by the Federal Reserve."

172.    The following day, June 10, 2022, Barron's wrote that "Wells Fargo is under criminal investigation over a scandal involving accusations the company conducted bogus job interviews with diverse candidates after positions had already been filled, according to a report in the New York Times." Barron's further reported that "Wells Fargo shares fell 6% Friday [June 10, 2022] to $40.08 and reached a 52-week low of $40.02 in intraday trading."

## M.    Relevant Post-Class Period Developments

173.    Following these revelations regarding Wells Fargo's sham interviews, members of Congress excoriated the Company and called for additional investigations and penalties. For example, on June 29, 2022, the House Financial Services Committee issued a press release entitled, *Chairwoman Waters Calls on Regulators to Hold Wells Fargo Accountable for Continued Troubling Patterns and*

*Practices of Anti-Consumer Behavior*. The release reported that on June 28, 2022, Congresswoman Waters sent a letter to regulators—including the United States Department of Housing & Urban Development, the Federal Reserve, the Federal Deposit Insurance Corporation, the CFPB, and the OCC—urging them to investigate recent allegations that Wells Fargo denied Black refinancing applicants when interest rates were at their lowest and hosted "mock" interviews with diverse candidates to pad diversity numbers.

174.    In the letter, Congresswoman Waters wrote:

> I write today to share my profound disappointment and significant concerns regarding the ongoing actions by one of America's largest megabanks, Wells Fargo. Wells Fargo has been under scrutiny by the Financial Services Committee and by your agencies in recent years for a myriad of reasons, including creating almost 3.5 million unauthorized consumer accounts, charging customers for auto insurance policies they did not need, ripping off veterans by overcharging them for refinance loans, and multiple class action suits regarding discrimination against people of color, people with disabilities, and other protected individuals. As I have made clear in the past, Congress has given regulators like yourselves significant tools to properly penalize Wells Fargo for its continuous wrongdoing, and based on Wells Fargo's recent behavior, I am writing to urge you to escalate penalties in a way that is reflective of its history of repeat offenses.

> Wells Fargo previously reached a settlement with the Consumer Financial Protection Bureau (CFPB), Office of the Comptroller of the Currency (OCC), and the City and County of Los Angeles in 2016 regarding some of its practices, but these penalties proved to be insufficient to deter future offenses. In September 2017, I released a Democratic Committee staff report detailing further abusive practices by Wells Fargo and outlining where regulators could use the full suite of their authorities to curb a pattern of repeated unlawful behavior. In 2018, the Federal Reserve, under then Chair Janet Yellen's leadership, ordered that Wells Fargo keep its total assets below $1.95 trillion until the bank improved its governance and risk controls. . . .

> . . . .

> Yet, we continue to learn that the megabank is far from achieving the vision that CEO Scharf put forward at his first townhall in 2020, when he stated: "Our work has tremendous impact upon people. We need to recognize that and make sure that we're doing everything we can to operate the company to the highest standards of operational excellence." While Wells Fargo has continued to rake in billions of dollars in profit – more than $21 billion in 2021 alone – and their CEO received a 20% increase in compensation to total more than $24 million in 2021-- the megabank's misdeeds continue. . . .

> . . . .

> The New York Times reports that Wells Fargo staff have inflated their diversity, equity, and inclusion data by conducting "fake" interviews with women and candidates of color. According to the article, the interviews "seemed to be more about helping Wells Fargo record its diversity efforts on paper—partly in anticipation of possible regulatory audits—

rather than hiring more women or people of color." Recently, The New York Times also reported that federal prosecutors are investigating these "sham" interviews and if federal laws were violated. To be clear, commitments to diversity, equity, and inclusion are not stunts to be taken advantage of by megabanks; diversity, equity, and inclusion encompass aspects of both moral and legal obligations that financial institutions hold. ***It is unacceptable that Wells Fargo would mislead applicants and the public***.

The need for warnings and "cost of doing business fines" have long passed. The asset cap imposed by now-Treasury Secretary Janet Yellen has failed to force the bank to change its behavior. Despite Mr. Scharf's leadership, Wells Fargo continues to display a troubling pattern of bad behavior with an inability to competently redress such patterns. Wells Fargo and other mega-financial institutions must face real consequences to curb their recidivism. I previously introduced legislation directing the banking regulators to use their severe authorities to immediately stop Wells Fargo from harming customers, and I plan to do so again. My legislation will improve oversight and governance of megabanks while ensuring repeat offenders like Wells Fargo can no longer abuse their customers or lie to the public. I am also calling on the CFPB, OCC, FDIC, Federal Reserve, and HUD to take immediate action to end this pattern and practice of egregious consumer abuses at Wells Fargo and finally hold this repeat offender accountable.

175.    On August 1, 2022, in its Form 10-Q for the second quarter of 2022 filed with the SEC, Wells Fargo confirmed that the DOJ was investigating its diverse slate hiring practices: "Government agencies, including the United States Department of Justice, have undertaken formal or informal inquiries or investigations regarding the Company's hiring practices related to diversity." Analysts highlighted Wells Fargo's confirmation regarding the investigation. On August 2, 2022, in a report entitled, *Wells Fargo 2Q22 10-Q Review: Discloses Hiring Practices Investigations, RPL Increases*, analyst Barclays reported that "WFC believes regulators may impose additional penalties or take other enforcement actions, as it has not yet satisfied certain aspects of its consent orders. It disclosed that Government agencies, including U.S Department of Justice, have undertaken formal or informal inquiries or investigations regarding WFC's hiring practices related to diversity." The following day, Credit Suisse similarly reported that "[g]overnment agencies, including the United States Department of Justice, have undertaken formal or informal inquiries or investigations regarding [Wells Fargo's] hiring practices related to diversity."

176.    Following these reports, analysts noted that the revelations regarding Wells Fargo's hiring practices could impact the lifting of the Asset Cap. For example, on June 29, 2022, Deutsche Bank reported that although it still had "optimism that the asset cap will be lifted in the next 6-9 months," "***our conviction is lower than a few months ago given various headlines involving WFC*** as well as risk mgmt issues

arising at other large banks in recent months." The following day, Barclays similarly reported that "WFC believes it is in a better spot today than it was 3 years ago at completing the consent orders. However, late in the quarter, reportedly, a new criminal investigation was opened against WFC for its hiring practices around diversity."

177.    Similarly, in a report entitled, *Where We Stand On The Asset Cap; 2H Update; Reiterate BUY*, analyst Deutsche Bank wrote, "[r]ecall that WFC remains under an asset cap put in place by bank regulators back in February 2018" which has "limited the ability to gather deposits and grow the capital markets business" and also resulted in "higher costs to address regulatory issues and likely some other foregone revenue . . . as mgmt and staff prioritize improving risk mgmt and other issues potentially at the cost of revenue . . . ." It further noted that "[p]er WFC's 2Q 10Q, government regulators (including the DOJ) are looking into Wells' hiring practices related to diversity. This was reported in the media and officially disclosed in the 10Q." Deutsche Bank further wrote that its "base case" estimate was "that the asset cap will be removed in the spring of 2023." It noted, however, that "[i]t's still anyone's guess on when the asset cap will be lifted, but we do know that the regulators think Wells is making progress ...***but we also know that challenges/issues (such as hiring practices) continue***." (ellipsis in original).

178.    On August 1, 2022, Wells Fargo also issued a press release entitled, *Wells Fargo Completes Comprehensive Review of Diverse Candidate Slate Guidelines*. The release stated that Wells Fargo "is reinstating its diverse candidate slate guidelines following a pause that started in June." It noted that "[o]ver the past six weeks, the company completed a review of diverse candidate slate hiring approaches and interviewed Wells Fargo recruiters and hiring managers to determine what's working and what's not." The Company stated that "[w]e are recommitting to our diverse candidate slate guidelines with changes that will help clarify and simplify the process and lead to a better experience for all candidates, internal and external."

