UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SEB INVESTMENT MANAGEMENT AB, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>WELLS FARGO & COMPANY, et al.,<br><br>Defendants. | Case No. 22-cv-03811-TLT<br><br>**ORDER GRANTING MOTION TO DISMISS**<br><br>Re: ECF No. 100 |

Pending before the Court is Defendants Wells Fargo & Company, Charles W. Scharf, Kleber R. Santos, and Carly Sanchez's motion to dismiss Lead Plaintiff SEB investment Management AB and additional plaintiff West Palm Beach Firefighters' Pension Fund's Amended Complaint. ECF No. 100. The Court finds that Plaintiffs have not sufficiently pled the requirements of falsity and scienter as to the allegedly misleading statements.

Accordingly, Defendants' motion is **GRANTED.** Plaintiffs' claims for violation of Sections 10(b) and 20(a) of the Exchange Act are dismissed, **with leave to amend**.

**I.     BACKGROUND**

Plaintiffs bring this securities fraud class action against Defendants for making allegedly misleading statements between February 24, 2021, and June 9, 2022 ("Class Period"). Am. Compl. ("Complaint"), ECF No. 69.

Wells Fargo is a Delaware corporation headquartered in San Francisco, California, that provides financial services and employs over 247,000 people. *Id.* ¶¶ 31, 43. Scharf has been Wells Fargo's CEO since 2019. *Id.* ¶¶ 32, 75. Santos was Wells Fargo's Head of Diverse Segments, Representation, and Inclusion during the Class Period and was also the interim Head of Human Resources from April 23, 2021, to October 1, 2021. *Id.* ¶ 33. Sanchez was Wells Fargo's

EVP, Talent Acquisition, Affirmative Action/Equal Employment Opportunity, Diversity Recruiting during the Class Period. *Id.* ¶ 34.

In March 2020, Wells Fargo announced the Diverse Search Requirement, which required that "for most U.S. roles with total direct compensation greater than $100,000, at least 50% of interview candidates must be diverse with respect to at least one diversity dimension." *Id.* ¶¶ 6, 10. Race/ethnicity, gender, LBGTQ individuals, veterans, and people with disabilities were considered "diversity dimensions." *Id.* ¶ 125. Defendants discussed the Diverse Search Requirement on multiple instances, including (1) Wells Fargo's 2020 Annual Report, released on February 23, 2021; (2) Wells Fargo's March 2021 Proxy, filed on March 16, 2021; (3) Wells Fargo's 2020 Social Impact and Sustainability Highlights, filed on April 26, 2021; (4) Scharf's testimony before the United States Senate Committee on Banking, Housing, and Urban Affairs on May 26, 2021; (5) Wells Fargo's 2021 ESG Report, published on July 15, 2021; (6) Sanchez's interview on Talent Acquisition Next Practices Monthly on October 7, 2021; (7) Wells Fargo's Priority Recommendations of the Wells Fargo Human Rights Impact Assessment and Actions in Response, published on February 15, 2022; (8) Wells Fargo's March 2022 Proxy, filed on March 14, 2022; (9) Wells Fargo's 2022 DE&I Report, published on June 1, 2022; and (10) Business Insider's article on June 3, 2022, with comments from Sanchez. *Id.* ¶¶ 189–203.

On May 19, 2022, the New York Times published an article titled "At Wells Fargo, a Quest to Increase Diversity Leads to Fake Job Interviews." *Id.* ¶ 158. The article alleged that Wells Fargo's Wealth Management division regularly conducted sham interviews of diverse candidates for positions that had already been filled. *Id.* ¶ 157. Wells Fargo issued a statement on May 20, 2022, denying the claim. *Id.* ¶ 162. On May 27, 2022, Business Insider published an article titled "Wells Fargo exec responds to reports that it denied mortgages to Black applicants and held sham job interviews." *Id.* ¶ 163. On June 3, 2022, Business Insider published another article titled "Wells Fargo's first diversity report shows progress but also that work remain to make Wall Street look more like Main Street." *Id.* ¶ 165. On June 6, 2022, Scharf announced suspension of the hiring policy, as reported by The New York Times in an article titled "Wells Fargo Announces 'Pause' of Policy That Led to Fake Job Interviews." *Id.* ¶¶ 166–67.

