1   Brendan P. Cullen (SBN 194057)
    (cullenb@sullcrom.com)
2   Sverker K. Hogberg (SBN 244640)
    (hogbergs@sullcrom.com)
3   Alexis C. Holmes (SBN 321393)
    (holmesa@sullcrom.com)
4   SULLIVAN & CROMWELL LLP
    550 Hamilton Avenue
5   Palo Alto, CA 94301
    Telephone: (650) 461-5600
6   Fax: (650) 461-5700

7   *Counsel for Defendants Wells Fargo &
    Company, Charles W. Scharf, Kleber R.*
8   *Santos, and Carly Sanchez*

9   [Additional counsel listed on signature page]

10

11

12                    **UNITED STATES DISTRICT COURT**

13                  **NORTHERN DISTRICT OF CALIFORNIA**

14
     SEB INVESTMENT MANAGEMENT AB          Case No. 3:22-cv-03811-TLT
15   and WEST PALM BEACH FIREFIGHTERS'
     PENSION FUND, Individually and On      **DEFENDANTS' NOTICE OF MOTION**
16   Behalf of All Others Similarly Situated,   **AND MOTION FOR SUMMARY**
                                            **JUDGMENT; MEMORANDUM OF**
17                    Plaintiffs,            **POINTS AND AUTHORITIES IN**
                                            **SUPPORT THEREOF**
18          v.
                                            The Hon. Trina L. Thompson
19   WELLS FARGO & COMPANY, CHARLES W.      Courtroom:  9
     SCHARF, KLEBER R. SANTOS, and CARLY    Date:  September 9, 2025
20   SANCHEZ,                               Time:  2:00 p.m.

21                    Defendants.

22

23

24

25

26

27

28

## NOTICE OF MOTION AND MOTION

TO PLAINTIFFS AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on September 9, 2025 at 2:00 p.m., or as soon thereafter as counsel may be heard, in Courtroom 9 of the U.S. District Court for the Northern District of California, located at 450 Golden Gate Avenue, San Francisco, California 94102, Defendants Wells Fargo & Company ("Wells Fargo" or the "Company"), Charles W. Scharf, Kleber R. Santos, and Carly Sanchez will and hereby do move this Court to grant summary judgment to Defendants on Plaintiffs' claims for violations of the federal securities laws.  Defendants' Motion is based on the grounds that there are no material facts in genuine dispute on multiple elements of Plaintiffs' claims and that Defendants are entitled to judgment as a matter of law.

This Motion is made pursuant to Rule 56 of the Federal Rules of Civil Procedure, and is based on this Notice of Motion, the accompanying Memorandum of Points and Authorities, the accompanying declarations of Brendan P. Cullen and Ryan Ballew, all pleadings and papers filed herein, oral argument of counsel, and any matter that may be submitted at or after the hearing.

Dated:  July 7, 2025

/s/ *Brendan P. Cullen*
Brendan P. Cullen (SBN 194057)
(cullenb@sullcrom.com)
Sverker K. Hogberg (SBN 244640)
(hogbergs@sullcrom.com)
Alexis C. Holmes (SBN 321393)
(holmesa@sullcrom.com)
SULLIVAN & CROMWELL LLP
550 Hamilton Avenue
Palo Alto, CA 94301
Telephone: (650) 461-5600
Fax: (650) 461-5700

*Counsel for Defendants Wells Fargo & Company, Charles W. Scharf, Kleber R. Santos, and Carly Sanchez*

[Additional counsel listed on signature page]

# TABLE OF CONTENTS

**Page**

INTRODUCTION .................................................................................................................. 1

BACKGROUND .................................................................................................................... 4

    A.    Wells Fargo's Diverse Slates Guidelines ................................................ 4

    B.    *The New York Times* Articles and Resulting Government Investigations .............. 4

    C.    Plaintiffs' First Complaint and Defendants' Motion to Dismiss ........................... 5

    D.    The Operative Complaint and Defendants' Motion to Dismiss............................. 6

    E.    Plaintiffs Take Extensive Discovery ...................................................... 7

LEGAL STANDARD ............................................................................................................ 7

ARGUMENT ......................................................................................................................... 8

I.    PLAINTIFFS CANNOT ESTABLISH A TRIABLE ISSUE AS TO FALSITY. .............8

    A.    A Fake Interview Can Mean Only an Interview Where a Candidate Has No Shot at Getting the Job. ...................................................................... 8

    B.    Plaintiffs' Evidence Concerning Just a Handful of Purported Fake Interviews Cannot Establish that Fake Interviews Were Widespread. ................... 9

    C.    The Former Employees' Testimony Does Not Support the Existence of Widespread Fake Interviews During the Class Period. ....................................... 10

    D.    Joe Bruno's Declaration Is Not Evidence of Widespread Fake Interviews During the Class Period. ...................................................................... 15

    E.    Plaintiffs Cannot Prove that Mr. Santos's or Ms. Sanchez's Statements Were False. ........................................................................................ 16

II.    NO REASONABLE JURY COULD FIND THAT DEFENDANTS WERE AWARE OF WIDESPREAD FAKE INTERVIEWS DURING THE CLASS PERIOD. ...................................................................................................18

    A.    There Is No Evidence that Mr. Scharf Was Aware of Widespread Fake Interviews................................................................................... 18

    B.    There Is No Evidence that Kleber Santos Was Aware of Widespread Fake Interviews................................................................................... 21

    C.    There Is No Evidence that Carly Sanchez Was Aware of Widespread Fake Interviews................................................................................... 22

    D.    There Is No Evidence of Scienter With Respect to Any of the Six Statements Not Attributed to the Individual Defendants. ................................... 23

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

III.    PLAINTIFFS CANNOT PROVE LOSS CAUSATION BECAUSE THE JUNE 9, 2022 *NEW YORK TIMES* ARTICLE ABOUT FAKE INTERVIEWS WAS NOT NEW NEWS. ...............................................................................................................23

CONCLUSION........................................................................................................................... 25

SULLIVAN & CROMWELL LLP

1

**TABLE OF AUTHORITIES**

2

**Page(s)**

3

**Cases**

4

*Anderson* v. *Liberty Lobby, Inc.*,
    477 U.S. 242 (1986)....................................................................................................................7

*Angle* v. *Miller*,
    673 F.3d 1122 (9th Cir. 2012) ................................................................................................16

*In re Apple Comput., Inc. Sec. Litig.*,
    243 F. Supp. 2d 1012 (N.D. Cal. 2002), *aff'd*, 127 F. App'x 296 (9th Cir. 2005) ...............23

*Boca Raton Firefighters' & Police Pension Fund* v. *DeVry Inc.*,
    2012 WL 1030474 (N.D. Ill. Mar. 27, 2012)........................................................................10

*Briggs* v. *Blomkamp*,
    70 F. Supp. 3d 1155 (N.D. Cal. 2014) ..................................................................................10

*Cellularm Inc.* v. *Bay Alarm Co.*,
    1991 WL 332052 (N.D. Cal. Apr. 11, 1991) ........................................................................15

*Celotex Corp.* v. *Catrett*,
    477 U.S. 317 (1986)..................................................................................................................7

*In re Convergent Techs. Sec. Litig.*,
    948 F.2d 507 (9th Cir. 1991) ...................................................................................................8

*Das* v. *Unity Software Inc.*,
    2024 WL 1141733 (N.D. Cal. Mar. 15, 2024)......................................................................12

*Espy* v. *J2 Global, Inc.*,
    99 F.4th 527 (9th Cir. 2024) ..................................................................................................23

*Evanston Police Pension Fund* v. *McKesson Corp.*,
    2021 WL 4902420 (N.D. Cal. Oct. 21, 2021).................................................................4, 25

*In re Fannie Mae Sec. Litig.*,
    898 F. Supp. 2d 176 (D.D.C. 2012) ......................................................................................19

*Ferraro Fam. Found., Inc.* v. *Corcept Therapeutics Inc.*,
    501 F. Supp. 3d 735 (N.D. Cal. 2020) ..................................................................................10

*Gross* v. *AT&T Inc.*,
    2021 WL 9803956 (S.D.N.Y. Sept. 27, 2021), *aff'd* 2022 WL 17587853 (2d Cir. Dec.
    13, 2022) ................................................................................................................................10

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SULLIVAN & CROMWELL LLP

*Heavy & Gen. Laborers' Loc. 472 & 172 Pension & Annuity Funds* v. *Fifth Third Bancorp*,
  2022 WL 1642221 (N.D. Ill. May 24, 2022) ...................................................................19

*In re Herbalife, Ltd. Sec. Litig.*,
  2015 WL 1245191 (C.D. Cal. Mar. 16, 2015) ................................................................25

*Karam* v. *Corinthian Colls., Inc.*,
  2012 WL 8499135 (C.D. Cal. Aug. 20, 2012) ...........................................................10, 14

*Kelley* v. *AW Distrib., Inc.*,
  657 F. Supp. 3d 1237 (N.D. Cal. 2023) ....................................................................16, 20

*Lias* v. *County of Alameda*,
  2006 WL 13050 (N.D. Cal. Jan. 3, 2006) .................................................................13, 14

*Lloyd* v. *CVB Fin. Corp.*,
  811 F.3d 1200 (9th Cir. 2016) .....................................................................................25

*In re Oracle Corp. Sec. Litig.*,
  2009 WL 1709050 (N.D. Cal. June 19, 2009), *aff'd*, 627 F.3d 376 (9th Cir. 2010) ....................23, 25

*Pac. Gulf Shipping Co.* v. *Vigorous Shipping & Trading S.A.*,
  992 F.3d 893 (9th Cir. 2021) .........................................................................................8

*In re PETCO Corp. Sec. Litig.*,
  2008 WL 8876554 (S.D. Cal. Apr. 29, 2008) ........................................................20, 21, 22