179.    These modifications significantly diminished the policy that Defendants had just spent the entire Class Period touting to investors. For example, Defendants made it much easier for the Company's managers and executives to obtain exemptions from the Diverse Search Requirement. Moreover, rather than a hard rule of requiring a 50% diverse candidate slate for open positions at Wells Fargo with total

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

direct compensation of more than $100,000, Defendants announced that the Diverse Search Requirement would now apply to roles that were "in-scope" based on unspecified job levels, not compensation.

180.    Moreover, in announcing the reinstatement, Defendants essentially conceded that the Diverse Search Requirement had been subject to abuse during the Class Period. In a same-day article entitled, *Wells Fargo Revives Policy That Led to Fake Job Interviews, With Tweaks*, The New York Times reported on an internal Wells Fargo memo regarding the reinstatement of the policy:

> Wells Fargo is reactivating a hiring practice that it paused this year after a former employee revealed that it was leading managers to interview nonwhite candidates for jobs that had already been filled, according to a memo seen by The New York Times.

> Beginning Aug. 19, the practice will again be put in place for certain jobs, **with new features added to prevent abuse**, according to the memo, which was sent to managers at the bank on Monday.

> **The bank acknowledged in the memo that its guidelines could be improved**. One problem executives found, according to the memo: "Our guidelines and processes can be overly prescriptive."

> The biggest changes will be increased training for managers and an easier approval process for exemptions to the diverse slate requirement.

> There will also be a change in which open jobs must meet the requirement. The earlier version of the policy required that every job with a salary of $100,000 or more be filled only after interviews were conducted with a diverse slate of candidates.

> "Instead of the previous compensation-based criteria, roles that are in-scope will now be based on job level, not compensation," the memo said. It did not specify which job levels would fall within the requirement.

181.    The article further reported that:

> When they suspended the policy, the bank's leaders vowed to spend the following weeks talking to employees to find out how to improve the program.

> "Overwhelmingly, we heard the need to improve the candidate and manager experience and the need for a stronger and longer-term commitment and investment to help employees develop their skills and grow their careers," the memo said.

182.    Then, on September 13, 2022, after years of urging its shareholders to vote against racial equity audits (*see supra* Section IV.H.), Wells Fargo suddenly issued a press release announcing that it would "commission an external, third-party racial equity audit" by law firm Covington & Burling LLP. It

noted that "[t]he assessment will include input from both internal and external stakeholders and focus on elements of Wells Fargo's efforts to serve diverse communities and promote a diverse workforce."

183.    The announcement came shortly before Scharf was scheduled to testify before congressional committees. Indeed, in a September 14, 2022 article entitled, *Wells Fargo Hires Law Firm to Conduct Diversity Audit*, Barron's reported that "Scharf is reportedly scheduled to testify next week before a pair of congressional committees where he would likely face intense questioning about the firm's hiring and diversity practices."

184.    Market commentators noted Wells Fargo's sudden about-face. For example, Bloomberg reported in a September 13, 2022 article entitled, *Wells Fargo Commits to Racial-Equity Audit Ahead of Hearings*, that Wells Fargo "urged shareholders to vote against a shareholder-proposed racial-equity audit earlier this year and last year, arguing that it was already committed to advancing diversity, equity and inclusion. On both occasions, shareholders rejected the proposals."

185.    During a September 21, 2022 hearing before the United States House of Representatives Committee on Financial Services entitled, *Holding Megabanks Accountable: Oversight of America's Largest Consumer Facing Banks*, Congresswoman Waters grilled Defendant Scharf regarding the sham interviews, including asking "[i]s it true that you interviewed an African-American employee for a position after you had already hired a White employee? Is that true?" In response, Defendant Scharf stated: "We are in the middle of continuing an investigation to make sure that we understand every instance where people felt as if they were not treated fairly, and if we have findings, we will take appropriate action."

186.    On September 22, 2022, United States Senator Bob Menendez (D-N.J.), a senior member of the Senate Banking, Housing, and Urban Affairs Committee, Chairman Sherrod Brown (D-Ohio), and Senator Elizabeth Warren (D-Mass.) issued a press release entitled, *Menendez, Brown, Warren Hold Wells Fargo Accountable for Conducting Misleading Interviews with Women and Minority Candidates*. The press release explained that Senators Menendez, Brown, and Warren had sent a same-day "letter to Wells Fargo CEO and President Charles Scharf and Senior Vice President Bei Ling to express their deep concerns about the bank's reported practice of conducting 'fake interviews' with women and minority candidates after already filling vacancies." In the letter, the Senators wrote that:

We write with deep concern regarding recent reports that Wells Fargo conducts "fake interviews" with women and minority candidates for positions that have already been filled. According to the New York Times, Wells Fargo undertakes these fake interviews to artificially boost diversity statistics in an attempt to satisfy an internal goal to interview at least one woman and one person of color for each open position—a goal that was meant to increase diversity among Wells Fargo's workforce. The information uncovered by The New York Times is ***not only highly offensive and suggestive of systemic bias and discrimination at the bank, but also may represent a pattern of misleading shareholders*** and federal and state regulators in oversight of Wells Fargo's execution of nondiscrimination laws and broader, public commitment to diversity, equity, and inclusion.

. . . .

In response to The New York Times article, Wells Fargo said it will attempt to end fake interviews by allowing hiring managers to seek exemptions from the bank's diverse interviewing goals altogether. However, if hiring managers can more easily opt out of its goals, diverse candidates may be considered less often for open positions. Additionally, Wells Fargo recently announced that it agreed to a third-party racial-equity audit after years of urging shareholders to vote against such audits. While these are potentially good first steps, Wells Fargo should take more immediate action to rebuild confidence in its recruitment, application, interview, and hiring processes.

187.    In addition to the DOJ's criminal investigation into its hiring practices, in its October 31, 2022 Form 10-Q for the third quarter of 2022, Wells Fargo disclosed that the SEC was also investigating its hiring practices: "Government agencies, including the United States Department of Justice and the United States Securities and Exchange Commission, have undertaken formal or informal inquiries or investigations regarding the Company's hiring practices related to diversity."

188.    Analysts highlighted this disclosure. For example, on November 1, 2022, analyst Barclays reported that "[g]overnment agencies, including the United States Department of Justice and the United States Securities and Exchange Commission, have undertaken formal or informal inquiries or investigations regarding WFC's hiring practices related to diversity." In a November 16, 2022 report entitled, *Question Bank: Key Issues and Questions Surrounding WFC*, Deutsche Bank wrote that "WFC disclosed in the second quarter 10Q that the DOJ was investigati[ng] hiring practices related to diversity. In the third quarter 10Q, WFC noted that the SEC is also investigating on the same issue." It further reported, referring to those investigations and others, that "[i]t seems logical (to us, at least) that the above issues need to be resolved before the Fed lifts the asset cap."

## V.    DEFENDANTS' MATERIALLY FALSE OR MISLEADING STATEMENTS AND OMISSIONS

189.    On February 23, 2021, Wells Fargo released its 2020 Annual Report. The 2020 Annual report contained a "[l]etter from CEO," which included a section entitled "Diversity, Equity, and Inclusion." In that section, Scharf stated that, "[t]hroughout 2020, we also announced our expanded commitments to diversity, equity, and inclusion," which included, among other measures, "*[i]n the U.S., we are requiring a diverse slate of candidates* — and a diverse interview team — *for most roles with total direct compensation of more than $100,000 per year*."