1    Subsequently, on June 9, 2022, The New York Times reported in an article titled "Federal
2  Prosecutors Open Criminal Inquiry of Wells Fargo's Hiring Practices" that additional employees
3  confirmed the sham interviews and that the United States Attorney's Office for the Southern
4  District of New York had opened an investigation. *Id.* ¶ 168.
5    The price of Wells Fargo common stock dropped 10.2% from a close of $44.63 on June 8,
6  2022, to $40.08 on June 10, 2022. *Id.* ¶ 170.
7    Plaintiffs alleged that during the Class Period, Defendants made material
8  misrepresentations and omissions in statements discussing the Diverse Search Requirement. *Id.* ¶
9  1. Plaintiffs bring this action for (1) violation of violation of Section 10(b) of the Securities
10 Exchange Act ("Exchange Act") and Rule 10b-5 promulgated thereunder and (2) violation of
11 Section 20(a) of the Exchange Act. Defendants filed the instant motion to dismiss. ECF No. 100.
12 The Court heard oral arguments on August 15, 2023. ECF No. 110.

## II.   JUDICIAL NOTICE

"The Court may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). The Court may "consider materials that are submitted with and attached to the Complaint. [The Court] may also consider unattached evidence on which the complaint 'necessarily relies' if: (1) the complaint refers to the document; (2) the document is central to the plaintiff's claim; and (3) no party questions the authenticity of the document." *United States v. Corinthian Colleges*, 655 F.3d 984, 999 (9th Cir. 2011).

Defendants request judicial notice of six exhibits. ECF No. 100-2. Plaintiffs oppose. ECF No. 102-1.

### A.   Exhibits A, E

Exhibit A is Wells Fargo's 2022 Form 10-K filed on February 21, 2023. Exhibit E is a press release issued by the Federal Reserve Board on February 2, 2018. Both exhibits are readily available on government websites, and Plaintiffs do not contest their accuracy.

Defendants cite Exhibit A in their motion for the purpose of supporting the background

information that Wells Fargo employs 250,000 people across four business lines.  Mot. at 3:18–20.  Defendants cite Exhibit E to support their argument that Wells Fargo's regulatory challenges "have nothing to do with the allegations in this case." *Id.* at 6:16.  As the Court finds that facts from these exhibits are not needed to resolve the instant motion, the Court takes judicial notice of only the existence and availability of Exhibits A and E.

### B. Exhibits B–D, F

Exhibit B is an article published by Business Insider on June 3, 2022, titled "Wells Fargo's first diversity report shows progress but also that work remains to make Wall Street look like Main Street."  Exhibit C is an article published by The New York Times on June 6, 2022, titled "At Wells Fargo, a Quest to Increase Diversity Leads to Fake Job Interviews."  Exhibit D is an article published by The New York Times on June 9, 2022, titled "Federal Prosecutors Open Criminal Inquiry of Wells Fargo's Hiring Practices."  Exhibit F is an article published by Business Inside on May 27, 2022, titled "Wells Fargo exec responds to reports that it denied mortgages to Black applicants and held sham job interviews."  The parties do not dispute that these exhibits are authentic.

Defendants argue that these four exhibits are incorporated by reference in Plaintiffs' complaint.  The Court agrees.  "[I]ncorporation-by-reference is a judicially created doctrine that treats certain documents as though they are part of the complaint itself. The doctrine prevents plaintiffs from selecting only portions of documents that support their claims, while omitting portions of those very documents that weaken—or doom—their claims." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1002 (9th Cir. 2018) (citation omitted).