*Provenz* v. *Miller*,
  102 F.3d 1478 (9th Cir. 1996) ......................................................................................18

*In re REMEC Inc. Sec. Litig.*,
  702 F. Supp. 2d 1202 (S.D. Cal. 2010) .....................................................18, 22, 23, 25

*River City Mkts., Inc.* v. *Fleming Foods W., Inc.*,
  960 F.2d 1458 (9th Cir. 1992) .......................................................................................1

*SEB Inv. Mgmt. AB* v. *Wells Fargo & Co.*,
  2023 WL 11691540 (N.D. Cal. Aug. 18, 2023) ................................................3, 6, 12, 20

*SEB Inv. Mgmt. AB* v. *Wells Fargo & Co.*,
  742 F. Supp. 3d 1003 (N.D. Cal. 2024) ............................................................. *passim*

*Skillsky* v. *Lucky Stores, Inc.*,
  893 F.2d 1088 (9th Cir. 1990) .................................................................................13, 14

*Soremekun* v. *Thrifty Payless, Inc.*,
  509 F.3d 978 (9th Cir. 2007) ......................................................................................16

-iv-

*Synopsys, Inc.* v. *Real Intent, Inc.*,
    2024 WL 5364480 (N.D. Cal. Aug. 26, 2024) ......................................................................8

**Other Authorities**

Fed. R. Civ. P. 56..........................................................................................................................7

SULLIVAN & CROMWELL LLP

## <u>ISSUES TO BE DECIDED</u>

1.      Have Plaintiffs established a genuine dispute of material fact as to the falsity of the challenged statements concerning Wells Fargo's Diverse Slates Guidelines where, after full and fair discovery, Plaintiffs lack admissible evidence that more than a handful of fake interviews may have taken place during the Class Period?

2.      Have Plaintiffs established a genuine dispute of material fact as to scienter where there is no evidence that Charles Scharf, Kleber Santos, or Carly Sanchez was aware that any fake interviews occurred during the Class Period, much less that fake interviews were widespread?

3.      Have Plaintiffs established a genuine issue of material fact as to loss causation with respect to the alleged corrective disclosure in the June 9, 2022 *New York Times* article where the same allegations concerning fake interviews at Wells Fargo were publicly disclosed more than two weeks earlier — in a May 19, 2022 *New York Times* article and in subsequent reports before June 9, 2022?

**INTRODUCTION**

The 11 challenged statements in this action are either general descriptions of Wells Fargo's Diverse Slates Guidelines or statements concerning progress made in diverse hiring under the Guidelines. (ECF 116, Amended Complaint ("AC" or the "Complaint") ¶¶ 262-80.)   These statements largely describe, in broad strokes, that the Guidelines required a diverse interview team and a slate of at least 50% diverse interview candidates — where diverse persons were defined to include racial minorities, women, LGBTQ+, veterans, and people with disabilities — when hiring for most U.S. jobs at Wells Fargo with total compensation above $100,000.   (*See*, *e.g.*, *id.* ¶¶ 262-67, 273-74.)   There is no dispute that Defendants' descriptive statements were true.   Wells Fargo implemented the Guidelines in accordance with these requirements.   To plead around their literal truth, Plaintiffs instead contend that these statements were misleading because there supposedly was a "widespread" practice of conducting so-called "fake" or "sham" interviews to feign compliance with the Guidelines during the Class Period (February 24, 2021 – June 9, 2022).  (*Id.* ¶¶ 148, 268, 271-72, 280.)

"To survive a motion for summary judgment, plaintiffs must produce sufficient evidence to establish the existence of every essential element of their case on which they will bear the burden of proof at trial."  *River City Mkts., Inc.* v. *Fleming Foods W., Inc.*, 960 F.2d 1458, 1462 (9th Cir. 1992).   After taking full and fair discovery — including receiving over 95,000 documents and 2,400 interview and hiring records and taking the depositions of more than a dozen fact witnesses — Plaintiffs have not come close to adducing evidence sufficient to meet their burden as to multiple elements of their claims.   Indeed, as set forth below, much of the putative evidence that Plaintiffs relied on in their Complaint to get past the pleading stage has now been abandoned or retracted.

***Plaintiffs cannot prove falsity.***   First and foremost, Plaintiffs have *no* admissible evidence that fake interviews were widespread at Wells Fargo during the Class Period.   Although Plaintiffs have advanced multiple definitions of fake interviews at various points in this litigation, the only fake interviews that can give rise to a cause of action for securities fraud are the sort described in the June 9, 2022 *New York Times* article — which Plaintiffs claim "revealed the truth" about fake interviews.  (AC ¶ 332-39.) As described in that article, as well as in the earlier May 19, 2022 *New York Times* article (to which the June 9, 2022 article expressly refers), fake interviews are interviews "for roles that ha[ve] already been

promised to other people"; where "the so-called diverse candidate would be interviewed for a job that had already been promised to someone else"; where "the decision had already been made to give the job to another candidate"; where the hiring employee "had already picked someone for the job"; and where the diverse candidate "ha[d] no shot at getting the job." (*See* Exs. A & B[1].)  Plaintiffs' own witnesses, and their expert, agree with this definition.[2]  So does the Court.  *See SEB Inv. Mgmt. AB* v. *Wells Fargo & Co.*, 742 F. Supp. 3d 1003, 1018 (N.D. Cal. 2024) ("Interviewing candidates who had *no chance* of receiving an offer could not accomplish Defendants' stated goal of improving workforce diversity.") (emphasis added).  Accordingly, Plaintiffs must prove that (i) diverse candidates interviewed under the Guidelines had no chance of getting the jobs in question, including because the decision already had been made to give that job to someone else; and (ii) this practice was so widespread that the challenged statements about the Guidelines were misleading.  After months of discovery, Plaintiffs have no such evidence.

*First*, Plaintiffs have no employment or complaint data that supports their claim that fake interviews were widespread during the Class Period — in fact, this data, which was produced to Plaintiffs in discovery, entirely rebuts Plaintiffs' claims.  Wells Fargo conducted approximately 100,000 interviews for positions subject to the Guidelines during the Class Period.  (*See infra* Section I.B.)  But the sum total of *all* of the allegations attributed to Plaintiffs' confidential witnesses (including those who could not be deposed and those whose testimony is inadmissible or relates to events outside of the Class Period) is, at most, a handful of alleged fake interviews.  Even if Plaintiffs somehow were able to prove that 100 fake interviews occurred — which is many multiples of the number of fake interviews alleged by the confidential witnesses, and which the evidence does not remotely support — that still would constitute, at most, 0.1% of the interviews during the Class Period that were subject to the Guidelines.  Defendants, therefore, are entitled to summary judgment because no reasonable jury could find that just one out of every 1,000 interviews constitutes widespread fake interviews.

*Second*, the confidential witness allegations on which Plaintiffs relied to get past the pleading stage

---

[1]    "Ex. [_]" refers to exhibits to the accompanying Declaration of Brendan P. Cullen.

[2]    As set forth below (Section I.A), all of the former employees whom Plaintiffs cited in the Amended Complaint and who were able to be located and deposed agreed that an interview is "fake" only if the diverse candidate has no shot at getting the job.

have now largely been abandoned or retracted, and Plaintiffs have no admissible witness testimony that there were widespread fake interviews at Wells Fargo.  Of the 11 confidential witnesses cited in the Complaint, five refused to appear for depositions, evaded service of Defendants' subpoenas, or otherwise were not deposed.  Of the remaining six confidential witnesses whom Defendants were able to depose, half testified that at least some of the allegations regarding fake interviews attributed to them were false or misleading.  (*See infra* Section I.C.)  Another half testified to alleged fake interviews that occurred before or after the Class Period, which cannot support Plaintiffs' claims.  And the majority of the remaining confidential witness testimony constitutes non-admissible hearsay or conclusory or speculative assertions that cannot raise a genuine dispute of fact as a matter of law.

***Plaintiffs cannot prove scienter.***  Plaintiffs' claims also must be dismissed for the independent reason that they have no evidence that the challenged statements were made with intent to defraud.  After months of discovery, including depositions of the individual Defendants, there is no evidence in the record that Messrs. Scharf or Santos or Ms. Sanchez knew about a *single* alleged fake interview being conducted during the Class Period — much less that such interviews were widespread.  For Mr. Scharf, Plaintiffs point to two emails that he testified he has no recollection of seeing and which nowhere alleged that fake interviews occurred *during the Class Period*.  As this Court already held, although non-specific allegations may be "sufficient to draw the inference that some sham interviews likely occurred . . . they fall short of the inference that sham interviews took place *during the Class Period*."  *SEB Inv. Mgmt. AB* v. *Wells Fargo & Co.*, 2023 WL 11691540, at *6 (N.D. Cal. Aug. 18, 2023) (emphasis added); *cf. id.* ("[A]lleging that sham interviews took place without specifying whether they occurred during the Class Period is not sufficient to meet the falsity requirement.").  Similarly, for Mr. Santos — who made his alleged misstatements after the May 19, 2022 *New York Times* article was published — Plaintiffs point only to one email (there is no evidence that Mr. Santos ever read it) and to Mr. Santos's review of information that Wells Fargo collected beginning on May 2, 2022, as part of its investigation into the allegations of the forthcoming May 19 article.  As discovery has shown (*see infra* Sections I.E & II.B), none of the information that Mr. Santos reviewed in connection with that investigation remotely suggested that fake interviews were widespread.  Finally, as to Ms. Sanchez, Plaintiffs have no evidence that she knew of a single fake interview during the Class Period and certainly not at the time that she made her statement.