190.    On March 16, 2021, Wells Fargo filed its March 2021 Proxy. The March 2021 Proxy included a section entitled, *We Are Advancing Diversity, Equity, and Inclusion*. Under a sub-heading entitled, *Improving Diverse Representation and Inclusion within the Company*, Defendants stated, "[w]e are expanding our diversity and inclusion commitments with a focus on hiring, promotions, and turnover, with increased accountability across all of those areas and are taking specific actions in support of these commitments." In particular, Defendants stated, "*[i]n the U.S., we are requiring a diverse slate of candidates – and a diverse interview team – for most roles with total direct compensation of more than $100,000 per year*."

191.    Under another sub-heading in the same section of the March 2021 Proxy entitled, *Our Diverse Candidate Sourcing and Interview Guidelines*, Defendants stated:

> Consistent with our commitment to advance diversity, equity, and inclusion (DE&I) and improve workforce diversity, ***Wells Fargo has established Diversity Sourcing and Interview Team Guidelines that require diverse candidate slates*** and interview teams ***(referred to as our Diverse Search Requirement)***. Our Diverse Search Requirement was originally implemented based on our evaluation of the Company's workforce in order to determine how best to improve workforce diversity. Based on our ongoing review, the Company decided to expand the scope of the Diverse Search Requirement in 2020 as part of our overall and continuing efforts to enhance workforce diversity. We define diversity for these purposes to include the following diversity dimensions: race/ethnicity, gender, LGBTQ, veterans, and people with disabilities.

> ***The Diverse Search Requirement requires the following for most U.S. roles with total direct compensation greater than $100,000***:

> - ***At least 50% of interview candidates must be diverse with respect to at least one diversity dimension***; and
> - At least one interviewer on the hiring panel must represent at least one diversity dimension.

192.    On April 26, 2021, Wells Fargo published a report entitled, *2020 Social Impact and Sustainability Highlights*. In a section of this document entitled, *Elevating diversity, equity, and inclusion*, Defendants outlined Wells Fargo's Diverse Search Requirement, stating, in relevant part:

> To be successful, we must continue to create a truly diverse and inclusive workforce that brings a wide range of insights and perspectives to all levels of our company. ***Our Diverse Search Requirement requires that for most U.S. roles with total direct compensation greater than $100,000, at least 50% of interview candidates must be diverse with respect to at least one diversity dimension***. Further, at least one interviewer on the hiring panel must represent at least one diversity dimension. For these purposes, our definition of diversity includes race/ethnicity, gender, LGBTQ, veterans, and people with disabilities. We're expanding this program internationally. ***As of December 31, 2020, the Diverse Search Requirement***:

> - Applied to approximately 95% of all U.S. roles with total direct compensation greater than $100,000; and

> - Applied to approximately 48% of all active U.S. employees irrespective of their total direct compensation

> - ***91% of applicable requisitions had a diverse interview slate*** [and]

> - 94% of applicable requisitions had a diverse interview team.

193.    On May 26, 2021, Scharf provided testimony during a hearing before the United States Senate Committee on Banking, Housing, and Urban Affairs. In a portion of his testimony under a heading entitled, *Our Commitment to Diversity, Equity, and Inclusion*, Scharf stated, among other things, "for the hiring of many senior roles, ***we have implemented guidelines that require a diverse slate of candidates (at least 50 percent) and a diverse interview panel***."

194.    On July 15, 2021, Wells Fargo published its 2021 ESG Report, which began with a letter signed by Scharf. In the 2021 ESG Report, Defendants provided an "[u]pdate on Wells Fargo's DE&I commitments," stating that the Company "***[r]equire[s] diverse candidate slates*** and interview teams ***for key roles with total direct compensation of more than $100,000***." In this same portion of the 2021 ESG Report, Wells Fargo also stated:

> ***In the U.S., we now require that at least 50% of interview candidates identify with at least one diversity dimension*** — and we require a diverse team of interviewers — ***for most roles with total direct compensation of more than $100,000***. Outside the U.S., we have country-specific strategies in place to ensure that we're considering diverse candidate slates for executive-level roles.

195.    Defendants' statements in ¶¶189-94 were materially false and misleading and omitted material facts when made. Specifically, while Defendants lauded the Diverse Search Requirement to the

market, in reality, the Company was engaging in widespread "sham" or "fake" interviews of diverse candidates. More specifically, Wells Fargo was "interviewing" diverse candidates simply to claim compliance with its Diverse Search Requirement when, in truth, another candidate had already been selected for the position and the Company had no intention of hiring the diverse candidates it was interviewing.

196.    On October 7, 2021, Defendant Sanchez participated in a virtual interview with i4cp during an installment of its *Talent Acquisition Next Practices Monthly* series. As an organization dedicated to "discover[ing] and advanc[ing] next practices in human capital," i4cp's "Talent Acquisition Next Practices Monthly series provides a forum for the [talent acquisition] leadership community to come together to discover and advance next practices" in the industry. During the interview, host Lorrie Lykins asked Sanchez to "talk a little bit about building diverse candidate slates and increasing opportunities" for diverse job candidates at Wells Fargo. As part of her response, Sanchez stated, in relevant part, that:

> *[W]e have really focused a lot on the external sourcing and making sure that we are proactively sourcing for building diverse candidate slates*. . . .
>
> *[W]e formalized the candidate slate requirement for roles $100K and above. It's probably about a year and a half or two years ago to say that you have to have 50% of the slate -- of the candidate slate that will be interviewed needs to be diverse in one dimension or another*. Also, the interview team has to diverse, and so that's very important as well.
>
> But *I think the core for us and what's key is not to sit back and wait and see who arrives in that candidate pool, but to be constantly targeting external as well as internal sourcing to make sure that the pipeline is filled with great candidates*. And we'll identify with the recruiters who work hand-in-hand with our diversity sourcing group.

197.    Sanchez added that, in trying to build a pool of diverse candidates, Wells Fargo's "*recruiters can say look, I have a really tough role to fill. I'm having a hard time pipelining that, and so the diversity sourcing group can step in and also do a targeted effort to make sure that they've filled that pipeline adequately and found where they can find diverse groups*."

198.    Defendant Sanchez's statements in ¶¶196-97 were materially false and misleading and omitted material facts when made. Specifically, while Defendants lauded the Diverse Search Requirement to the market, in reality, the Company was engaging in widespread "sham" or "fake" interviews of diverse candidates. More specifically, Wells Fargo was "interviewing" diverse candidates simply to claim compliance with its Diverse Search Requirement when, in truth, another candidate had already been

selected for the position and the Company had no intention of hiring the diverse candidates it was interviewing.

199.    In addition, Defendant Sanchez's statements in ¶¶196-97 that "we have really focused a lot on the external sourcing and making sure that we are proactively sourcing for building diverse candidate slates," "the core for us and what's key is not to sit back and wait and see who arrives in that candidate pool, but to be constantly targeting external as well as internal sourcing to make sure that the pipeline is filled with great candidates," and "the diversity sourcing group can step in and also do a targeted effort to make sure that they've filled that pipeline adequately and found where they can find diverse groups" were materially false and misleading and omitted material facts when made because, in reality, Wells Fargo was building slates of diverse candidates simply to claim compliance with its Diverse Search Requirement when, in truth, another candidate was already selected for the position and the Company had no intention of hiring the diverse candidates it was interviewing.