The Complaint quotes directly from these four articles. *See, e.g.*, Compl. ¶¶ 163, 165, 166, 168.  In addition, rather than as a passing reference, Plaintiffs rely on these articles to form the basis of their claims.  For example, Plaintiffs cite to statements in an article from a former Wells Fargo employee, Joe Bruno, to support their allegation that sham interviews took place.  Thus, this is not a situation where "the mere mention of the existence of a document is insufficient to incorporate the contents of a document." *Khoja*, 899 F.3d at 1002 (citation omitted).  Moreover, during oral argument, Plaintiffs conceded that the Court may take judicial notice of these exhibits

4

for their existence and their content. As such, the Court finds that Exhibits B–D and F are incorporated by reference into Plaintiffs' Complaint. The Court takes judicial notice of these articles for their existence and their content but not for the truth of the matter. *See In re Kalobios Pharms., Inc. Sec. Litig.*, 258 F. Supp. 3d 999, 1003 (N.D. Cal. 2017) ("Judicial notice of news articles may be appropriate in securities fraud cases to show 'that the market was aware of the information contained in news articles.'") (citation omitted). The Court does not take judicial notice of the statistics included in Exhibit D, as the parties dispute those facts.

### III. LEGAL STANDARD

Under Rule 12(b)(6), a party may move to dismiss for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To overcome a motion to dismiss, a plaintiff's "factual allegations [in the complaint] 'must . . . suggest that the claim has at least a plausible chance of success.'" *Levitt v. Yelp! Inc.*, 765 F.3d 1123, 1135 (9th Cir. 2014) (citing *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) and *Bell Atlantic Corporation v. Twombly*, 550 U.S. 544 (2007)). The court "accept[s] factual allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). However, "conclusory allegations of law and unwarranted inferences are insufficient to avoid a Rule 12(b)(6) dismissal." *Cousins v. Lockyer*, 568 F.3d 1063, 1067 (9th Cir. 2009).

"Securities fraud class actions must meet the higher, more exacting pleading standards of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act ('PSLRA')." *Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 604 (9th Cir. 2014). Rule 9(b) dictates that the "circumstances constituting fraud or mistake shall be stated with particularity." Fed. R. Civ. Proc. 9(b). It is not enough for a plaintiff merely to identify an allegedly fraudulent statement made by defendants. *In re GlenFed, Inc. Secs. Litig.*, 42 F.3d 1541, 1548 (9th Cir. 1994) (en banc). Plaintiffs must allege "why the disputed statement was untrue or misleading when made." *Id.* at 1549. Moreover, "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint

shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1)(B).

The PSLRA additionally requires a complaint to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind" with respect to each alleged false statement or omission. 15 U.S.C. § 78u-4(b)(2)(A). Plaintiffs alleging securities fraud must plead all the elements of a securities fraud action with particularity. *Or. Pub. Emps.*, 774 F.3d at 605.

## IV. DISCUSSION

### A. Section 10(b) of the Exchange Act and Rule 10b-5

"To recover damages for violations of section 10(b) and Rule 10b–5, a plaintiff must prove (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 267 (2014) (citation and modifications omitted). Here, Defendants challenge the first and second elements, falsity, and scienter.

#### 1. Falsity

"The PSLRA has exacting requirements for pleading 'falsity.' The plaintiff's complaint 'shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.'" *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1070 (9th Cir. 2008) (citing 15 U.S.C. § 78u–4(b)(1)). "[A] statement is misleading if it would give a reasonable investor 'the impression of a state of affairs that differs in a material way from the one that actually exists.'" *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008) (citation omitted). "A litany of alleged false statements, unaccompanied by the pleading of specific facts indicating why those statements were false, does not meet this standard." *Metzler*, 540 F.3d at 1070.

Defendants argue that Plaintiffs did not plausibly allege the falsity of the allegedly misleading statements.

6

### a. Description of the Diverse Search Requirement

Defendants contend that nine public statements describing the Diverse Search Requirement are not false:

(1) "*[I]n the U.S., we are requiring a diverse slate of candidates* — and a diverse interview team — *for most roles with total direct compensation of more than $100,000 per year*." Compl. ¶ 189 (emphasis in original).

(2) "*[I]n the U.S., we are requiring a diverse slate of candidates – and a diverse interview team – for most roles with total direct compensation of more than $100,000 per year.*" *Id.* ¶ 190 (emphasis in original).