Sullivan & Cromwell llp

Defendants' Motion for Summary Judgment
Case No. 3:22-CV-03811-TLT

***Plaintiffs cannot prove loss causation.***  Plaintiffs also cannot prove that their losses were caused by the alleged misstatements because the allegations about supposed fake interviews at Wells Fargo were publicly disclosed *more than two weeks* before the June 9, 2022 *New York Times* article — Plaintiffs' sole alleged corrective disclosure.  The May 19, 2022 *New York Times* article reported the allegations that Wells Fargo's Guidelines "often" resulted in diverse candidates being "interviewed for a job that had already been promised to someone else"; "that fake interviews were conducted for many types of positions"; and that this conduct was alleged to have occurred across multiple states.  (Ex. A.)  Indeed, it was the May 19 article that "spurred" an investigation of Wells Fargo's hiring practices by the Department of Justice.  (*See* Ex. B.)  There also was further reporting and public discourse regarding the alleged problem of fake interviews — all before the June 9 article was published.  (*See infra* Section III.)  Because the alleged "truth" concerning fake interviews was publicly disclosed long before the alleged corrective disclosure, Plaintiffs cannot prove that the June 9 article caused them harm, and their claims must be dismissed.  *See Evanston Police Pension Fund* v. *McKesson Corp.*, 2021 WL 4902420, at *4-6 (N.D. Cal. Oct. 21, 2021) (granting summary judgment where the alleged corrective disclosure offered nothing new).

Because Plaintiffs do not have sufficient evidence to prove falsity, scienter, or loss causation following months of discovery, their claims should be dismissed.

## BACKGROUND

### A.     Wells Fargo's Diverse Slates Guidelines

In March 2020, Wells Fargo announced the Guidelines as part of its ongoing efforts to promote diversity in its senior ranks.  (Ex. C.)  The Guidelines built on and expanded an already-in-place rule and went into effect later in 2020, requiring that "for most U.S. roles with total direct compensation greater than $100,000," "[a]t least 50% of interview candidates must be diverse with respect to at least one diversity dimension."  (Ex. D at -042.)  Over the next several months, Wells Fargo generally described the Guidelines in its public reporting and provided periodic updates on the Company's diversity initiatives in reports and interviews.  (*See*, *e.g.*, Ex. E at -739; Ex. D at -039, -042; Ex. F at -469; Ex. G at -528; Ex. H at -754; Ex. I at -182.)

### B.     *The New York Times* Articles and Resulting Government Investigations

In May and June of 2022, *The New York Times* published two articles reporting on what the author

described as instances of purported "sham" interviews of diverse candidates. (Exs. A & B.) The first article, published on May 19, 2022, reported on fake interviews being conducted for "many types of positions" at Wells Fargo across multiple states. (Ex. A.) The article relied heavily on allegations made by Joseph Bruno — a former Wells Fargo employee in the Wealth & Investment Management ("WIM") division in Jacksonville, Florida — as well as 11 other then-current or former Wells Fargo employees. (*See id.* at 1.) Mr. Bruno claimed that his supervisors instructed him to conduct interviews of diverse candidates, "even though the decision had already been made to give the job to another candidate." (*Id.*) The article also reported that Anthony Thorpe, one of the confidential witnesses referenced in the Amended Complaint (FE-9), stated that "he had tried to find a 'diverse pool' of candidates, even though he knew exactly who would be getting the job." (*Id.* at 3.) Following the publication of the May 19 article, the U.S. Attorney's Office for the Southern District of New York opened an investigation into Wells Fargo's alleged practice of conducting "sham" interviews. (*See* Ex. B.) On June 9, 2022, *The New York Times* published another article citing additional allegations of fake interviews from "10 current and former employees" and reporting on the Department of Justice's recently opened investigation. (*Id.*) The SEC also opened an investigation into Wells Fargo's diverse hiring practices. (*See* Ex. J at 138.) Both government investigations were closed without any action being taken against Wells Fargo. (*Id.*)

**C. Plaintiffs' First Complaint and Defendants' Motion to Dismiss**

On January 31, 2023, Plaintiffs filed their initial complaint against Defendants, asserting Exchange Act Section 10(b) claims against all Defendants and a Section 20(a) claim against Mr. Scharf. Plaintiffs challenged 11 statements made by Defendants, most of which generally explain the existence and requirements of the Guidelines. (*See* ECF 69 ("Compl.") ¶¶ 189-90 ("In the U.S., we are requiring a diverse slate of candidates . . . for most roles with total direct compensation of more than $100,000 per year."); *id.* ¶ 200 ("We also instituted diverse candidate slates and interview teams on most jobs of over $100,000 in total compensation."); *see also id.* ¶¶ 191-94, 201-22.) Plaintiffs also challenged Ms. Sanchez's remarks during an October 7, 2021 interview describing the Guidelines and discussing Wells Fargo's "focus[]" on "sourcing" diverse candidates to "make sure that the pipeline is filled with great candidates." (*Id.* ¶¶ 196-97.) Lastly, Plaintiffs challenged two additional statements attributed to Mr. Santos: (i) his statement in a May 27, 2022 *Business Insider* article that, after "research[ing] all of

the specific hiring-practice allegations" shared by the *New York Times* reporter prior to publishing the May 19, 2022 article, Wells Fargo "could not corroborate the[] allegations as factual" (*id.* ¶ 162); and (ii) his statement in a June 3, 2022 *Business Insider* article that "[t]he rule is working" (*id.* ¶ 203).

According to Plaintiffs, the challenged statements were misleading because Wells Fargo employees were interviewing diverse candidates when another candidate had already been chosen for the job and Wells Fargo had no intention of hiring the diverse candidates. (*Id.* ¶ 131.) Plaintiffs also alleged that Defendants knew about such fake interviews at the time that they made their statements. (*Id.* ¶ 205.) In support of their claims, Plaintiffs pointed to the *New York Times* articles; a June 6, 2022 LinkedIn post by Mr. Bruno alleging fake interviews; and allegations from two confidential witnesses. (*See id.* ¶¶ 132-50.) The Court granted Defendants' motion to dismiss with leave to amend, holding that Plaintiffs' allegations were not sufficiently particularized to infer that widespread fake interviews had occurred. *SEB*, 2023 WL 11691540, at *5. The Court also held that Plaintiffs "[fell] short of adequately alleging scienter," again, due to the lack of particularized allegations. *Id.* at *8.

**D.    The Operative Complaint and Defendants' Motion to Dismiss**

On September 8, 2023, Plaintiffs filed their Amended Complaint, which challenges the same 11 statements and is largely a copy of Plaintiffs' first complaint. To bolster their falsity allegations, Plaintiffs added fake interview allegations from nine additional confidential witnesses. (AC ¶¶ 165-208.) Plaintiffs also added scienter allegations — namely, an email from a job applicant named Phillip Miller to Wells Fargo's Board Communications inbox alleging a single fake interview prior to the Class Period, and a 4,500-word email from Mr. Bruno to over 250 people, including Messrs. Scharf and Santos, in which Mr. Bruno wrote two vague sentences (out of hundreds) criticizing his former supervisor for allegedly instructing him to conduct fake interviews at some indeterminate time. (*Id.* ¶¶ 209, 213.) Plaintiffs omitted that the Company investigated Mr. Miller's allegations and, as reported to a Board committee, found them to be "unsubstantiated." (Ex. K at -695.)

This time, the Court denied Defendants' motion to dismiss, holding that Plaintiffs adequately alleged falsity based on the newly added allegations because they sufficiently "expand[ed] the geographical and organizational scope of the sham interviews" for purposes of withstanding a motion to dismiss. *SEB*, 742 F. Supp. 3d at 1020. Specifically, the Court focused on FE-3's allegation that "'70-

80% of all open positions in commercial banking' involved sham interviews" and FE-6's allegation that she "experienced at least six sham interviews." *Id.* The Court also held that allegations regarding Messrs. Bruno's and Miller's communications and circumstantial evidence (including regular updates to management on DE&I initiatives) raised a strong inference of scienter. *Id.* at 1021-23.

### E.    Plaintiffs Take Extensive Discovery

Discovery is complete. Wells Fargo produced over 95,000 documents, more than 2,400 records from five internal databases concerning allegations of unfair interview experiences, and over two years' worth of candidate-level data from Wells Fargo's recruiting systems. The parties took 21 depositions — 17 fact depositions and four Rule 30(b)(6) depositions. In lieu of deposing Mr. Bruno, Plaintiffs obtained a declaration from him. As for expert discovery, Plaintiffs retained Dr. Joseph Mason, a financial economist, to opine on loss causation and damages. To rebut Dr. Mason's opinions, Defendants retained Dr. Paul Gompers, an economist and professor of corporate finance, and Patsy Doerr, who has three decades of experience with diversity policies in the workplace. These experts were deposed as well.[3]

### LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, a "court shall grant summary judgment" when the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 322, 325 (1986) ("[T]he burden on the moving party may be discharged by 'showing' . . . that there is an absence of evidence to support the nonmoving party's case."). Plaintiffs, in opposing this summary judgment motion, "may not rest upon mere allegations or denials of [their] pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). Plaintiffs' "burden of production at this point 'is not a light one' — [they] 'must show more than the mere existence of a scintilla of evidence' or 'some metaphysical doubt' as to the material facts at issue"; they "must come forth with evidence from which a

---

[3]    On April 25, 2025, the Court granted Plaintiffs' motion for class certification. Defendants timely filed a Rule 23(f) petition seeking review of that decision, which remains pending in the Ninth Circuit.

SULLIVAN & CROMWELL LLP

jury could reasonably render a verdict in [their] favor." *Pac. Gulf Shipping Co.* v. *Vigorous Shipping & Trading S.A.*, 992 F.3d 893, 897-98 (9th Cir. 2021). "[C]onclusory and speculative testimony does not raise genuine issues of fact and is insufficient to defeat summary judgment." *Synopsys, Inc.* v. *Real Intent, Inc.*, 2024 WL 5364480, at *2 (N.D. Cal. Aug. 26, 2024).