200.    On February 15, 2022, Wells Fargo published its *Priority Recommendations of the Wells Fargo Human Rights Impact Assessment and Actions in Response*. In the "Diversity, equity, and inclusion" section of this document, under the "Sourcing of diverse talent" sub-heading, Defendants stated:

> In 2021, we increased our partnerships with colleges, universities, and other organizations spotlighting diverse talent recruitment. For example, by expanding our engagement we increased our hiring of candidates from Historically Black Colleges and Universities and Hispanic- Serving Institutions. **We also instituted diverse candidate slates** and interview teams **on most jobs of over $100,000 in total compensation**. We are in the process of eliminating education requirements in certain job categories to increase equity in hiring. Programs such as Glide-Relaunch (an in-house returnship program) and our Career Development Cohort program (an in-house diversity focused program that supports our partnership with the OneTen Coalition) further support our DE&I recruiting efforts.

201.    On March 14, 2022, Wells Fargo filed its March 2022 Proxy. In the March 2022 Proxy, in a section entitled, *Our Approach to Advancing Diversity, Equity, and Inclusion*, Wells Fargo made various representations regarding the Company's Diverse Search Requirement, including, *inter alia*, that:

> Our DE&I commitments include a focus on hiring, promotions, and retention, and have been designed with increased accountability across those areas. These include:
>
> **Diverse Candidates[:] Diversity Sourcing and Interview Team Guidelines that require diverse candidate slates** and interview teams **for designated posted positions**. We define diversity for these purposes to include the following diversity dimensions: race/ethnicity, gender, LGBTQ, veterans, and people with disabilities.
>
> . . . .

We conduct and track targeted outreach efforts to underutilized populations in order to attract well-qualified individuals to apply for open positions and identify placement goals to help focus recruitment strategies toward underrepresented groups.

We seek to recruit the best and brightest talent with a keen focus on diversity for senior-level roles. [We] pursue this goal by establishing trusted partnerships with candidates, hiring managers, and recruiting consultants.

202.    On June 1, 2022, Wells Fargo published its 2022 DE&I Report. The report contained two "Messages" in the front, one from Scharf (which he signed) and one from Santos (which he signed). In a section of that report entitled, *Diverse candidate slates and interview teams*, Wells Fargo stated:

> **For most posted roles in the U.S. with total direct compensation greater than $100,000 per year, Wells Fargo requires that at least 50% of the interview candidates must represent a historically under-represented group with respect to at least one diversity dimension** and at least one interviewer on the hiring panel must also represent a historically under-represented group with respect to at least one diversity dimension.

203.    On June 3, 2022, Business Insider published an article entitled, *Wells Fargo's first diversity report shows progress but also that work remains to make Wall Street look more like Main Street*. The article reported that:

> Wells Fargo's Santos said the bank was focused on improving diversity among leaders. In 2020, the banking giant instituted a rule that for all posted roles in the US with annual compensation greater than $100,000, at least half of interview candidates must be from a historically underrepresented group.
>
> **The rule is working**, Santos said.

204.    Defendants' statements in ¶¶200-03 were materially false and misleading and omitted material facts when made. Specifically, while Defendants lauded the Diverse Search Requirement to the market, in reality, the Company was engaging in widespread "sham" or "fake" interviews of diverse candidates. More specifically, Wells Fargo was "interviewing" diverse candidates simply to claim compliance with its Diverse Search Requirement when, in truth, another candidate had already been selected for the position and the Company had no intention of hiring the diverse candidates it was interviewing.

## VI.    ADDITIONAL ALLEGATIONS OF DEFENDANTS' SCIENTER

205.    Numerous facts, including those detailed above, considered collectively, raise a strong inference that Defendants knew, or were deliberately reckless in not knowing, that Wells Fargo was conducting fake interviews of diverse candidates to allow the Company to report that it was meeting its

Diverse Search Requirement. Certain allegations reflecting Defendants' scienter are summarized below.

### A.    Defendants Had Unfettered Access To Information About Wells Fargo's Diverse Hiring Initiatives

206.    Prior to and throughout the Class Period, a trove of information concerning the Company's DE&I initiatives—including diverse hiring generally, and the Diverse Search Requirement specifically—was tracked, available to, and regularly discussed at the highest levels of Wells Fargo.

207.    Wells Fargo's robust data concerning its diversity initiatives stemmed, in part, from the *Slaughter* Action settlement, in which Wells Fargo agreed to a number of measures described as "Programmatic Relief" (i.e., non-monetary actions). While the period for which Wells Fargo agreed to comply with the Programmatic Relief was originally set to expire in May 2021, as a result of numerous agreements between the *Slaughter* Action class and Wells Fargo, the Company remained subject to the Programmatic Relief throughout the Class Period and into 2023.

208.    Among other things, Wells Fargo agreed to establish two "[l]eadership [t]eams" (that included senior business leaders) that would meet at least semi-annually to review "data and analysis regarding [financial advisor] diversity efforts, progress and results." The leadership teams received information and reports on an as needed basis, which included information reflecting, among other things, "[financial advisor] representation, recruiting and hiring of" experienced and inexperienced financial advisors and financial advisor trainees. The reports and information included racial data for financial advisors, and the leadership teams could request additional information helpful to perform their function. Wells Fargo also agreed to create two "[f]ocus [g]roups" that would meet at least semi-annually with the leadership teams to engage with the leadership teams on their areas of focus. Wells Fargo also agreed to a resource whose main responsibility was the recruitment of African-American Financial Advisors and Financial Advisor trainees, the results of which would be reported to "Leadership Councils."

209.    In addition, in 2020, 2021, and 2022, Wells Fargo admitted that it monitored its progress on enhancing diversity at all levels of the Company using numerous internal and external metrics. DE&I metrics and activities were also included in all regular business reviews to gauge whether the Company was meeting its DE&I goals. Scharf explained that the Enterprise Diversity & Inclusion Council, which he chaired, met "monthly and [wa]s charged with driving the education and change necessary for making

meaningful progress against our objectives," and that Wells Fargo was "setting clear, specific, and measurable goals and will be holding people accountable to advancing our diversity and inclusion efforts at all levels."

210.    To that end, Wells Fargo maintained significant data related to its diversity hiring practices. This data included keeping records of every job interview conducted by the Company in the event of an audit by the OCC.

211.    In addition, Scharf stated in sworn testimony before the United States House Financial Services Committee in March 2020, that "[t]he CFO and I hold monthly business reviews that were not held in the past where we meet with every business along with their senior folks and we review their financial results, their risk controls, progress they are making on people including the diversity component of that on a going-forward basis."

212.    The Company's Operating Committee met "multiple times per week and discusse[d] all important issues across the company," and Wells Fargo "ha[d] formal processes throughout the company to manage the work that is required, and this all feeds into regular Operating Committee reviews. Any issues requiring management attention [we]re reviewed formally multiple times weekly at regularly scheduled meetings and [the Company] review[ed] all work streams at least monthly in detail."

213.    The Operating Committee was also specifically focused on "promoting and enhancing DE&I priorities and goals within the Company and externally," which "include[d] a focus on diverse workforce representation (including significantly increasing Black leadership), [and] accountability of senior management for progress in improving diverse representation and inclusion."

214.    In addition, all requests for exceptions from the Diverse Search Requirement had to be approved by an Operating Committee member or one of their direct reports (or their assigned delegates).

215.    Moreover, in an October 7, 2021 presentation hosted by i4cp, Sanchez recounted the Company's robust data and the extent to which senior management was involved with the Company's diverse hiring. For example, she explained:

> [T]he leadership team meets not only for the regular leadership meeting every week, but we also have what we call the **open positions meeting every other**.
>
> **And we look at [a] deep dive into the data**, what's working, what isn't. **And that is a constant conversation**. And then we can reflect that back to the HR business partners

and we can reflect it back to the businesses, ***so we're keeping everybody in the loop*** on the directions that we're going and what we're utilizing.