(3) "Consistent with our commitment to advance diversity, equity, and inclusion (DE&I) and improve workforce diversity, *Wells Fargo has established Diversity Sourcing and Interview Team Guidelines that require diverse candidate slates and interview teams (referred to as our Diverse Search Requirement). . . The Diverse Search Requirement requires the following for most U.S. roles with total direct compensation greater than $100,000*: *At least 50% of interview candidates must be diverse with respect to at least one diversity dimension*." *Id.* ¶ 191 (emphasis in original).

(4) "*Our Diverse Search Requirement requires that for most U.S. roles with total direct compensation greater than $100,000, at least 50% of interview candidates must be diverse with respect to at least one diversity dimension . . . As of December 31, 2020, the Diverse Search Requirement*: *91% of applicable requisitions had a diverse interview slate*." *Id.* ¶ 192 (emphasis in original).

(5) "Scharf stated, among other things, 'for the hiring of many senior roles, *we have implemented guidelines that require a diverse slate of candidates (at least 50 percent) and a diverse interview panel*." *Id.* ¶ 193. (emphasis in original).

(6) "[T]he Company '*[r]equire[s] diverse candidate slates* and interview teams *for key roles with total direct compensation of more than $100,000*.' In this same portion of the 2021 ESG Report, Wells Fargo also stated: '*In the U.S., we now require that at least 50% of interview candidates identify with at least one diversity dimension* — and we require a diverse team of interviewers — *for most roles with total direct compensation of more than $100,000*." *Id.* ¶ 194 (emphasis and modifications in original).

(7) "*We also instituted diverse candidate slates and interview teams on most jobs of over $100,000 in total compensation.*" *Id.* ¶ 200 (emphasis in original).

(8) "Our DE&I commitments include a focus on hiring, promotions, and retention, and have been designed with increased accountability across those areas. These include: *Diverse Candidates[:] Diversity Sourcing and Interview Team Guidelines that require diverse candidate slates* and interview

7

        teams *for designated posted positions*." *Id.* ¶ 201 (emphasis and modifications in original).

    (9) "*For most posted roles in the U.S. with total direct compensation greater than $100,000 per year, Wells Fargo requires that at least 50% of the interview candidates must represent a historically under-represented group with respect to at least one diversity dimension* and at least one interviewer on the hiring panel must also represent a historically under-represented group with respect to at least one diversity dimension." *Id.* ¶ 202 (emphasis in original).

These statements largely describe the Diverse Search Requirement. Defendants contend that Plaintiffs failed to allege that they were false because Plaintiffs did not allege facts that the Diverse Search Requirement was not implemented or that it was not as described.

Plaintiffs instead, counter that even if the statements were literally true, they were nonetheless misleading when considered in context. Specially, Plaintiffs point to allegations that Wells Fargo conducted systemic sham interviews. *See* Opp'n at 12:12–15 ("Far from 'isolated incidents,' Plaintiffs allege, based on reports by over 25 current and former Wells Fargo employees, that fake interviews were widespread across myriad business lines and took place before and during the Class Period. This is more than sufficient.").

The Court agrees that a reasonable investor, under the circumstances alleged, would not expect sham interviews to be conducted to fulfill the Diverse Search Requirement. The PSLRA, however, requires particularized allegations sufficient to infer that sham interviews took place during the Class Period and that they were widespread. The Plaintiffs fall short of satisfying this requirement.

Plaintiffs' claim depends on Joe Bruno and confidential witnesses Former Employee 1 ("FE-1") and Former Employee 2 ("FE-2"). Bruno is a former Senior Vice President-Market Leader for the Wealth Management division in Jacksonville, Florida. Compl. ¶ 40. Meanwhile, FE-1 is a former employee in the HR Department from late 2012 to early 2022, most recently as a Military Acquisition Talent Liaison for the Wealth Management division. FE-2 is a contractor from early 2019 to early 2020 who was Corporate Recruiter for the Wealth Management division.

8

1   *Id.* ¶¶ 41–42.[1]  In addition, Plaintiffs cite to related news articles.