## ARGUMENT

## I. PLAINTIFFS CANNOT ESTABLISH A TRIABLE ISSUE AS TO FALSITY.

Summary judgment is proper in a securities fraud action where there is no evidence that the alleged misstatement "conveyed a false or misleading impression." *In re Convergent Techs. Sec. Litig.*, 948 F.2d 507, 512 (9th Cir. 1991). Plaintiffs fail to meet their burden to demonstrate a genuine dispute as to falsity because they have no admissible evidence that fake interviews were widespread during the Class Period.

### A. A Fake Interview Can Mean Only an Interview Where a Candidate Has No Shot at Getting the Job.

A fake interview occurs when a candidate is interviewed for a job but has no chance at receiving an offer. This is the definition used in the *New York Times* article that Plaintiffs claim "revealed the truth" to the market. (*See* AC ¶¶ 332, 339; Ex. B.) Plaintiffs' confidential witnesses also agree with this. (*See* Ex. L at 112:19-113:7 (fake interview "is an interview with no intention to hire" the candidate); Ex. M at 27:12-32:10 (fake interview occurs when a candidate is interviewed for a position after it is filled); Ex. N at 35:6-10 (fake interview occurs when "someone is already selected" for the position); Ex. O at 60:20-61:12; Ex. P at 41:10-24 (defining a fake interview as one where the "candidate d[oes] not have a chance of . . . getting an offer").) Dr. Mason likewise testified that a fake interview occurs when the "position[] [is] already filled" or the candidate is "not qualified" for the role. (Ex. Q at 97:19-99:22.) And the Court embraced this definition in denying Defendants' motion to dismiss, pointing to allegations that "Wells Fargo conducted interviews with diverse candidates that they had *no intention of hiring*"; that Defendants "recruited diverse candidates for interviews even though they were *certain not to receive an offer*"; and that Defendants "solicited interviews from diverse candidates even when another candidate *had already been selected*." *SEB*, 742 F. Supp. 3d at 1018 (emphases added).

By contrast, an interview where the candidate has a chance to get the job (even a small chance) is not fake. (Ex. O at 60:20-61:12; Ex. P at 96:18-97:3 (testifying that a candidate with a 10% or 5% chance at getting the job would still have an "actual chance").) It similarly is not a fake interview if a hiring

1  manager merely has a preferred or leading candidate in mind at the time of the interview, but where the

2  decision whom to hire has not been made.  Almost every company interviews candidates where the

3  interviewer may already have a candidate in mind, but these are not fake interviews if other candidates

4  still have a chance to be hired.  Indeed, the entire point of the Guidelines was to ensure that, before making

5  a hiring decision, hirers considered diverse candidates whom they might never have thought to interview

6  otherwise — *especially* where they already had a candidate in mind.  (Ex. R ¶ 17; Ex. S at 131:14-21

7  ("Even if a manager knew of a strong candidate, that did not necessarily mean that that candidate would

8  be a successful candidate. . . . [T]hat is the whole purpose of doing diversity sourcing."); *see also id.* at

9  193:12-17, 194:13-23, 215:7-15 (testifying that candidates have been successful "even when the hiring

10  manager believes that they have the leading candidate or the best candidate" because the former have, "in

11  fact, been stronger than that person").)

12        **B.        Plaintiffs' Evidence Concerning Just a Handful of Purported Fake Interviews Cannot
              Establish that Fake Interviews Were Widespread.**

13              During the Class Period, Wells Fargo conducted approximately 100,000 interviews for positions

14  subject to the Guidelines.  (Decl. of Ryan Ballew ¶ 2.)  Despite the voluminous amount of recruiting and

15  hiring data that Wells Fargo produced in discovery, to date, Plaintiffs have failed to quantify or present

16  evidentiary support for the number of fake interviews that they claim occurred during the Class Period.

17  That likely is because the interview data, documents, and deposition testimony show that the number of

18  interviews during the Class Period that Plaintiffs could even plausibly claim to have been fake is

19  vanishingly small.  For example, even if the Court were to credit the allegations of every one of Plaintiffs'

20  11 confidential witnesses — including, as discussed below, those who evaded depositions and have

21  submitted no sworn testimony, those who testified to alleged fake interviews outside the Class Period or

22  for positions that were not subject to the Guidelines, and those who offered only allegations based on

23  hearsay or otherwise inadmissible testimony — Plaintiffs can point to only a few dozen total alleged fake

24  interviews.  (*See* AC ¶¶ 164-208; Exs. L-P, T; *infra* Section I.C.)  Assuming, counterfactually, that

25  Plaintiffs could *prove* that 100 fake interviews occurred, that still would constitute just 0.1% of the

26  interviews conducted during the Class Period under the Guidelines (said differently, 99.9% of Class Period

27  interviews complied with the Guidelines and were not fake).  Such a tiny percentage (0.1%) cannot

28  remotely constitute evidence of widespread fake interviews and is insufficient as a matter of law to show

that the alleged misstatements about the Guidelines were false.  *See Boca Raton Firefighters' & Police Pension Fund* v. *DeVry Inc.*, 2012 WL 1030474, at *4 (N.D. Ill. Mar. 27, 2012) ("Even concrete allegations of wrongdoing may be deficient if they do not allege a problem of sufficient magnitude to undermine the defendants' public statements about [company] policies and practices.").

Indeed, courts have dismissed complaints with significantly stronger allegations on the grounds that they failed adequately to show that the misconduct at issue was sufficiently widespread to make statements materially false or misleading.  *See*, *e.g.*, *Ferraro Fam. Found., Inc.* v. *Corcept Therapeutics Inc.*, 501 F. Supp. 3d 735, 761 (N.D. Cal. 2020) (holding that general statements that a drug was marketed "for on-label use" were not rendered misleading where plaintiffs failed to plead a "widespread off-label marketing scheme" based on the allegations of ten witnesses and an expert because "such a small omission did not create an impression of a state of affairs that differed in a material way from the one that actually existed"); *Gross* v. *AT&T Inc.*, 2021 WL 9803956, at *6-7 & nn.14, 16 (S.D.N.Y. Sept. 27, 2021), *aff'd* 2022 WL 17587853 (2d Cir. Dec. 13, 2022) (concluding that anecdotal or vague accounts of problems from 70 confidential witnesses across approximately 500 stores did not adequately establish that fraudulent sales practices were widespread at an "enormous" company with "thousands of stores" and roughly "260,000 employees"); *Karam* v. *Corinthian Colls., Inc.*, 2012 WL 8499135, at *7 (C.D. Cal. Aug. 20, 2012) (holding that the accounts of eight confidential witnesses "pertain[ing] to each [witness's] generalized, subjective impressions of practices at individual [Corinthian] campuses . . . fail[ed] to support Plaintiffs' allegations of widespread misconduct").

### C.    The Former Employees' Testimony Does Not Support the Existence of Widespread Fake Interviews During the Class Period.

Plaintiffs' lack of evidence of widespread fake interviews during the Class Period also is underscored by the evidentiary deficiencies in the confidential witness testimony.  Defendants deposed six of the 11 confidential witnesses that Plaintiffs relied on in their Complaint.  The remaining confidential witnesses (FE-2, FE-4, FE-5, FE-7, and FE-10) could not be deposed, despite Defendants' efforts, and their unsworn allegations are not evidence of anything and provide zero support for Plaintiffs' claims on summary judgment.  *See Briggs* v. *Blomkamp*, 70 F. Supp. 3d 1155, 1166 (N.D. Cal. 2014) ("[A]llegations in a complaint are not evidence that can be used to support or oppose summary judgment.").  The six confidential witnesses who were deposed include Amy Caffee (FE-3), a former Commercial Banking

recruiter, and Lalesha McKoy (FE-6), a former Senior Business Execution Consultant, whom the Court identified as providing the additional allegations that Plaintiffs needed to satisfy their pleading burden. *SEB*, 742 F. Supp. 3d at 1020. But these allegations have not held up in discovery. In fact, the confidential witness deposition testimony rebuts Plaintiffs' claims of widespread fake interviews.

*Multiple confidential witnesses testified that allegations attributed to them in the Complaint were inaccurate.* Following their depositions, several confidential witness allegations concerning purported fake interviews on which Plaintiffs relied in their Complaint have now been narrowed or recanted entirely. The Complaint alleges that Diana Jackson (FE-8), a former Senior HR Business Partner, claimed that a recruiter peer was "doubtful" that diverse candidates identified by their names or physical appearance "were truly being considered for the jobs for which they were recruited to apply." (AC ¶ 170.) But Ms. Jackson recanted that allegation, testifying at her deposition that she "d[id]n't remember them saying to me that they were not being considered for the jobs." (Ex. T at 40:4-10.) Ms. McKoy (FE-6) similarly identified multiple incorrect allegations attributed to her in the Complaint. As just one example, Ms. McKoy testified that the allegation that "many times" she was "the sole African American among the candidate pool" "need[ed] to be corrected" because she did not, in fact, have such information. (Ex. N at 82:20-83:6.) And Mr. Thorpe (FE-9), a former financial advisor who was extensively quoted in the May 19, 2022 *New York Times* article, testified that the Complaint incorrectly attributed statements to him that he never made. For instance, Mr. Thorpe testified that, contrary to Plaintiffs' allegations, he had no recollection of stating "that everyone in [WIM] from the President down was aware of" the Guidelines. (*See* AC ¶ 167; Ex. L at 146:6-17.) Mr. Thorpe also testified that he never "spoke to senior people within Wells Fargo HR and Legal departments . . . about having to look for diverse candidates when certain positions were already intended for other nondiverse candidates." (*See* AC ¶ 167; Ex. L at 149:14-150:14.)