And I think that we implemented that open positions meeting probably about halfway through 2021 -- 2020. ***And it's been essential for us to be able to stay on top of the data***, to look at the trending, to look at capacity management . . . .

216.    Sanchez explained that attendance at the open positions meetings was wide-ranging:

So it's all my direct reports, so the delivery leaders and targeted recruiting leaders, etc. There's -- the person on our team who's amazing, Allyssa Hilton, who really drives all of our reporting for capacity management and open positions. . . .

[Talent Acquisition] operations leads. So that sits separately from us, so they are joining that meeting. And then usually our finance partner as well . . . .

217.    Sanchez, who has been with Wells Fargo since 2013, also stated that, despite Wells Fargo cycling through three CEOs between 2016 and 2019, diversity initiatives stayed "front and center with the CEOs, including Charlie Scharf," which, in turn, led to an increase in "resourcing" for Sanchez's team "to be able to meet what we need to do."

218.    Sanchez also recalled "a representative of -- very senior role who -- and has -- his or her own team that aligns with an Operating Committee that's leading one of the businesses" who conducted a "deep dive in terms of where are our opportunities for our diverse communities within each line of business and develop[ing] a very targeted strategy" which, as Sanchez explained, involved "lots of program management."

219.    Sanchez also highlighted Wells Fargo's "deep dive in terms of data" on DE&I and noted that it had "a data lead particularly targeted and dedicated to the DSRI space. And all of us meet on a regular, regular basis to make that sure we're -- our teams -- anybody whose focused on DE&I, is meeting on a regular basis."

220.    Similarly, Sanchez recounted that Scharf and Santos were regularly updated on the Company's DE&I initiatives. Indeed, she explained that Scharf and Santos held "regular engagement sessions with black African-American leaders and also Hispanic Latino leaders," and that she participated in the meetings with Hispanic and Latino leaders on a monthly basis. She further explained that when those meetings began, "both of those groups met individually to come up with a list of what are the initiatives that we think the organization needs to move forward with, to really change a variety of things," including "how do we grow and develop more talent so that we can really expand what we're doing at the top of the

house and growing in diverse talent." Sanchez explained that "71 initiatives" were generated through those meetings, and that "[w]e meet regularly to report out on those [initiatives]. ***They get regular reports up to Charlie [Scharf] and Kleber [Santos]. And that's reviewed on a regular basis***."

221.    Wells Fargo's Board and its HR Committee also received regular reporting on the Company's DE&I initiatives, including reporting on talent acquisition and development, and diversity reporting, which included information on diverse representation within the Company. And beginning in the fall of 2020, the full Board received DE&I updates at each regularly scheduled Board meeting.

222.    Indeed, Wells Fargo's then-Chairman of the Board, Charles H. Noski, stated in a signed letter at the beginning of Wells Fargo's March 2021 Proxy that "[t]he Board and its Human Resources Committee are fully engaged in overseeing Wells Fargo's diversity, equity, and inclusion initiatives and human capital management to support management in its efforts to drive meaningful change." During Wells Fargo's annual proxy meeting in April 2021, then-Chairman Noski told investors that DE&I was a "key focus" for the Company's Board and management team. He also explained that "DEI is a topic that is regularly on our Board agenda. We discuss it with management and the responsible leaders, including Charlie at every one of our regularly scheduled meetings. It is frankly, right near the top of our agenda."

223.    The significant data, reporting, meetings, monitoring, and Company-wide focus on DE&I initiatives throughout the Class Period, including at the highest levels of Wells Fargo, supports the strong inference that Defendants knew, or were deliberately reckless in not knowing, of the false and misleading nature of their statements about the Company's diverse hiring efforts and the Diverse Search Requirement during the Class Period, as set forth above. Similarly, that "fake" interviews were widespread and regularly conducted throughout Wells Fargo's business lines, coupled with the vast amounts of data, reporting, meetings, and monitoring the Company had concerning its hiring practices generally, and its diversity hiring practices specifically, supports the strong inference that Defendants knew, or were deliberately reckless in not knowing, of the false and misleading nature of their statements about the Company's diverse hiring efforts and the Diverse Search Requirement during the Class Period, as set forth above.

### B.    Defendants Repeatedly Spoke About The Diverse Search Requirement

224.    As set forth in Sections IV.F., IV.I., IV.J., V, and VI.A., above, throughout the Class Period, Defendants repeatedly spoke about the Diverse Search Requirement, recruiting diverse individuals at all

levels of the Company, and its intense focus on tracking and evaluating data concerning its DE&I initiatives. These repeated statements strongly and plausibly suggest each had access to negative material undisclosed information. They also demonstrate Defendants' knowledge of and access to information about these topics or, at the very least, that they were deliberately reckless in failing to investigate the very issues on which they publicly spoke during the Class Period.

C.    **Implementing Adequate Controls And Resolving The Company's Myriad Regulatory Issues Was A Key Priority**

225.    As discussed in Section IV.B., above, Wells Fargo had for years engaged in a series of misconduct, including numerous settlements with regulators and private plaintiffs that involved discriminatory conduct against diverse individuals. The consequences of those scandals had a significant negative impact on the Company's business. As a result, leading up to and during the Class Period, Defendants were focused on ensuring that the Company had adequate controls and risk management processes in place to ensure that it was not engaging in additional misconduct. As Scharf admitted in sworn testimony before the United States House Financial Services Committee in March 2020, "the most important thing that I did when I arrived at the company, when I talked about setting the clear priorities, is making sure that everyone understands that our first priority, by far, is to do all of the regulatory work that is required." Indeed, during the same hearing, Scharf explained that he spent "easily 75 to 80 percent" of his time on resolving the Company's various regulatory issues, while Wells Fargo's Chief Operating Officer, Scott Powell, spent roughly 90% of his time on those issues. Scharf reassured the American public, stating, "I am focused on fixing these issues that we have, which are these regulatory problems and the underlying control infrastructure work, and that has to come before everything."

226.    Market analysts echoed similar sentiments. For example, R. Scott Siefers, an analyst at Sandler O'Neill & Partners, noted that dealing with Wells Fargo's regulators "will be job No. 1, 2 and 3" for Scharf. Piper Sandler published a report in February 2020 noting that "[n]ew CEO Charlie Scharf has made it clear that resolving the company's myriad regulatory issues is among his top priorities."

227.    Scharf and the rest of Wells Fargo's senior executives remained laser focused on fixing the Company's regulatory issues prior to and during the Class Period. Indeed, during each of the Company's

Class Period earnings calls with investors, Wells Fargo's regulatory issues and risk and control infrastructure was flagged as the Company's highest priority.

228.    During Wells Fargo's fourth quarter 2020 earnings call with investors on January 15, 2021, Scharf stated: "We still have significant work to do, but we are diligently doing what's necessary, issue by issue. It will continue to be our top priority to dedicate all necessary resources and make meaningful progress on this critical work." During the same call, an analyst stated, "Charlie, you mentioned in your prepared remarks that the bank's #1 focus is building the right management team." In response, Scharf corrected him stating, "so just -- first of all, our #1 priority is getting the risk and regulatory work done . . . ."

229.    In response to a question about the Company's Asset Cap during its first quarter 2021 earnings call with investors on April 14, 2021, Mike Santomassimo, Wells Fargo's CFO, stated, "as Charlie has said a couple of times on the call, that we're -- it's our top priority, and we're continuing to do whatever we need to do to sort of work our way through that." During Wells Fargo's second quarter 2021 earnings call with investors on July 14, 2021, Scharf told the market that "continuing to build the risk and control infrastructure and satisfy the regulatory requirements is a gate to a really successful future of ours that we need to get through."