2   First, the Court notes that these three individuals relied upon by Plaintiffs are all from the Wealth Management division, similar to the focus of the May 19 article from The New York Times.  While The New York Times asserted in its article on June 9 that "sham interviews occurred across multiple business lines," Cullen Decl., Ex. D at 1, the article did not provide any particularized facts to support that statement.  Instead, the article stated only that additional anonymous current and former Wells Fargo employees have shared stories with The New York Times.  While Plaintiffs may rely on allegations that stem from news reports that cite anonymous sources, the articles here, and thus Plaintiffs, fall shy of providing particularized factual allegations that the alleged sham interviews also occurred outside of the Wealth Management division.  *See In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248, 1272 (N.D. Cal. 2000) ("To the extent that a newspaper article corroborates plaintiff's own investigation and provides detailed factual allegations, it can—at least in combination with plaintiff's investigative efforts—be a reasonable source of information and belief allegations."); *see also In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 985 (9th Cir. 1999), *as amended* (Aug. 4, 1999) ("It is not sufficient for a plaintiff's pleadings to set forth a belief that certain unspecified sources will reveal, after appropriate discovery, facts that will validate her claim.").  Plaintiffs must allege additional facts from their own investigation.

Moreover, while Plaintiffs' allegations are sufficient to draw the inference that some sham interviews likely occurred, as acknowledged by Defendants during oral argument, they fall short of the inference that sham interviews took place during the Class Period.  For example, while the May 19 article from The New York Times alleged the existence of sham interviews taking place prior to the implementation of the Diverse Search Requirement, and specifically before the start of the Class Period, the article contains only generalized allegations that sham interviews continued after the Diverse Search Requirement was announced and during the Class Period.  *See* Cullen Decl., Ex. C ("But six current and former Wells Fargo employees, including Mr. Bruno, said that

---

[1] Plaintiffs do not allege the locations where FE-1 and FE-2 were based during their employment with Wells Fargo.

9

1    fake interviews were conducted for many types of positions.  Three current employees said they
2    conducted fake job interviews or knew of them as recently as this year."); *see also* Compl. ¶ 139.
3    As the news reports do not provide particularized allegations of sham interviews during the Class
4    Period, they can only corroborate Plaintiffs' factual allegations.  Here, Plaintiffs included
5    allegations from only two identified individuals that were employed during the Class Period,
6    Bruno, and FE-1.  Plaintiffs, however, did not include particularized allegations from either to
7    suggest that sham interviews took place during the Class Period.  As Plaintiffs confirmed during
8    oral argument, they seek liability only for conduct during the Class Period.  Thus, alleging that
9    sham interviews took place without specifying whether they occurred during the Class Period is
10   not sufficient to meet the falsity requirement.  *See Or. Pub. Emps.*, 774 F.3d at 605 (noting that all
11   elements must be pled with particularity).

12        Relatedly, as Plaintiffs did not adequately allege that sham interviews took place during
13   the Class Period, they have also not adequately alleged that sham interviews were a widespread or
14   systemic practice during the Class Period.  While the parties disputed at oral argument the number
15   of sham interviews sufficient for the practice to be considered widespread, they do not dispute that
16   sham interviews must be widespread in order for the statements to be misleading.  The Court does
17   not set a threshold number but note that Plaintiffs must allege more than isolated incidents to
18   support Plaintiffs' theory that Defendants' statements were misleading due to widespread sham
19   interviews.

20        Lastly, the Court notes that Plaintiffs' allegations regarding FE-1 and FE-2 fall short of
21   drawing the inference that sham interviews occurred.  For example, FE-1 averred that "hiring
22   managers were directed by the senior lead to hire the referral and that the hiring managers had to
23   choose the non-diverse referral candidate," while FE-2 averred that "hiring managers often had a
24   candidate in mind for a position."  Compl. ¶¶ 145, 149.  As pled, these are not sufficient for the
25   Court to infer that non-standard hiring practices took place.

26        For the reasons above, the Court finds that Plaintiffs have not sufficiently pled that the
27   challenged statements are false.
28   //

### b. Sanchez and Santos

The Court does not separately address the statements by Sanchez and Santos, as the falsity of those statements likewise depend on the existence of widespread sham interviews. As such, the Court finds that Plaintiffs have not sufficiently pled falsity as to the challenged statements by Sanchez and Santos.