*Half of the deposed confidential witnesses testified about conduct outside of the Class Period.* Three of the six confidential witnesses who were deposed also testified *only* to events that pre-date or post-date the Class Period, which is not evidence that any fake interview occurred during the Class Period. Mr. Thorpe testified about investment-advisor-specific hiring practices that occurred in or before 2019 — years before the Class Period began. (Ex. L at 62:3-15; 65:1-66:18.) Ms. Jackson testified about her recruiter colleague's experience with sourcing diverse candidates in or before 2020 — again, before the

1    Class Period. (Ex. T at 29:22-30:1.) And Janean Armstrong (FE-11), a former Regional District Manager,

2    testified about an alleged fake interview in October 2022, after the Class Period. (Ex. M at 37:5-10, 93:17-

3    19.) Putting aside whether this testimony supports a finding that fake interviews occurred, none of this

4    testimony is evidence that a single fake interview took place *during the Class Period*. As the Court

5    previously observed, because Plaintiffs "seek liability only for conduct during the Class Period," they

6    must point to fake interviews that occurred during the Class Period. *SEB*, 2023 WL 11691540 at *6; *see

7    also Das* v. *Unity Software Inc.*, 2024 WL 1141733, at *9 (N.D. Cal. Mar. 15, 2024) (holding that "any

8    inference that pre-Class Period practices continued during the Class Period amounts to unsubstantiated

9    speculation" and does "not establish the falsity of the statements made during the Class Period"). But,

10   again, three of Plaintiffs' six confidential witnesses are unable to offer any such evidence. Indeed,

11   Mr. Thorpe, who left Wells Fargo before the Guidelines were rolled out in March 2020 and had never

12   even heard of them prior to reading the Complaint, testified that he never conducted a fake interview and

13   was not aware of anyone else doing so either. (Ex. L at 62:3-15, 77:8-13, 155:25-156:25.)

14          ***Much of the confidential witness testimony concerning alleged fake interviews is either

15   inadmissible at trial or is speculative and conclusory.*** The remaining confidential witness deposition

16   testimony is riddled with inadmissible hearsay or conclusory assertions and speculation that cannot raise

17   a genuine issue of material fact. Wendy Castillo-Garza (FE-1) testified that she learned of the alleged

18   directive of WIM senior leadership to hire "referral candidates" (internal candidates favored by hiring

19   managers) from conversations she supposedly had with those managers and a senior talent liaison within

20   WIM. (Ex. O at 79:9-18, 85:21-87:20.) Setting aside that Ms. Castillo-Garza could not recall the names

21   of the hiring managers or when she allegedly had these conversations, her knowledge of purported fake

22   interviews is based entirely on her speculation about the experiences of hiring managers and the talent

23   liaison. (*See*, *e.g.*, *id.* at 88:6-15 (Q: "How do you know that the other candidates were just as qualified

24   as the referral candidates?" A: "I don't. I'm assuming based on the conversation."); *id.* at 97:3-17 (when

25   Ms. Castillo-Garza was asked about the basis for her understanding that WIM hiring managers were "just

26   going through the motions," she testified, "I didn't do it. That was just, again, a conversation" with "[the

27   talent liaison].").) Such speculative and hearsay testimony about what others at Wells Fargo supposedly

28

1    told her is inadmissible and "cannot raise a genuine issue of material fact sufficient to withstand summary

2    judgment." *Skillsky* v. *Lucky Stores, Inc.*, 893 F.2d 1088, 1091 (9th Cir. 1990).

3         Ms. McKoy (FE-6) alleged that she was subjected to six fake interviews, but her belief that they

4    were fake also was based on hearsay — double hearsay, in fact.  She testified that, after learning she was

5    not offered a job following these interviews, she spoke to various unnamed employees who told her that

6    unnamed hiring managers had told them that they "already had somebody [unnamed] in mind." (Ex. N at

7    75:16-21.)  Ms. McKoy further testified that she had "general coffee chat conversations" with unnamed

8    colleagues regarding the news surrounding fake interviews — some unknown number of whom

9    supposedly told her that they had "been through that too." (*Id.* at 45:8-46:14.)  All of these statements —

10   from an unidentified number of anonymous speakers — are inadmissible hearsay and cannot raise a

11   genuine issue of material fact as to the alleged occurrence of fake interviews.[4]  *See Skillsky*, 893 F.2d at

12   1091-92 (affirming summary judgment and exclusion of deponent's hearsay testimony about what a

13   supervisor had heard from others, which was conveyed to the deponent); *Lias* v. *County of Alameda*, 2006

14   WL 13050, at *2 (N.D. Cal. Jan. 3, 2006) (ruling that the deponent's belief about a co-worker's salary

15   "based on 'office conversation'" was inadmissible "[h]earsay and speculation" at summary judgment).

16        The Complaint alleged that Ms. Caffee (FE-3) said that, "for 70-80% of all open positions in

17   commercial banking[,] recruiters were including candidates who were not as qualified only because they

18   were diverse." (AC ¶ 182.)  The Court credited this specific-sounding allegation at the pleading stage in

19   its motion-to-dismiss order.  *SEB*, 742 F. Supp. 3d at 1020.  But discovery has shown that this allegation

20   is based on pure speculation and hearsay.  Ms. Caffee testified at her deposition that she determined the

21   70-80% figure "based on [her] own personal req[uisition] load as well as what [she] was hearing of [her]

22   peers," including during "team meetings." (Ex. P at 92:9-16, 94:2-3.)[5]  Ms. Caffee had no other factual

23

---

24   [4]      During Ms. McKoy's nine-year tenure at Wells Fargo, she applied to "well over 300 [positions],"
     for which she received multiple job offers — each time a promotion. (Ex. N at 90:25-91:3; *id.* at 134:25-
25   135:11; *id* at 136:4-7.)  She also testified that she was a "top candidate" who went to the final interviews
     for all six of the alleged fake interviews. (*Id.* at 75:12-15.)

26   [5]      *See also* Ex. P at 87:10-18 (testifying that "[c]hances are" the "not-as-qualified candidates"
     referenced in the Complaint "likely did not" have "the desired qualifications" for the roles to which they
27   applied but that she "d[id] not know each situation"); *id.* at 93:16-94:7 (testifying that "[w]e would hear
     recruiters on our team meetings across the enterprise discuss" the practice of interviewing "less-qualified
28   diverse candidates" and that she "assume[d]" these discussions were in 2021 and 2022 but that she could
     not "recall").)

basis for her 70-80% figure — which purportedly represented the 20 to 40 open requisitions being handled by Commercial Banking's 11 to 15 recruiters at any given time. (*See id.* at 87:22-89:5.) Ms. Caffee also confirmed that hiring managers — not recruiters like Ms. Caffee — decided which candidates would be interviewed and who ultimately would be selected for a given role. (*Id.* at 92:25-93:5, 94:23-24.) In other words, Ms. Caffee has no personal knowledge about whether or not these candidates were being seriously considered by the hiring managers and her testimony amounts to pure speculation that fake interviews may have occurred — not admissible evidence of actual fake interviews. Remarkably, Plaintiffs never deposed any of these hiring managers. Ms. Caffee also mentioned two candidates who allegedly told her that they had experienced fake interviews. One candidate supposedly told Ms. Caffee that his interview was fake "[b]ecause he was diverse" and "there was a lack of diversity in the senior leadership team." (Ex. P at 52:24-53:2, 101:20-24.) Ms. Caffee did not know what roles this man had applied for or if he was qualified for them. (*Id.* at 101:2-5.) As for the other candidate, Ms. Caffee testified only that the candidate "felt like she was interviewed multiple times because she was an African American diverse female." (*Id.* at 117:17-118:2.) None of this testimony — which either is not based on Ms. Caffee's personal knowledge, is speculative and conclusory, or is classic hearsay — is admissible at trial or can create a genuine issue of material fact for purposes of surviving summary judgment.[6] *See Skillsky*, 893 F.2d at 1091-92; *Lias*, 2006 WL 13050, at *2.

**_The confidential witnesses' testimony is not sufficient evidence that any fake interviews occurred during the Class Period._** In addition to being speculative, conclusory, or inadmissible, the confidential witnesses' testimony does not provide a sufficient factual basis to find that even one fake interview occurred during the Class Period, much less *widespread* fake interviews. That a candidate was not hired after an interview does not mean that interview was fake, and testimony to that effect is not evidence that a fake interview occurred. *See Karam*, 2012 WL 8499135, at *8 (reasoning that the fact that "a large number of students 'dropped out' of Corinthian's programs" did not support plaintiffs'

---

[6] Other confidential witness testimony further undermines Plaintiffs' claims of widespread fake interviews during the Class Period. For instance, Mr. Thorpe testified that, prior to reading Plaintiffs' Complaint, he had never heard of the Guidelines — which were rolled out after he left Wells Fargo — and that he never conducted any interviews as part of his recruiting efforts. (Ex. L at 66:11-67:21, 77:8-13 ("I'm ashamed to say that I do not know what their guideline is – their diverse slate's guidelines.").) Ms. Jackson similarly testified that she "do[es]n't really know what a fake interview is." (Ex. T at 31:17, 32:2-13.)

1    "claims of materially widespread improper practices" of "retaining failing and nonattending students"

2    because "students may withdraw for any number of reasons unrelated to their ability to pass classes").