230.    On October 14, 2021, during the Company's third quarter 2021 earnings call with investors, Scharf explained that "building an appropriate risk and control infrastructure has been and remains Wells Fargo's top priority," and again noted, "we are committed to devoting the resources necessary to our risk and regulatory work." During Wells Fargo's fourth quarter 2021 earnings call with investors on January 14, 2022, Scharf once again emphasized that "we continued to prioritize our risk and control work," and also claimed, "[w]e are laser-focused on meeting our own expectations and those of our regulators. We have clear plans in place and clear owners for every regulatory deliverable we have." And during Wells Fargo's first quarter 2022 earnings call with investors on April 14, 2022, Scharf once again stated that "[b]uilding an appropriate risk and control infrastructure remains our top priority."

231.    Likewise, in a July 15, 2022 Form 8-K, filed after the Class Period, Scharf was quoted as stating: "Our work to build an appropriate risk and control infrastructure is ongoing and remains our top priority." Similarly, in an October 14, 2022 Form 8-K, Scharf was quoted as stating: "Our top priority

remains strengthening our risk and control infrastructure which includes addressing open historical issues and issues that are identified as we advance this work."

232. Defendants' persistent messaging about the importance of, and their focus on, resolving Wells Fargo's regulatory issues and implementing adequate controls supports the strong inference that they knew, or were deliberately reckless in not knowing, of the false and misleading nature of their statements about the Company's diverse hiring efforts and the Diverse Search Requirement during the Class Period, as set forth above.

> **D.** **Wells Fargo's Statements After The New York Times' May 19 Article And The Temporal Proximity Of Those Statements To The Announcement That The Diverse Search Requirement Would Be Paused And Revelation Of The Relevant Truth Further Support Scienter**

233. As described above in Section IV.K., on May 19, 2020, The New York Times reported that current and former Wells Fargo employees confirmed that the Wealth Management business within Wells Fargo regularly conducted "fake" interviews of diverse candidates for positions that had already been filled.

234. However, less than two weeks after those allegations surfaced, in Wells Fargo's 2022 DE&I Report published on June 1, 2022, the Company again stated, "*[f]or most posted roles in the U.S. with total direct compensation greater than $100,000 per year, Wells Fargo requires that at least 50% of the interview candidates must represent a historically under-represented group with respect to at least one diversity dimension*."

235. Just two days later, on June 3, 2022, Business Insider published an article entitled, *Wells Fargo's first diversity report shows progress but also that work remains to make Wall Street look more like Main Street*, that reported on the Company's 2022 DE&I Report published two days earlier. The article reported that:

> Wells Fargo's Santos said the bank was focused on improving diversity among leaders. In 2020, the banking giant instituted a rule that for all posted roles in the US with annual compensation greater than $100,000, at least half of interview candidates must be from a historically underrepresented group.
>
> **The rule is working**, Santos said.

236.     Then, just a few days later, on Monday, June 6, 2022, The New York Times reported that Wells Fargo had announced that it was pausing the Diverse Search Requirement. Specifically, The New York Times reported that "[o]n Monday, Mr. Scharf told employees that the policy would be put on hold for several weeks **to give the bank's leaders time to study its use** and make changes." The New York Times further reported that "[t]he pause would allow the bank to gain confidence that 'the guidelines live up to their promise,' and that 'hiring managers, senior leaders and recruiters fully understand how the guidelines should work,' Mr. Scharf said in the letter."

237.     That Defendants made the statements in ¶¶234-35 (*see also* ¶¶202-03), above, **after** the publication of The New York Times' May 19 article supports the strong inference that Defendants knew, or were deliberately reckless in not knowing, of the false and misleading nature of their statements.

238.     In fact, in Scharf's sworn testimony before the United States House of Representatives Committee on Financial Services on September 21, 2022—i.e., more than three months **after** Defendants made the statements in ¶¶234-35 (*see also* ¶¶202-03)—he admitted that the Company was still investigating whether "fake" interviews had taken place. Specifically, he was asked by Chairwoman Waters whether it was true "that you interviewed an African-American employee for a position after you had already hired a white employee?" In response, Scharf stated: "**We are in the middle of continuing an investigation** to make sure that we understand every instance where people felt as if they were not treated fairly, and if we have findings, we will take appropriate action." This underscores that, at a minimum, Defendants' statements continuing to tout the Diverse Search Requirement after the May 19 article were deliberately reckless.

239.     In addition, the close temporal proximity between Defendants' June 1 and 3, 2022 statements in ¶¶234-35 (*see also* ¶¶202-03) above, and the June 6, 2022 announcement that the Company had temporarily suspended the Diverse Search Requirement in order to give Wells Fargo's leaders "time to study its use and make changes" and "gain confidence that 'the guidelines live up to their promise,' and that 'hiring managers, senior leaders and recruiters fully understand how the guidelines should work'" supports a strong inference of scienter.

240.     The close temporal proximity between Defendants' June 1 and 3, 2022 statements in ¶¶234-35 (*see also* ¶¶202-03) above, and the June 9, 2022 corrective disclosure the very next week also

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

supports a strong inference of scienter. The close temporal proximity between Defendants' statements once again emphasizing the Diverse Search Requirement and the revelation of the relevant truth ***just six and eight days later*** that Wells Fargo conducted widespread "fake" interviews of diverse candidates who the Company had no intention of hiring throughout the Company's divisions supports the strong inference that Defendants knew, or were deliberately reckless in not knowing, of the false and misleading nature of their statements about the Company's diverse hiring efforts and the Diverse Search Requirement during the Class Period, as set forth above.

## VII.    <u>LOSS CAUSATION</u>

241.    As a result of Defendants' materially false and misleading statements, omissions of material facts, and fraudulent course of conduct, Wells Fargo's publicly traded common stock traded at artificially inflated prices during the Class Period. Relying on the integrity of the market price for Wells Fargo common stock and public information related to Wells Fargo, Plaintiffs and other Class members purchased or otherwise acquired Wells Fargo common stock at prices that incorporated and reflected Defendants' misrepresentations and omissions of material fact alleged herein. As a result of their purchases of Wells Fargo common stock during the Class Period at artificially inflated prices and the removal of that inflation upon the disclosures set forth in *infra* ¶¶245-50, Plaintiffs and the Class suffered economic losses (i.e., damages) under the federal securities laws.

242.    Defendants' false and misleading statements, material omissions, and deceptive course of conduct had their intended effect, directly and proximately causing Wells Fargo common stock to trade at artificially inflated prices during the Class Period, with a closing price as high as $59.06 per share on February 9, 2022. Those misrepresentations and omissions of material fact that were not immediately followed by an upward movement in the price of Wells Fargo common stock served to maintain the price of Wells Fargo common stock at an artificially inflated level.

243.    Had Defendants been truthful about Wells Fargo's hiring practices during the Class Period, Plaintiffs and other Class members would not have purchased or otherwise acquired their Wells Fargo common stock at the artificially inflated prices at which they traded. It was entirely foreseeable to Defendants that misrepresenting and concealing material facts from the public would artificially inflate the price of Wells Fargo common stock. The economic losses (i.e., damages suffered by Plaintiffs and other

members of the Class) were a direct, proximate, and foreseeable result of Defendants' materially false and misleading statements and omissions of material fact, which artificially inflated the price of the Company's common stock, and the subsequent significant decline in the value of the Company's common stock when the relevant truth was revealed and/or the risks previously concealed by Defendants' material misrepresentations and omissions materialized.