The Court notes that the challenged statements by Sanchez pertain to diverse candidate slates. For example, Plaintiffs argue that Sanchez' statement that Wells Fargo must not "sit back and wait and see who arrives in the candidate pool" was misleading because it "left investors with the misleading impression that the Company was effective in filling its candidate pools with diverse applicants who were being legitimately considered for open positions." Opp'n at 14:23–25. Plaintiffs, however, did not allege facts that pertain to Wells Fargo's effectiveness in "filling its candidate pools with diverse applicants." The Court notes that "pleading falsity under an omissions theory would be 'no small task for an investor.'" *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech.*, Inc., 856 F.3d 605, 615 (9th Cir. 2017) (quoting *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 194 (2015)).

The Court further notes that Plaintiffs do not explain how Santos's statement—"The rule is working"—is capable of being objectively verified. *See Or. Pub. Emps.*, 774 F.3d at 606 ("Statements by a company that are capable of objective verification are not 'puffery' and can constitute material misrepresentations.") (citation omitted).

### 2. Scienter

"To establish liability under § 10(b) and Rule 10b–5, a private plaintiff must prove that the defendant acted with scienter, 'a mental state embracing intent to deceive, manipulate, or defraud.'" *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 319 (2007) (citation omitted). Plaintiffs must show that "the defendants made false or misleading statements either intentionally or with deliberate recklessness." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 991 (9th Cir. 2009), *as amended* (Feb. 10, 2009). "'Deliberate recklessness' is more than '*mere* recklessness or a motive to commit fraud.' It is instead 'an *extreme* departure from the standards of ordinary care,' which 'presents a danger of misleading buyers or sellers that is either known to

11

the defendant or is so obvious that the actor must have been aware of it.'" *Nguyen v. Endologix, Inc.*, 962 F.3d 405, 414 (9th Cir. 2020) (citations omitted) (emphasis in original).

"The inquiry . . . is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs*, 551 U.S. at 322–23 (citation omitted). "[I]n determining whether the pleaded facts give rise to a 'strong' inference of scienter, the court must take into account plausible opposing inferences." *Id.* at 323. "[T]he inference of scienter must be more than merely 'reasonable' or 'permissible'—it must be cogent and compelling, thus strong in light of other explanations." *Id.* at 324. "A complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.*

### a. Individual Defendants

Plaintiffs argue that they adequately pled scienter because the individual Defendants were deliberately reckless in not knowing about the allegedly widespread and systemic fake interviews. Plaintiffs cite to a number of allegations as support—Bruno's accounts of widespread fake interviews; The New York Times articles; data kept of each job interview; the individual Defendants' positions and roles in various committees, etc. Plaintiffs also point to Wells Fargo's past regulatory challenges.

Defendants contend that Plaintiffs' allegations of the individual Defendants' scienter are insufficient because they are based on the Defendants' "positions and access to unspecified data, the Company's general focus on regulatory matters and improving diversity, and vague allegations from a handful of employees that never mention any of the individual Defendants." Reply at 9:14–17. The Court agrees that Plaintiffs fall short of adequately alleging scienter as to the individual Defendants.

The glaring issue with Plaintiffs' allegations is that there are no particularized allegations supporting a strong inference that each of the individual Defendants were aware or should have been aware of widespread sham interviews. Plaintiffs' allegations regarding the individual Defendants' positions, attendance at regular meetings, and reports received at those meetings are

12

1  insufficient, as they do not connect the individual Defendants to specific knowledge of the alleged
2  sham interviews. Even if the individual Defendants were focused on diversity initiatives,
3  Plaintiffs must nonetheless plead particularized facts regarding how information regarding
4  widespread sham interviews may have been included in a report to the individual Defendants,
5  presented at a meeting where the individual Defendants were present, or otherwise communicated
6  to the individual Defendants in a manner such that it would have been so obvious that they must
7  have been aware of it. *See Nguyen*, 962 F.3d at 414.