3    Nor is a candidate being "not as qualified" or having a comparatively lower probability of getting the job

4    probative of whether an interview was fake (never mind *proof* of a fake interview) if that candidate had

5    an actual chance of getting an offer.  (*See*, *e.g.*, Ex. P at 96:21-97:3 (testifying that a candidate with a 10%

6    chance and a 5% chance at getting a job would still have an "actual chance"); *see also id.* at 73:16-17

7    ("Every candidate I moved forward had [the] required qualifications.").)  Without evidence that candidates

8    were, for example, interviewed when a hiring decision had already been made, the claims by these

9    confidential witnesses are speculative, conclusory, and thus insufficient as a matter of law to raise a

10   genuine issue of material fact.  *Cellularm Inc.* v. *Bay Alarm Co.*, 1991 WL 332052, at *5 (N.D. Cal.

11   Apr. 11, 1991) ("Conclusory, speculative testimony is insufficient to raise genuine issues of fact and,

12   thereby, defeat summary judgment.").    Moreover, testimony that a hiring manager allegedly had

13   "somebody else in mind," as Ms. McKoy and others testified (*e.g.*, Ex. N at 75:12-21), simply is not

14   evidence of fake interviews (*see supra* Section I.A).

15                                        *        *        *

16          As set out in the following chart, not a single confidential witness has provided any evidence that

17   raises a genuine issue of material fact that fake interviews occurred during the Class Period.

| Confidential Witness | Conduct Outside the Class Period | Inaccurate Allegations | Inadmissible Evidence | Not a Fake Interview | No Sworn Testimony |
|---|---|---|---|---|---|
| FE-1 (Castillo-Garza) | | | ✓ | ✓ | |
| FE-3 (Caffee) | | | ✓ | ✓ | |
| FE-6 (McKoy) | | ✓ | ✓ | ✓ | |
| FE-8 (Jackson) | ✓ | ✓ | ✓ | ✓ | |
| FE-9 (Thorpe) | ✓ | ✓ | ✓ | ✓ | |
| FE-11 (Armstrong) | ✓ | | | ✓ | |
| FE-2, 4, 5, 7 & 10 | | | | | ✓ |

26   **D.    Joe Bruno's Declaration Is Not Evidence of Widespread Fake Interviews During the Class Period.**

27          Plaintiffs also principally rely on Joe Bruno's testimony to support their claims.  Mr. Bruno's five-

28   page declaration, which he submitted in lieu of the deposition that Plaintiffs noticed, mostly recounts his

interactions with his boss, Keith Vanderveen.  Mr. Bruno asserts that he mentioned purported fake interviews to Mr. Vanderveen and others, but they were either dismissive of the issue or threatened him to stop raising it.  (*See* Ex. U ¶¶ 4-14.)  But Mr. Bruno's supposed complaints (and the supposedly fake interviews mentioned in them) occurred mostly *before* the Class Period — and before the Guidelines were in place — and thus provide no support for Plaintiffs' claims.  Even if they had occurred during a relevant time, the interviews Mr. Bruno alleges were for financial consultant roles in WIM that were *not* subject to the Guidelines and are therefore irrelevant to Plaintiffs' falsity claims.  (*See*, *e.g.*, Ex. V.)  Mr. Bruno references only one supposedly fake interview that he claims occurred within the Class Period (for a "Market Leader"), but he provides no factual basis to determine whether the position in question was subject to the Guidelines or whether the interview was, in fact, fake.  (Ex. U ¶ 12.)  Notably, Mr. Bruno fails to explain how he knew that "the strongest candidate" for this position "was a Latino man"; how he knew that the "white man" ultimately selected "lacked any relevant experience" or was not himself diverse; or how Mr. Bruno supposedly determined that the diverse candidate had no actual chance at getting the Market Leader position.  (*Id.*)  These allegations are entirely conclusory and speculative and cannot raise any genuine issues of fact as to falsity.  *See Soremekun* v. *Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007) ("Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment."); *Angle* v. *Miller*, 673 F.3d 1122, 1134 (9th Cir. 2012) (holding that affidavits were "too vague, conclusory and speculative to create a triable issue" where the declarants failed to explain in sufficient detail the basis for their assertions); *Kelley* v. *AW Distrib., Inc.*, 657 F. Supp. 3d 1237, 1245 (N.D. Cal. 2023) (granting defendant summary judgment where a declarant omitted to include critical "details in his declaration" and could "only speculate about [defendant's] involvement").  In short, because Mr. Bruno's allegations concern a *single* alleged fake interview during the Class Period, they fall far short of evidence of *widespread* fake interviews.

### E.    Plaintiffs Cannot Prove that Mr. Santos's or Ms. Sanchez's Statements Were False.

Plaintiffs challenge two statements made by Mr. Santos that are slightly different than the other challenged statements (which are mere descriptions of the Guidelines): (i) a May 27, 2022 statement that Wells Fargo "researched" and "could not corroborate . . . as factual" the specific allegations described in

the May 19 *New York Times* article (AC ¶ 276); and (ii) a June 3, 2022 statement describing progress made under the Guidelines and that "[t]he rule is working" (*id.* ¶ 278). But Plaintiffs have no evidence that these statements, which were made in connection with Wells Fargo's review of the fake interview allegations raised by *The New York Times*, were false or misleading either.

Mr. Santos's May 27, 2022 statement would be false or misleading only if Wells Fargo did not, in fact, conduct the investigation described by Mr. Santos, or if Mr. Santos misrepresented the results of the Company's investigation. Plaintiffs have no evidence of either scenario. Indeed, the record shows that Mr. Santos and his team diligently investigated the allegations shared by the *New York Times* reporter beginning on May 2, 2022 (more than two weeks before the first *Times* article was published), and that they could not confirm that any fake interviews took place. (*See*, *e.g.*, Ex. W at -699 (Mr. Santos asking colleagues to "start pulling data/facts on" the reporter's request for comment); Ex. X at -460 (employees gathering diverse hiring data in response); Ex. Y (Mr. Santos receiving updates on review of *New York Times* allegations).) In addition, as part of the investigation, Mr. Santos's team assembled data on diverse hiring and diverse representation at Wells Fargo as reflected in two slide decks titled "Diverse Hiring Fact Pack," dated May 17 and June 7, 2022. (*See* Exs. Z & AA.) Consistent with Mr. Santos's June 3, 2022 statement that the Guidelines were "working," this data showed that the number of diverse hires at Wells Fargo *increased* under the Guidelines. The Fact Pack also showed that the share of diverse hires for roles earning more than $100,000 increased by 5.4% since 2019 (Ex. Z at -366), and that Black hiring likewise increased (Ex. AA at -359). All of this refutes Plaintiffs' claim that Mr. Santos's statements were false or misleading, and Plaintiffs have no evidence to the contrary.

Nor can Plaintiffs prove that Ms. Sanchez's October 7, 2021 remarks during a virtual interview discussing Wells Fargo's "focus[]" on "sourcing" candidates and efforts to ensure "that the pipeline is filled with great candidates" were false or misleading. (AC ¶ 269.) Because there is no evidence that fake interviews were widespread during the Class Period, Ms. Sanchez's statements were not false or misleading on that basis. Moreover, Ms. Sanchez's statements were about "sourcing" diverse candidates and filling the candidate pipeline (not about the interview process itself) and would be false only if Wells Fargo was not making an effort to "fill" candidate slates with diverse applicants. Plaintiffs have no such evidence.

* * *

In sum, Plaintiffs do not have sufficient evidence to raise a genuine issue of material fact as to the falsity of any of the alleged misstatements.  Out of the roughly 100,000 interviews that were conducted under the Guidelines during the Class Period, Plaintiffs have alleged, *at most*, a handful of fake interviews during the Class Period, have admissible evidence concerning just a tiny subset of those interviews (if any), and rely on speculative and conclusory testimony with little or no evidentiary value.  Accordingly, Defendants are entitled to summary judgment.

## II.    NO REASONABLE JURY COULD FIND THAT DEFENDANTS WERE AWARE OF WIDESPREAD FAKE INTERVIEWS DURING THE CLASS PERIOD.

Summary judgment is appropriate where there is "no rational basis in the record for concluding that any of the challenged statements was made with . . . scienter," a "mental state embracing an intent to deceive, manipulate, or defraud," or conscious recklessness.  *Provenz* v. *Miller*, 102 F.3d 1478, 1490 (9th Cir. 1996).  To defeat summary judgment, "the plaintiff must present significant probative evidence relevant to the issue of intent."  *Id.* at 1489-90.  "[M]ere conclusory allegations are insufficient to require the motion for summary judgment be denied."  *Id.* at 1490.  Here, Plaintiffs cannot raise a genuine issue of fact as to Defendants' scienter by proving that they may have been alerted to a small number of alleged instances of fake interviews during the Class Period.  Plaintiffs instead must prove that each Defendant was informed of such a *large number* of fake interviews during the Class Period that they knew, or should have known, that fake interviews were not just a possible occasional occurrence, but a *widespread* practice.  Because Plaintiffs have no such evidence as to Messrs. Scharf or Santos, or Ms. Sanchez, Defendants are entitled to summary judgment.  *See In re REMEC Inc. Sec. Litig.*, 702 F. Supp. 2d 1202, 1238 (S.D. Cal. 2010) (granting defendants summary judgment on scienter where plaintiffs failed to "produce[] evidence sufficient to raise a question of fact of an intent to deceive").

### A.    There Is No Evidence that Mr. Scharf Was Aware of Widespread Fake Interviews.

Mr. Scharf sat for a full-day deposition in this case and testified under oath that he had no knowledge of widespread fake interviews.  In fact, he testified that he neither recalled being personally informed of accounts of fake interviews nor recalled speaking to anyone at Wells Fargo who believed that they were subjected to a fake interview.  (Ex. BB at 18:10-14, 19:9-14.)