244.    Plaintiffs and other Class members suffered actual economic loss and were damaged when the material facts and/or the foreseeable risks concealed or obscured by Defendants' misrepresentations and omissions were revealed and/or materialized through the disclosure of new information concerning Wells Fargo on June 9, 2022. As alleged in this Section, the disclosure of the relevant truth and/or materialization of the foreseeable risks concealed by Defendants' fraud directly and proximately caused a foreseeable decline in the price of Wells Fargo common stock by removing the artificial inflation in the price of Wells Fargo common stock that resulted from Defendants' fraud. The timing and magnitude of the decline in the price of Wells Fargo common stock, as detailed herein, negate any inference that the loss suffered by Plaintiffs and the Class was caused by changed market conditions or other macroeconomic factors unrelated to Defendants' fraudulent conduct.

245.    On June 9, 2022, The New York Times published an article entitled, *Federal Prosecutors Open Criminal Inquiry of Wells Fargo's Hiring Practices*. The article disclosed that:

> At Wells Fargo, one of the nation's largest banks, with nearly 250,000 employees, sham interviews occurred across multiple business lines, including its mortgage servicing, home lending and retail banking operations. The Times report last month focused on the bank's wealth management business.
>
> Since then, another 10 current and former employees have shared stories about how they were subject to fake interviews, or conducted them, or saw paperwork documenting the practice. The people spoke on the condition of anonymity because they feared retaliation from Wells Fargo or their current employers.

246.    The article noted that:

> These sham interviews were the result of the bank's quest to increase diversity — a noble goal that became twisted in practice because, some employees said, it was more about recording the bank's efforts to hire more minorities than actually hiring them.
>
> The practice was tied to Wells Fargo's "diverse slate" policy, which stipulated that at least half the candidates interviewed for jobs paying $100,000 or more needed to be "diverse." The rule was put in place in mid-2020. However, the practice of conducting fake interviews existed long before then, because Wells Fargo had a similar unwritten policy.

247.    The article further reported that:

> In some instances, there were written records of the practice of conducting fake interviews. In late 2020, just days after Wells Fargo offered a job to a person who counted as "diverse" by the bank's standards, a human resources employee asked that person to apply for a different job at the bank, according to an email reviewed by The Times.
>
> The first offer was still on the table, the Wells Fargo employee explained, but the bank also wanted to show that it had "qualified candidates" for both roles. "Simply book keeping for us," the employee wrote in the email.
>
> When asked about the human resources employee's message, [Bei Ling, Wells Fargo's Head of HR] said: "We're reviewing the communications."

248.    The article further disclosed that Wells Fargo was under federal criminal investigation for the sham interview practices:

> Authorities are investigating whether the bank violated federal anti-discrimination laws by conducting sham interviews of minority candidates.
>
> Federal prosecutors in New York have opened a criminal investigation into whether Wells Fargo violated federal laws by conducting sham interviews of minority and female job candidates, according to two people with knowledge of the inquiry.
>
> The investigation is being conducted by members of a newly created civil rights unit inside the criminal division of the Manhattan U.S. attorney's office, the people said. . . .
>
> . . . .
>
> In creating the civil rights unit, [Damian Williams, the United States attorney for the Southern District of New York] said federal authorities needed to reconsider how the justice system treated issues of discrimination. Pursuing criminal cases, he said, would make efforts to get justice for victims of discrimination "more effective."

249.    The article also discussed the new revelations in the context of Wells Fargo's previously disclosed wrongdoing, noting that:

> Wells Fargo has been working its way through an organization-wide cleanup of its business practices for the past five years. Beginning in 2016, it was publicly revealed that the bank had been opening fake accounts in customers' names without their knowledge, charging some of them bogus fees on mortgage loans and forcing others to buy unnecessary auto insurance. The scandals have cost the bank more than $4.5 billion in fines.
>
> In early 2018, the Federal Reserve imposed an asset cap on Wells Fargo, restricting it from growing until regulators were satisfied that its risk management practices and its treatment of customers had stabilized. The bank's leadership has turned over since then, and Mr. Scharf took over in the fall of 2019. Regulators have still not given Wells Fargo the all-clear.
>
> Its woes have continued.

250.    That same day, in response to The New York Times article, Wells Fargo issued a press release acknowledging that "[n]o one should be put through an interview without a real chance of receiving an offer, period." Wells Fargo also explained that "it's important that implementation of our guidelines is consistent. Earlier this week, the company temporarily paused the use of its diverse slate guidelines. During this pause, the company is conducting a review so that hiring managers, senior leaders and recruiters fully understand how the guidelines should be implemented – and so we can have confidence that our guidelines live up to their promise."

251.    On this news, the price of Wells Fargo common stock fell $4.55, or 10.2%, over two days, from a close of $44.63 per share on June 8, 2022, to a close of $40.08 on June 10, 2022.

252.    In a same-day article entitled, *Wells Fargo is under federal investigation for conducting fake job interviews of minority candidates, report says*, Fortune reported that Wells Fargo "is being investigated by the civil-rights unit of the Manhattan U.S. attorney's office, the New York Times reported . . . ." It further noted that on June 9, "[t]he stock fell 4.4% to $42.67." Fortune also reported that "[t]he probe is the latest potential blow to Wells Fargo's public image. The bank has been dealing with a series of scandals and regulatory issues for years, and is operating under a growth cap imposed by the Federal Reserve."

253.    The following day, June 10, 2022, Barron's wrote that "Wells Fargo is under criminal investigation over a scandal involving accusations the company conducted bogus job interviews with diverse candidates after positions had already been filled, according to a report in the New York Times." Barron's further reported that "Wells Fargo shares fell 6% Friday [June 10] to $40.08 and reached a 52-week low of $40.02 in intraday trading."

## VIII.    CLASS ACTION ALLEGATIONS

254.    Plaintiffs bring this action as a class action under Rule 23 of the Federal Rules of Civil Procedure on behalf of the Class consisting of all persons and entities who purchased or acquired Wells Fargo common stock between February 24, 2021, and June 9, 2022, both dates inclusive (the "Class"). Excluded from the Class are Defendants and their families, the officers, directors, and affiliates of Defendants, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

255.     The members of the Class are so numerous that joinder of all members is impracticable. Wells Fargo common stock is actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are thousands of members in the proposed Class because over 3.79 billion shares of Wells Fargo common stock were outstanding as of April 22, 2022. Record owners and other members of the Class may be identified from records maintained by Wells Fargo or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

256.     Plaintiffs' claims are typical of Class members' claims, as all Class members are similarly affected by Defendants' wrongful conduct in violation of federal law as complained of herein.

257.     Plaintiffs will fairly and adequately protect the Class members' interests and have retained counsel competent and experienced in class and securities litigation.

258.     Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members. Among the questions of law and fact common to the Class are:

a.     whether Defendants violated the Exchange Act and Rule 10b-5 promulgated thereunder;

b.     whether Defendants made materially false or misleading statements or omissions of material fact during the Class Period;

c.     whether Defendants acted with the requisite level of scienter;

d.     whether and to what extent the price of Wells Fargo common stock was artificially inflated during the Class Period because of the materially misleading statements and omissions alleged herein;

e.     whether the market for Wells Fargo common stock was efficient;

f.     whether Scharf was a controlling person of the Company; and

g.     whether the members of the Class have sustained damages as a result of the conduct complained of herein and, if so, the appropriate measure of damages.

259.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for Class members to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## IX.    A PRESUMPTION OF RELIANCE APPLIES

260.    At all relevant times, the market for Wells Fargo's common stock was an efficient market for the following reasons, among others:

a.    Wells Fargo's common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

b.    As a regulated issuer, Wells Fargo filed periodic public reports with the SEC and NYSE;

c.    Wells Fargo regularly and publicly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

d.    Wells Fargo was followed by several securities analysts employed by major brokerage firm(s) who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firm(s). Each of these reports was publicly available and entered the public marketplace.