8      As the Court noted during oral argument, it is unlikely that records of sham interviews
9  were explicitly created. Thus, even if there was a "record of every job interview," *id.* ¶ 151, it is
10 unlikely that collectively the records amounted to a database of sham interviews. Despite this
11 difficulty, Plaintiffs must nonetheless allege more than that the sham interviews were "an open
12 secret at Wells Fargo" and that one employee had "complained for years to HR, to [] immediate
13 managers, and to senior leaderships." *See* Compl. ¶ 142.[2] While the New York Times articles
14 recited an email from an unnamed human resources employee, Plaintiffs do not allege how the
15 individual Defendants may have been aware of the email. *See id.* ¶¶ 142, 168, 247. Without such
16 allegations, the inference that the individual Defendants had or should have had knowledge of the
17 sham interviews is not as compelling as the alternative that they were not aware of this alleged
18 practice.

19     Lastly, Plaintiffs' allegations regarding other regulatory challenges by Wells Fargo is not
20 sufficient to imbue the individual Defendants with scienter of the fake interviews alleged in this
21 action. While Plaintiffs' attempt to tie them together under the broad general category of diversity
22 may add color to their claims, none of Wells Fargo's past regulatory issues dealt specifically with
23 sham interviews conducted to fulfill the Diverse Search Requirement. Thus, while Wells Fargo's
24 history provides some context for the allegedly misleading statements, it is not sufficient to confer
25 scienter.

26     Accordingly, whether individually or holistically, Plaintiffs' allegations fall short of a

---

[2] Plaintiffs do not specifically allege that the individual Defendants received or were aware of the complaints mentioned.

13

1    compelling inference that is "strong in light of other explanations"—that the individual
2    Defendants were not aware of the allegedly widespread sham interviews. *See Tellabs*, 551 U.S. at
3    324. Thus, the Court finds that Plaintiffs' allegations do not give rise to a strong inference of
4    scienter as to the individual Defendants.

### b.   Wells Fargo

"[A] corporation is responsible for a corporate officer's fraud committed 'within the scope of his employment' or 'for a misleading statement made by an employee or other agent who has actual or apparent authority.'" *In re ChinaCast Educ. Corp. Sec. Litig.*, 809 F.3d 471, 476 (9th Cir. 2015) (citation omitted). "The scienter of the senior controlling officers of a corporation may be attributed to the corporation itself to establish liability as a primary violator of § 10(b) and Rule 10b–5 when those senior officials were acting within the scope of their apparent authority." *Id.* (citation omitted).

As discussed above, the Court finds that Plaintiffs did not plausibly allege scienter as to the individual Defendants. Thus, there is no scienter that can be imputed to Wells Fargo. The Court does not separately address the parties' dispute regarding whether Plaintiff has adequately pled that individual Defendants made the statements contained in various statements and filings issued by Wells Fargo.

### B.   Section 20(a) of the Exchange Act

"In order to prove a prima facie case under § 20(a), plaintiff must prove: (1) a primary violation of federal securities laws . . .; and (2) that the defendant exercised actual power or control over the primary violator . . .." *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1065 (9th Cir. 2000) (citation omitted). "Section 20(a) provides derivative liability for those who control others found to be primarily liable under the Act." *Kyung Cho v. UCBH Holdings, Inc.*, 890 F. Supp. 2d 1190, 1205 (N.D. Cal. 2012) (citation omitted). "Where a plaintiff asserts a Section 20(a) claim based on an underlying violation of Section 10(b), the pleading requirements for both violations are the same." *Id.* (citation omitted).

As discussed above, the Court found that Plaintiffs failed to plausibly plead a violation of Section 10(b) of the Exchange Act. Accordingly, Plaintiffs' claim under Section 20(a) also fails

and is dismissed.

## V. CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is **GRANTED**. Plaintiffs' claims for violation of Sections 10(b) and 20(a) of the Exchange Act are **DISMISSED WITHOUT PREJUDICE**, **WITH LEAVE TO AMEND**. Plaintiffs may amend their complaint within 21 days of this Order. The parties next appear before the Court for a further Case Management Conference on October 5, 2023, at 2 PM via video. *See* ECF No. 96.

This Order terminates ECF No. 100.

**IT IS SO ORDERED.**

Dated: August 18, 2023

TRINA L. THOMPSON
United States District Judge