Plaintiffs will point to Mr. Miller's email to the Board, in which Mr. Miller speculates that he was

-18-

1    subjected to a fake interview, but this is not evidence that Mr. Scharf was aware of widespread fake

2    interviews during the Class Period.  (Ex. CC.)  *First*, there is no evidence that Mr. Scharf saw Mr. Miller's

3    email:  it was sent to a "Board" mailbox (not Mr. Scharf's), there is no evidence that Mr. Scharf received

4    this email, and Mr. Scharf testified that he did not recall receiving it or being involved in any discussion

5    about it.  (*See* Ex. K at -691; Ex. BB at 224:14-20); *In re Fannie Mae Sec. Litig.*, 898 F. Supp. 2d 176,

6    188 (D.D.C. 2012) (holding that "plaintiffs cannot credibly argue that [a] memorandum is evidence that

7    [defendant] intended to deceive anyone" when "the memorandum's distribution list d[id] not even include

8    [defendant]").  *Second*, Mr. Miller's email cannot show that Mr. Scharf was aware of widespread fake

9    interviews *during* the Class Period, as Mr. Miller's allegation reflects a single candidate's *pre*-Class Period

10   interviewing experience.  (Ex. CC  at -235); *see Fannie Mae*, 898 F. Supp. 2d at 186 ("[P]laintiffs fail to

11   demonstrate that this pre-class-period evidence would be admissible as evidence of 'what the defendant

12   knew during the class period.'"); *Heavy & Gen. Laborers' Loc. 472 & 172 Pension & Annuity Funds* v.

13   *Fifth Third Bancorp*, 2022 WL 1642221, at *21-22 (N.D. Ill. May 24, 2022) (holding that *pre-class-period*

14   evidence, including an "internal email to 'corporate headquarters'" and "hundreds of customer complaints

15   about illegal sales practices" and the defendant-company's disclosure of more than 1,000 unauthorized

16   accounts, did not support a finding that CEO and CFO defendants were aware of a "bank-wide, persistent

17   problem" *during* the class period); *see also supra* Section I.C.  *Finally*, Mr. Miller's interview cannot

18   reasonably be construed as "fake."  The discovery record shows that Mr. Miller was selected as a top-

19   three candidate and that interviewers described Mr. Miller as having a "deeper analytics and data focus"

20   and was experienced as a "very seasoned leader," but also that he spoke in a way that was "a little overly

21   verbose and unstructured."  (Ex. DD at -641-43.)  In any event, Mr. Miller's allegations were investigated

22   by the Company and found to be unsubstantiated.  (Ex. K at -695.)

23        Plaintiffs also will point to Mr. Bruno's 4,500-word email-rant — which devotes only two

24   sentences to his vague fake interview allegations — but this is not evidence of scienter either.  (Ex. EE.)

25   As an initial matter, Mr. Scharf testified that he did not recall seeing Mr. Bruno's email.  (Ex. BB at 42:14-

26   24); *see Fannie Mae*, 898 F. Supp. 2d at 186 (holding that "plaintiffs cannot claim evidence of

27   [defendant's] scienter lies in a document . . . that [defendant] may have never read" where defendant "did

28   not recall reading" it).  Furthermore, the two sentences in question, in which Mr. Bruno criticizes

1    Mr. Vanderveen for instructing Mr. Bruno to conduct fake interviews, are entirely conclusory and detail-

2    free.  Mr. Bruno fails to explain when the alleged fake interviews occurred, the number of such interviews,

3    in which business lines they supposedly took place, who conducted them, or whether the interviews were

4    even for positions subject to the Guidelines.  (*See* Ex. EE at -693); *SEB*, 2023 WL 11691540, at *8 (finding

5    that allegations of scienter based on communications to individuals are insufficient unless they are made

6    "in a manner such that it would have been so obvious that [the defendants] must have been aware of

7    [widespread fake interviews]").[7]

8            The record further confirms that Mr. Scharf had no knowledge of widespread fake interviews.

9    Mr. Scharf received updates with "good news" about the success of the Guidelines in increasing diverse

10   representation.  (*E.g.*, Ex. FF.)  Mr. Scharf also encouraged Wells Fargo employees to share feedback with

11   him directly.  (Ex. BB at 157:19-21.)  Occasionally, individual employees contacted Mr. Scharf to share

12   their experiences with the Company's hiring practices, but to the extent that these few communications

13   bore on the relevant issues, they merely described candidates interviewing for roles where they perceived

14   the hiring manager had someone else in mind — not a fake interview in which the diverse candidate had

15   no chance of getting the position.  (*See, e.g.*, Exs. GG, HH, II; ECF 208-2; ECF 208-4); *see SEB*, 2023

16   WL 11691540, at *8 (finding that allegations of scienter based on "vague allegations from a handful of

17   employees" are insufficient).  More importantly, a candidate's perception that someone else was hired for

18   reasons other than that candidate's superior candidacy is of extremely limited evidentiary value.  And

19   even if each of these allegations related to an actual fake interview and Mr. Scharf received and read each

20   of these emails (for which Plaintiffs have no evidence), that would mean that, at most, Mr. Scharf learned

21   about a potential problem with a tiny fraction of the approximately 100,000 interviews conducted under

22   the Guidelines during the Class Period.  That is not sufficient evidence of scienter as a matter of law.  *See*

23   *In re PETCO Corp. Sec. Litig.*, 2008 WL 8876554, at *7 (S.D. Cal. Apr. 29, 2008) (granting summary

24   judgment to defendant-officer on scienter grounds where the officer testified that "he never directed

25   anyone to improperly accrue expenses" and was not aware of an expense-accrual problem until

26   _____

27   [7]        For the same reason, Mr. Bruno's one-sentence statement in his declaration that, on September 13, 2021, he sent an email to Messrs. Scharf and Barry Sommers, former head of WIM, to "inform[] them that a fake interview problem existed within Wells Fargo" cannot carry the day.  (Ex. U ¶ 13.)  Courts in the Ninth Circuit routinely hold that such conclusory assertions are not evidence of scienter.  *See, e.g.*, *Kelley*, 657 F. Supp. 3d at 1245.

28

-20-

1   management "informed him that some employees had made allegations to that effect").

2       **B.    There Is No Evidence that Kleber Santos Was Aware of Widespread Fake Interviews.**

3       Plaintiffs challenge Mr. Santos's May 27, 2022 statement that "we could not corroborate" the

4   specific allegations in the first *New York Times* article as "factual" and his June 3, 2022 statement

5   describing progress made under the Guidelines and that "[t]he rule is working." (AC ¶¶ 276-78.) As with

6   Mr. Scharf, Plaintiffs point to the Miller and Bruno emails as evidence of Mr. Santos's scienter for these

7   statements. But Mr. Santos is not a director, and there is no evidence that he received Mr. Miller's email.

8   And although Mr. Santos was a recipient of Mr. Bruno's email, Mr. Santos testified that he did not

9   remember it and there is no evidence that he read it. (Ex. JJ at 148:9-149:3.) But, again, even if Mr. Santos

10  had read the entirety of Mr. Bruno's 4,500-word email, he would not have discerned even a single fake

11  interview during the Class Period — let alone an epidemic of them. *See supra* Section II.B.

12      Discovery confirms that Mr. Santos made the two challenged statements in connection with an

13  investigation into the fake interview allegations raised by the *New York Times*, and that he saw no evidence

14  that fake interviews were widespread at Wells Fargo. After joining Wells Fargo in November 2020,

15  Mr. Santos was generally involved in Wells Fargo's diversity-hiring initiatives, including the Guidelines.

16  (*See*, *e.g.*, Ex. KK at -896; Ex. JJ at 20:24-21:13.) On May 2, 2022, Mr. Santos received questions from

17  the *New York Times* reporter about instances of what she characterized as fake interviews. (Ex. W at -699-

18  701.) As Mr. Santos testified, the reporter did not actually identify any specific instances of fake

19  interviews. (Ex. JJ at 165:20-167:14.) Consistent with his statement to *Business Insider* on May 27, 2022,

20  Mr. Santos promptly took action to investigate the allegations raised by the reporter by asking colleagues,

21  including Ms. Sanchez, to "start pulling data/facts on this." (Ex. W at -699.) Mr. Santos continued to

22  engage on the topics raised by the reporter, but ultimately received no evidence that fake interviews were

23  widespread at Wells Fargo. *See PETCO*, 2008 WL 8876554, at *5-6 ("Knowing enough to launch an

24  investigation (a corporate officer could not simply assume that the initial report of bad news was accurate)

25  is a very great distance from . . . proof of intent to deceive.") (cleaned up). On May 13, 2022, Mr. Santos

26  discussed the Guidelines at a Black/African-American Executive forum — after which he received

27  feedback from three employees who believed that they had personally experienced something akin to what

28  was alleged by the reporter, or suggested that they were aware of a similar practice. (Exs. II, LL, MM.)

None of these individuals, however, provided any specific details or information to enable Mr. Santos to determine whether those were, in fact, fake interviews — or whether they occurred during the Class Period or in connection with the Guidelines. (*See id.*) Even if these three anecdotes were evidence of fake interviews that occurred during the Class Period, however, that would fall far short of evidence of widespread fake interviews.

Notably, Mr. Santos received and reviewed hiring data that showed that the opposite was true: the Guidelines were working to increase the percentage of diverse candidates being hired by Wells Fargo. Consistent with what Mr. Santos told *Business Insider* on June 3, 2022, and as discussed above (*supra* Section I.E), the Diverse Hiring Fact Pack that Mr. Santos reviewed showed that the share of diverse hires for roles earning more than $100,000 (*i.e.*, roles covered by the Guidelines) *increased* by 5.4% between 2019 and 2021 and that diverse hiring across multiple dimensions had increased overall, particularly at the executive level, such that the Guidelines appeared to be working as intended. (Ex. X at -460; *see also* Ex. NN.) Plaintiffs have never rebutted these statistics and have no evidence to the contrary.