261.    As a result of the foregoing, the market for Wells Fargo's common stock promptly digested current information regarding Wells Fargo from all publicly available sources and reflected such information in the price of Wells Fargo's common stock. Under these circumstances, all purchasers and acquirers of Wells Fargo's common stock during the Class Period suffered similar injury through their purchase or acquisition of Wells Fargo's common stock at artificially inflated prices and the presumption of reliance applies.

262.    Further, at all relevant times, Plaintiffs and all other Class members reasonably relied upon Defendants to disclose material information as required by law and in the Company's SEC filings. Plaintiffs and other Class members would not have purchased or otherwise acquired Wells Fargo common stock at artificially inflated prices if Defendants had disclosed all material information as required. Thus,

to the extent that Defendants concealed or improperly failed to disclose material facts with regard to the Company and its business, Plaintiffs and other Class members are entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972).

## X.   THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE ARE INAPPLICABLE

263.   The PSLRA's statutory safe harbor and the bespeaks caution doctrine applicable to forward-looking statements under certain circumstances does not apply to any of the materially false and misleading statements alleged herein.

264.   None of the statements complained of herein was a forward-looking statement. Rather, each was a historical statement or a statement of purportedly current facts and conditions at the time such statement was made.

265.   To the extent that any of the materially false and misleading statements alleged herein can be construed as forward-looking, any such statement was not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statement.

266.   To the extent that the statutory safe harbor does apply to any forward-looking statement alleged herein, Defendants are liable for any such statement because at the time such statement was made, the particular speaker actually knew that the statement was false or misleading, and/or the statement was authorized and/or approved by an executive officer of Wells Fargo who actually knew that such statement was false when made.

267.   Moreover, to the extent that any Defendant issued any disclosures purportedly designed to "warn" or "caution" investors of certain "risks," those disclosures were also materially false and/or misleading when made because they did not disclose that the risks that were the subject of such warnings had already materialized and/or because such Defendant had the requisite state of mind.

1  **XI.    CAUSES OF ACTION**

2  **COUNT ONE**

3
4  **Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder**
**Against Defendants**

5       268.    Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth
6  herein.

7       269.    During the Class Period, Defendants carried out a plan, scheme, and course of conduct that
8  was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs
9  and the Class; and (ii) cause Plaintiffs and the Class to purchase or otherwise acquire Wells Fargo common
10  stock at artificially inflated prices. In furtherance of this unlawful scheme, plan, and course of conduct,
11  Defendants took the actions set forth herein.

12       270.    Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue
13  statements of material fact and/or omitted material facts necessary to make the statements not misleading;
14  and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the
15  purchasers or acquirers of Wells Fargo common stock in an effort to maintain artificially high market prices
16  thereof in violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5.

17       271.    During the Class Period, Defendants made the false statements specified above, which they
18  knew or deliberately recklessly disregarded to be false and misleading in that they contained
19  misrepresentations and failed to disclose material facts necessary in order to make the statements made, in
20  light of the circumstances under which they were made, not misleading.

21       272.    Defendants had actual knowledge of the misrepresentations and omissions of material fact
22  as set forth herein or deliberately recklessly disregarded the true facts that were available to them.
23  Defendants engaged in this misconduct to conceal Wells Fargo's true condition from the investing public
24  and to support the artificially inflated prices of Wells Fargo's common stock.

25       273.    Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the
26  market, they paid for or otherwise acquired Wells Fargo common stock at inflated prices. Plaintiffs and
27  the Class would not have purchased or otherwise acquired Wells Fargo common stock at such prices, or at

28

all, had they been aware that the market prices for Wells Fargo common stock had been artificially inflated by Defendants' fraudulent course of conduct.

274.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the Class suffered damages in connection with their respective purchases or acquisitions of Wells Fargo common stock during the Class Period.

### COUNT TWO

**Violation of Section 20(a) of the Exchange Act**
**Against Defendant Scharf**

275.     Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

276.     Scharf acted as a controlling person of Wells Fargo, Santos, and Sanchez within the meaning of Section 20(a) of the Exchange Act. By virtue of his high-level position, and his ownership and contractual rights, participation in and/or awareness of the Company's operations, and/or intimate knowledge of the false statements filed by the Company with the SEC and disseminated to the investing public, Scharf had the power to influence and control—and did influence and control, directly or indirectly—the decision-making of the Company, Santos, and Sanchez, including the content and dissemination of the various false and/or misleading statements alleged herein. Scharf was provided with or had unlimited access to copies of the Company's reports and other statements alleged by Plaintiffs to be false and misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

277.     In particular, Scharf had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the activities giving rise to the securities violations as alleged herein, and exercised the same.

278.     As described above, Wells Fargo and the Individual Defendants each violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 by their acts and omissions as alleged herein. By virtue of his position as a controlling person, Scharf is liable under Section 20(a) of the Exchange Act. As a direct and proximate result of this wrongful conduct, Plaintiffs and Class members suffered damages in connection with their purchases or acquisitions of Wells Fargo common stock during the Class Period.

XII.    **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully pray for judgment as follows:

A.    Determining that this action is a proper class action maintained under Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, certifying Plaintiffs as class representatives, and appointing Kessler Topaz Meltzer & Check, LLP as class counsel pursuant to Rule 23(g);

B.    Declaring and determining that Defendants violated the Exchange Act by reason of the acts and omissions alleged herein;

C.    Awarding Plaintiffs and the Class compensatory damages against all Defendants, jointly and severally, in an amount to be proven at trial together with prejudgment interest thereon;

D.    Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including but not limited to, attorneys' fees and costs incurred by consulting and testifying expert witnesses; and

E.    Granting such other and further relief as the Court deems just and proper.

XIII.    **DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a trial by jury.

Dated:  January 31, 2023                          Respectfully submitted,

                                               **KESSLER TOPAZ MELTZER**
                                                 **& CHECK, LLP**

                                              */s/ Jennifer L. Joost*
                                              JENNIFER L. JOOST (Bar No. 296164)
                                              (jjoost@ktmc.com)
                                              STACEY M. KAPLAN (Bar No. 241989)
                                              (skaplan@ktmc.com)
                                              One Sansome Street, Suite 1850
                                              San Francisco, CA 94104
                                              Tel:    (415) 400-3000
                                              Fax:    (415) 400-3001

                                                       -and-

                                              SHARAN NIRMUL*
                                              (snirmul@ktmc.com)
                                              GREGORY CASTALDO*
                                              (gcastaldo@ktmc.com)
                                              EVAN HOEY*
                                              (ehoey@ktmc.com)

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

280 King of Prussia Road
Radnor, PA 19087
Tel:    (610) 667-7706
Fax:    (610) 667-7056

*Counsel for SEB Investment Management AB and
Lead Counsel for the Putative Class*

**SAXENA WHITE P.A.**
LESTER R. HOOKER (SBN 241590)
lhooker@saxenawhite.com
DIANNE M. PITRE (SBN 286199)
dpitre@saxenawhite.com
7777 Glades Road, Suite 300
Boca Raton, FL 33434
Tel:    (561) 394-3399
Fax:    (561) 394-3382

*Counsel for Additional Plaintiff West Palm Beach
Firefighters' Pension Fund*

**KLAUSNER KAUFMAN JENSEN &
LEVINSON**
ROBERT D. KLAUSNER**
bob@robertdklausner.com
BONNI S. JENSEN**
7080 Northwest 4th Street
bonni@robertdklausner.com
Plantation, FL 33317
Tel:    (954) 916-1202
Fax:    (954) 916-1232

*Board Counsel for Additional Plaintiff West Palm
Beach Firefighters' Pension Fund*

*appearance pro hac vice

**pro hac vice application forthcoming