**C.    There Is No Evidence that Carly Sanchez Was Aware of Widespread Fake Interviews.**

Plaintiffs challenge remarks that Ms. Sanchez gave in an October 7, 2021 interview in which she stated that Wells Fargo was focused on "constantly targeting external as well as internal sourcing to make sure that the pipeline is filled with great candidates." (AC ¶ 269.) As this Court previously observed, Ms. Sanchez did not receive the Miller or Bruno emails, *SEB*, 742 F. Supp. 3d at 1021, and there is no evidence that she was ever made aware of those communications. Furthermore, Ms. Sanchez testified that she never even came across any allegation of a fake interview until she heard that term for the first time from a *New York Times* reporter in May 2022 — *months* after Ms. Sanchez made her lone alleged misstatement. (Ex. S at 200:9-11, 200:23-201:6.) Nothing in the discovery record suggests otherwise: there is no evidence that Ms. Sanchez ever knew about a single fake interview between the start of the Class Period and the time that she made her lone challenged statement in October 2021 — let alone widespread fake interviews during the Class Period. *See REMEC*, 702 F. Supp. 2d at 1239 (noting requirement that scienter must be established "at the time [defendant] made the challenged statement"); *PETCO*, 2008 WL 8876554, at *3 (granting summary judgment based on lack of scienter to defendant

who "had no knowledge of" improper under-accruals "until after the public statements issued during the class period").

### D.    There Is No Evidence of Scienter With Respect to Any of the Six Statements Not Attributed to the Individual Defendants.

Six of Plaintiffs' 11 alleged misstatements are not attributed to any individual Defendant, but only to Wells Fargo itself.  (AC ¶¶ 263-65, 267, 273, 274, 277.)  "A defendant corporation is deemed to have the requisite scienter for fraud *only* if the individual corporate officer making the statement has the requisite level of scienter, *i.e.*, knows that the statement is false, or is at least deliberately reckless as to its falsity, at the time he or she makes the statement."  *In re Apple Comput., Inc. Sec. Litig.*, 243 F. Supp. 2d 1012, 1023 (N.D. Cal. 2002), *aff'd*, 127 F. App'x 296 (9th Cir. 2005) (emphasis added).  Accordingly, to prove scienter as to each of these statements that Plaintiffs seek to attribute to Wells Fargo, Plaintiffs must identify the specific Wells Fargo employee or agent who made these statements and prove that these individuals had the requisite scienter — *i.e.*, that they knew about the alleged widespread practice of conducting fake interviews during the Class Period.  But Plaintiffs have no such evidence.  In fact, they have never alleged who made these statements on Wells Fargo's behalf.  As a result, Plaintiffs cannot satisfy their evidentiary burden as to any of these alleged misstatements.

### III.    PLAINTIFFS CANNOT PROVE LOSS CAUSATION BECAUSE THE JUNE 9, 2022 *NEW YORK TIMES* ARTICLE ABOUT FAKE INTERVIEWS WAS NOT NEW NEWS.

To establish loss causation, Plaintiffs must show not only that a corrective disclosure revealed the truth that was concealed by an alleged misstatement, but also that the disclosure of that truth caused the company's stock price to decline.  *See Espy* v. *J2 Global, Inc.*, 99 F.4th 527, 540 (9th Cir. 2024).  A disclosure that "does not reveal anything new to the market is, by definition, not corrective."  *REMEC*, 702 F. Supp. 2d at 1267.  Summary judgment is appropriate where a plaintiff fails to "identif[y] evidence that could lead a juror to conclude that defendants' alleged misrepresentations . . . were a 'substantial cause' of the decline in value of [the company's] stock."  *In re Oracle Corp. Sec. Litig.*, 2009 WL 1709050, at *17 (N.D. Cal. June 19, 2009), *aff'd*, 627 F.3d 376 (9th Cir. 2010).

Plaintiffs claim that the June 9, 2022 *New York Times* article is the lone corrective disclosure that caused the stock price to decline over two days.  (AC ¶¶ 332, 339; Ex. OO ¶ 78.)  But the market learned about the supposed "truth" well before June 9.  *The New York Times* first reported on purported "sham"

interviews for "many types of positions" at Wells Fargo on May 19, 2022 — several weeks before the alleged corrective disclosure date.  (Ex. A.)  The May 19 article relied on allegations from 12 current or former employees, including Mr. Bruno; alleged that employees in Wells Fargo's WIM division conducted "fake" interviews by interviewing candidates "even though the decision had already been made to give the job to another candidate"; claimed that Wells Fargo was more interested in "record[ing] its diversity efforts on paper" than in hiring diverse candidates; and described the Guidelines.  (*Id.*)  The May 19 article was followed by further news reporting and public commentary that conclusively show that the public was aware of allegations of widespread fake interviews at Wells Fargo well before June 9. (*See* Ex. PP ¶¶ 36-39.)  For instance, on May 31, 2022, then-Senator Sherrod Brown, Chairman of the Senate Committee on Banking, Housing, and Urban Affairs, sent a letter to Mr. Scharf that was reported in *The New York Times* the same day, chastising Wells Fargo for conducting "fake job interviews for minority and female candidates" and calling on the Company to reform its risk management and internal controls.  (Ex. QQ; *see* Ex. RR.)  On June 6, 2022, Mr. Bruno publicly posted on LinkedIn that the "problem" of fake interviews at Wells Fargo was "systemic." (Ex. SS.)  The following day, *The New York Times* again reported on the subject of fake interviews, noting that Wells Fargo was "temporarily suspending" the Guidelines and that Mr. Bruno "was one of a dozen" Wells Fargo employees "who said they had witnessed or participated in fake interviews." (Ex. TT.)  Plaintiffs' expert, Dr. Mason, agrees that there was no statistically significant stock price reaction following any of these disclosures.  (*See* Ex. UU ¶ 65; Ex. Q at 112:3-14, 274:1-15; *see also* Ex. PP ¶¶ 36-39)

The June 9 article — again, Plaintiffs' only alleged corrective disclosure — told the same story. It, too, identified Mr. Bruno as a whistleblower; alleged that Wells Fargo employees across multiple business lines conducted "fake" interviews, in which they interviewed candidates "for roles that had already been promised to other people"; claimed that Wells Fargo was more interested in "recording [its] efforts" to hire diverse individuals "than actually hiring them"; and described the Guidelines.  (Ex. B.) The only significant *new information* disclosed in the June 9 article was that the Department of Justice had opened an investigation into Wells Fargo's hiring practices in response to the May 19 article.  (*Id.*) But that disclosure is neither relevant nor corrective because the alleged misstatements are about the existence and requirements of the Guidelines, not the existence or non-existence of a government

investigation.  *See Lloyd* v. *CVB Fin. Corp.*, 811 F.3d 1200, 1209-10 (9th Cir. 2016) ("[T]he announcement of an investigation, 'standing alone and without any subsequent disclosure of actual wrongdoing, does not reveal to the market the pertinent truth of anything, and therefore does not qualify as a corrective disclosure.'").  While the June 9 article reported that "another 10 current and former employees" had come forward with "stories" about fake interviews (Ex. B at 2), such information amounts to nothing more than "confirmatory information" regarding fake interviews, which was "already known by the market" and thus "[can]not cause a change in stock price."  *In re Herbalife, Ltd. Sec. Litig.*, 2015 WL 1245191, at *4 (C.D. Cal. Mar. 16, 2015).  Indeed, Plaintiffs' expert has testified to that effect.  (*See* Defendants' Mot. to Exclude Testimony of Dr. Joseph R. Mason, at 11.)  Because the June 9 article's follow-on discussion of fake interviews was not new news, Defendants are entitled to summary judgment as to loss causation.  *Oracle*, 2009 WL 1709050, at *17 (granting defendants summary judgment on loss causation grounds); *see Evanston*, 2021 WL 4902420, at *5 (same).[8]

## CONCLUSION

After a full and fair opportunity to conduct extensive discovery, Plaintiffs still have no evidence to support their securities fraud claims, including as to falsity, scienter, and loss causation.  Accordingly, the Court should grant Defendants' summary judgment motion and dismiss the Complaint with prejudice.

Dated:  July 7, 2025

/s/ Brendan P. Cullen
Brendan P. Cullen (SBN 194057)
(cullenb@sullcrom.com)
Sverker K. Hogberg (SBN 244640)
(hogbergs@sullcrom.com)
Alexis C. Holmes (SBN 321393)
(holmesa@sullcrom.com)
SULLIVAN & CROMWELL LLP
550 Hamilton Avenue
Palo Alto, CA 94301

---

[8]    For the reasons explained in Defendants' accompanying *Daubert* motion to exclude the testimony and opinions of Dr. Mason, Plaintiffs have no admissible evidence to sustain their burden on loss causation, and summary judgment should be granted for this reason alone.  *REMEC*, 702 F. Supp. 2d at 1275.  As Defendants' expert explains, Dr. Mason fails to establish that the June 9 article contained a corrective disclosure at all, or that the abnormal return he identified in his event study was due to this allegedly corrective information in the June 9 article as opposed to other macroeconomic or company-specific information.  (*See* Ex. PP ¶ 23.)

Telephone: (650) 461-5600
Fax: (650) 461-5700

Christopher M. Viapiano (*pro hac vice*)
(viapianoc@sullcrom.com)
SULLIVAN & CROMWELL LLP
1700 New York Avenue N.W., Suite 700
Washington, DC 20006
Telephone: (202) 956-7500
Fax: (202) 956-7056

Leonid Traps (*pro hac vice*)
(trapsl@sullcrom.com)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004
Telephone: (212) 558-4000
Fax: (212) 558-3588

*Counsel for Defendants Wells Fargo & Company, Charles W. Scharf, Kleber R. Santos, and Carly Sanchez*