Brendan P. Cullen (SBN 194057)
(cullenb@sullcrom.com)
Sverker K. Hogberg (SBN 244640)
(hogbergs@sullcrom.com)
Alexis C. Holmes (SBN 321393)
(holmesa@sullcrom.com)
SULLIVAN & CROMWELL LLP
550 Hamilton Avenue
Palo Alto, CA 94301
Telephone: (650) 461-5600

*Counsel for Defendants Wells Fargo & Company, Charles W. Scharf, Kleber R. Santos, and Carly Sanchez*

[Additional counsel listed on signature page]

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| SEB INVESTMENT MANAGEMENT AB and WEST PALM BEACH FIREFIGHTERS' PENSION FUND, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>WELLS FARGO & COMPANY, CHARLES W. SCHARF, KLEBER R. SANTOS, and CARLY SANCHEZ,<br><br>Defendants. | Case No. 3:22-cv-03811-TLT<br><br>**REPLY TO PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE THE TESTIMONY OF DR. JOSEPH R. MASON**<br><br>The Hon. Trina L. Thompson<br>Courtroom: 9<br>Date: October 28, 2025<br>Time: 2:00 p.m. |

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT .................................................................................................... 1

ARGUMENT .................................................................................................................................. 2

    I.    PLAINTIFFS HAVE NOT SHOWN THAT DR. MASON'S LOSS CAUSATION OPINIONS ARE RELIABLE .............................................................. 2

        A.    Plaintiffs Fail To Support Dr. Mason's Treatment of the June 9, 2022 Disclosure as Corrective. ................................................................................. 2

        B.    Plaintiffs Fail To Support Dr. Mason's Use of a Two-Day Event Window .......... 8

    II.    PLAINTIFFS HAVE NOT SHOWN THAT DR. MASON APPLIED A RELIABLE METHODOLOGY TO ESTIMATE STOCK PRICE INFLATION AND DAMAGES. .................................................................................................. 10

    III.    PLAINTIFFS HAVE NOT SHOWN THAT DR. MASON'S OPINIONS ON MATERIALITY ARE RELIABLE. ........................................................................ 13

CONCLUSION ............................................................................................................................. 15

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Baker* v. *SeaWorld Ent., Inc.*,
    423 F. Supp. 3d 878 (S.D. Cal. 2019) ................................................................................... 11

*Basic Inc.* v. *Levinson*,
    485 U.S. 224 (1988) ............................................................................................................... 14

*In re BP p.l.c. Sec. Litig.*,
    2016 WL 3090779 (S.D. Tex. May 31, 2016) ....................................................................... 12

*Bricklayers & Trowel Trades Int'l Pension Fund* v. *Credit Suisse Sec. (USA) LLC*,
    752 F.3d 82 (1st Cir. 2014) ............................................................................................. 9, 10

*Copelan* v. *Techtronics Indus.*,
    2015 WL 1886510 (S.D. Cal. Apr. 24, 2015) ......................................................................... 6

*Daubert* v. *Merrell Dow Pharms., Inc.*,
    509 U.S. 579 (1993) .......................................................................................................... passim

*Engilis* v. *Monsanto Co.*,
    2025 WL 2315898 (9th Cir. Aug. 12, 2025) ................................................................... 1, 3, 9

*Goff* v. *PeaceHealth*,
    2024 WL 4979432 (D. Or. Dec. 4, 2024) ............................................................................... 5

*Halliburton Co.* v. *Erica P. John Fund, Inc.*,
    573 U.S. 258 (2014) ................................................................................................................ 9

*Homyk* v. *ChemoCentryx, Inc.*,
    2025 WL 1547625 (N.D. Cal. May 30, 2025) ....................................................................... 12

*Lloyd* v. *CVB Fin. Corp.*,
    811 F.3d 1200 (9th Cir. 2016) ............................................................................................. 7, 8

*Metzler Inv. GmbH* v. *Corinthian Colleges, Inc.*,
    540 F.3d 1049 (9th Cir. 2008) ................................................................................................. 3

*No. 84 Emp.-Teamster Joint Council Pension Tr. Fund* v. *Am. W. Holding Corp.*,
    320 F.3d 920 (9th Cir. 2003) ............................................................................................ 9, 14

*In re Nuveen Funds/City of Alameda Sec. Litig.*,
    2011 WL 1842819 (N.D. Cal. May 16, 2011) ........................................................................ 4

*Plumbers & Pipefitters Loc. Union #295 Pension Fund* v. *CareDx, Inc.*,
    2024 WL 5399664 (N.D. Cal. Sept. 18, 2024) ....................................................................... 8

*In re REMEC Inc. Sec. Litig.*,
    702 F. Supp. 2d 1202 (S.D. Cal. 2010) ............................................................................... 3, 6

*Retail Wholesale & Dep't Store Union Local 338 Ret. Fund* v. *Hewlett-Packard Co.*,
    845 F.3d 1268 (9th Cir. 2017) ............................................................................................ 14, 15

*Strougo* v. *Tivity Health, Inc.*,
    2025 WL 1415896 (M.D. Tenn. May 15, 2025) ................................................................. 8, 9

*United States* v. *Valencia-Lopez*,
    971 F.3d 891 (9th Cir. 2020) .............................................................................................. 6

**Other Authorities**

Fed. R. Evid. 702 ........................................................................................................................ 1, 5, 6

Defendants' Motion (ECF No. 226) explained why Dr. Joseph Mason's opinions on loss causation, damages, and materiality are unreliable. In their Opposition (which includes 30 lengthy, single-spaced footnotes that, were the arguments made in the body of the brief where they belong, would push the document well past the Court's page limit), Plaintiffs respond by attempting to shift the burden to Defendants and their rebuttal expert, Dr. Paul Gompers. That gets the standard backwards. As the Ninth Circuit recently emphasized, the "proponent of expert testimony must always establish the admissibility criteria of Rule 702 by a preponderance of the evidence and [] there is no presumption in favor of admission." *Engilis* v. *Monsanto Co.*, 2025 WL 2315898, at *6 (9th Cir. Aug. 12, 2025). Plaintiffs fall well short of meeting that burden here, for several reasons.

*First*, Plaintiffs fail to demonstrate the reliability of Dr. Mason's opinion that the June 9, 2022 *New York Times* article corrected alleged misstatements about the Diverse Slates Guidelines. Defendants' Motion identified several failings in Dr. Mason's analysis, including that it (i) relies on Plaintiffs' allegations rather than his own independent analysis; (ii) fails to provide any robust analysis for why the multiple disclosures before June 9, 2022, including three published in *The New York Times*, were not themselves corrective; and (iii) fails to justify his conclusion that the announcement of the DOJ investigation in the June 9, 2022 *New York Times* article corrected prior alleged misstatements. Plaintiffs' Opposition has no good response to these criticisms. Plaintiffs identify no meaningful analysis by Dr. Mason independent of Plaintiffs' allegations. They fail to explain why, for example, the May 19 *New York Times* article reporting on allegations of fake interviews was not fully corrective but the June 9 article was, particularly when everyone agrees that the former is what prompted the DOJ to investigate the Company in the first place. And they cannot explain how the announcement of a DOJ investigation corrected prior alleged misstatements that were made well before that investigation *even existed*.

*Second*, Plaintiffs fail to offer any justification for Dr. Mason's decision to use a two-day event window given the facts in this particular case. The alleged June 9, 2022 corrective disclosure followed *weeks* of reporting on the Diverse Slates Guidelines, and investors were therefore aware of the fake interview allegations prior to June 9. But Dr. Mason concludes without basis that the market failed to absorb further reporting on those allegations until June 10, which happened to coincide with historically negative inflation news announced that same morning. Despite attempting to shift the burden to

Defendants and their expert, Plaintiffs fail to reconcile Dr. Mason's opinion with the timing of the share price reaction of Wells Fargo's stock, or his prior conclusion that Wells Fargo's stock traded in an efficient market.

*Third*, Plaintiffs' Opposition does not rebut the flaws in Dr. Mason's damages methodology, which rests on his unsupported assumption that share price inflation was constant during the entire 15-month Class Period and equal to the cumulative price declines on June 9 and 10. Plaintiffs cannot defend Dr. Mason's failure to account for the individual or aggregate effect of the alleged misstatements. And, Plaintiffs do not justify, legally or factually, Dr. Mason's decision to back-cast to the entire Class Period any share price decline attributable to a DOJ investigation that only began after May 19.

*Finally*, the Opposition offers nothing to reassure the Court that Dr. Mason conducted a reliable analysis to evaluate whether the alleged misstatements were material to investors. In Dr. Mason's own words, his materiality opinion is simply "a natural economic conclusion based on" his "loss causation and inflation analyses," such that it adds nothing to the mix. (Ex. UU ¶ 80.) Plaintiffs also fail to explain how Dr. Mason's materiality opinion is consistent with Dr. Mason's other opinion that investors may have been skeptical of Wells Fargo's statements about the Guidelines given its past regulatory issues.

For all these reasons, Plaintiffs have failed to meet their burden to demonstrate the reliability of Dr. Mason's opinions, and those opinions should be excluded.

## ARGUMENT

### I. PLAINTIFFS HAVE NOT SHOWN THAT DR. MASON'S LOSS CAUSATION OPINIONS ARE RELIABLE.

#### A. Plaintiffs Fail To Support Dr. Mason's Treatment of the June 9, 2022 Disclosure as Corrective.

As explained in Defendants' Motion (9-16), Dr. Mason fails to provide reliable analysis for his opinion that the June 9, 2022 *New York Times* article (and only that article) was corrective of the alleged misstatements. Plaintiffs' responses miss the point. For example, Plaintiffs defend Dr. Mason's event study regression model, which is irrelevant because Defendants have not challenged it. (Opp. 1-2, 8-9.) Next, Plaintiffs fault *Defendants'* expert for rebutting Dr. Mason's opinions rather than offering an affirmative expert opinion, claiming that "Defendants point to *no* other piece of information that could

have caused the June 9, 2022 price decline" (*id.* 10 (emphasis in original))[1] — even though it is *Plaintiffs'* burden to justify the reliability of their expert testimony under *Daubert*. *Engilis*, 2025 WL 2315898, at *6. And Plaintiffs even attempt to disclaim the need for reliable expert analysis altogether, arguing that the fact of a "stock decline after [the June 9 *New York Times* article] was published . . . clearly indicates that the market viewed it as new, economically important information." (Opp. 10.) Again, that is not the law. *See*, *e.g.*, *Metzler Inv. GmbH* v. *Corinthian Colleges, Inc.*, 540 F.3d 1049, 1064 (9th Cir. 2008) (rejecting theory of loss causation based solely on price decline because "[e]nabling a plaintiff to proceed on such a theory would effectively resurrect . . . that loss causation is established through an allegation that a stock was purchased at an inflated price").

Plaintiffs' other defenses of Dr. Mason's loss causation opinion similarly fail.

***Plaintiffs cannot excuse Dr. Mason's failure to conduct his own analysis of the underlying facts in this action to support his opinions.*** Plaintiffs have no defense of Dr. Mason's reliance on mere allegations rather than his own independent analysis of the relevant facts. (*See* Mot. 9-10.) For example, Dr. Mason claims that the June 9 article was corrective because *Plaintiffs allege* that it revealed for the first time that fake interviews at Wells Fargo were "widespread" and "a systemic issue" that "foreseeab[ly]" led to a DOJ investigation. (Ex. OO ¶ 60; Ex. UU ¶ 64.) In their Opposition, Plaintiffs now simply quote Dr. Mason's expert merits report, which states that his loss causation opinion is based on his "review of the evidence." (*See* Opp. 9 (quoting Ex. OO ¶ 67).) But this conclusory argument is unsupported by the record. Dr. Mason admitted at his deposition that he has not "reviewed any fact witness testimony or depositions . . . or any internal documents of Wells Fargo" (Ex. Q at 16:12-23), despite previously promising to "consider the facts and circumstances of the case, including documents produced and testimony elicited." (ECF No. 182-2 ¶ 113.) Courts have been clear that expert testimony

---

[1] Plaintiffs are incorrect in asserting that Defendants' expert provided no alternate explanation for Wells Fargo's observed stock price decline on June 9. Professor Gompers explained that "the macroeconomic news released on June 10, 2022, and expectations about that announcement on the afternoon of June 9, 2022, reported caused the large market- and industry-wide price declines on the afternoon of June 9, 2022," and further that "[p]ublic press also discussed Wells Fargo's stock price decline on June 9, 2022 in the context of the expected inflation announcement on June 10, 2022." (Ex. PP ¶¶ 48, 52.) In any event, it remains Plaintiffs' burden to "provide sufficient evidence" to "show that an economic loss occurred after the truth behind the [alleged] misrepresentation or omission became known to the market," and as explained, Plaintiffs have failed to carry this burden. *In re REMEC Inc. Sec. Litig.*, 702 F. Supp. 2d 1202, 1266 (S.D. Cal. 2010).

should be excluded as "fatally flawed" when it is not based on "investigation or analysis [demonstrating] that plaintiffs' losses were caused by defendants' fraud." *In re Nuveen Funds/City of Alameda Sec. Litig.*, 2011 WL 1842819, at *8 (N.D. Cal. May 16, 2011).

***Plaintiffs ignore Dr. Mason's failure to account for earlier disclosures.*** Dr. Mason's opinions on loss causation should be excluded for the additional reason that he does not offer a reliable analysis of the public disclosures prior to June 9, 2022 discussing fake interview allegations at Wells Fargo. Dr. Mason makes no serious effort to analyze why investors would *not* have been alerted to the fake interview allegations by (i) the May 19, 2022 *New York Times* article that reported on "sham" interviews at Wells Fargo for "many types of positions" at various Wells Fargo offices across the country (Ex. A); (ii) Senator Elizabeth Warren's tweet the next day sharing the May 19 article and criticizing Wells Fargo (Ex. TT); (iii) Senator Sherrod Brown's (then-Chairman of the Senate Committee on Banking, Housing, and Urban Affairs) May 31 public letter to Wells Fargo's CEO explicitly referencing the "[r]ecent revelations" of fake interviews at Wells Fargo, which was reported in another *New York Times* article that same day (Ex. QQ; Ex. RR); (iv) a June 6 LinkedIn post by former Wells Fargo employee, Joe Bruno, calling fake interviews at Wells Fargo a "systemic" issue (Ex. SS); and (v) a June 6 *New York Times* article with the headline "Wells Fargo Announces 'Pause' of Policy That Led to Fake Job Interviews" that, like the May 31 article, reported that "Joe Bruno[] was one of a dozen current and former Wells Fargo employees who said they had witnessed or participated in fake interviews" resulting from the Diverse Slates Guidelines (Ex. TT). According to Dr. Mason, *none* of these public disclosures regarding purported fake interviews caused a stock price reaction, yet the later announcement concerning the same subjects on June 9 did. (*See* Ex. UU ¶ 65.) Dr. Mason conducted no actual analysis to substantiate his opinion that these multiple earlier disclosures "did not reveal the information that Plaintiffs allege was improperly omitted" and that investors somehow viewed the June 9 disclosure differently.[2] (Ex. OO ¶ 87; *see also* Ex. UU ¶ 52.)

---

[2] Plaintiffs try (in a footnote) to use internal Wells Fargo documents discussing the May 19 *New York Times* article to bolster Dr. Mason's conclusions. (*See* Opp. 11 n.8.) But even if their arguments were valid (they are not), they cannot substitute their own post-hoc interpretation of documentary evidence to remedy Dr. Mason's lack of analysis, particularly when Dr. Mason has admitted that he *did not review any* internal Wells Fargo documents when forming his opinions. (*See* Ex. Q at 16:12-23.)

Dr. Mason's lack of analysis is especially jarring because everyone agrees that the May 19 *New York Times* article prompted the DOJ to open an investigation into Wells Fargo's hiring practices. (*See* Compl. ¶ 233; *see also* Ex. OO ¶ 47.) Dr. Mason makes no effort to explain why the May 19 article was apparently enough to alert the DOJ to the issue, but not investors. And he cannot square his opinion with his deposition testimony that a disclosure of fake interviews *would* be corrective if the disclosure was "sufficiently broad as to attract regulatory and governmental attention in a way that would be important or material to investors." (Ex. Q at 76:19-77:15, 79:9-21.) That is *exactly* what happened in connection with the May 19 *New York Times* article. Similarly, Dr. Mason's contention that the June 9 reporting was different in kind from earlier disclosures because it showed that fake interviews were occurring "across business lines" (Opp. 10) is flatly inconsistent with his prior opinion that investors would not draw a distinction between "a disclosure of X number of fake interviews" and a "disclosure of X+3 fake interviews later." (ECF No. 205-2 ¶ 29.) Neither Plaintiffs nor Dr. Mason explain how these opinions can be reconciled with each other.

Plaintiffs' other attempts to revive Dr. Mason's purported analysis of earlier disclosures similarly fall short.

*First*, Plaintiffs reference Dr. Mason's testimony that the "June 9 article disclosed for the first time that 'there may be another process breakdown at Wells Fargo in a [program] that was put in place to remedy prior process breakdowns.'" (Opp. 11.) But neither Plaintiffs nor Dr. Mason explain how the earlier disclosures — including Senator Brown's letter, which explicitly linked disclosures of fake interviews to purported issues with Wells Fargo's internal controls — did not alert the market to these purported "process breakdowns." And in any event, at his deposition, Dr. Mason was unable to identify any direct connection between the Guidelines and Wells Fargo's past regulatory issues. (*See* Ex. Q 60:8-11, 69:4-70:7.)

*Second*, Plaintiffs assert that Defendants' Motion challenging the reliability of Dr. Mason's opinions should be understood as a "truth-on-the-market" defense. (Opp. 11.) Whether Defendants may also assert a "truth-on-the-market" affirmative defense has zero relevance to Defendants' *Daubert* Motion, where the question is solely whether Dr. Mason's opinions are reliable under Rule 702. *See*, *e.g.*, *Goff* v. *PeaceHealth*, 2024 WL 4979432, at *3 n.1 (D. Or. Dec. 4, 2024) (explaining that ruling excluding expert

testimony as inadmissible is "narrowly tailored to whether [expert's] opinions are based on reliable methodologies and reasoning under Rule 702 and *Daubert*" notwithstanding defendant's assertion of affirmative defense). *Third*, Plaintiffs point to Dr. Mason's statement that "Defendants denied the scope and seriousness of the allegations" in the May 19 article. (Ex. OO ¶ 87.) According to Dr. Mason, those denials negated the corrective effect of the article. (*See id.*) But as Defendants point out in their Motion (12), when Dr. Mason was asked to identify when this "deni[al]" occurred, he pointed only to a statement published on May 27 — eight days later. (*See* Ex. Q 159:13-160:20.) In response, Plaintiffs purport to cite evidence of other purported disavowals by Wells Fargo (Opp. 12 n.12), but again, Plaintiffs' record-based assertions now cannot substitute for Dr. Mason's own analysis and testimony. Moreover, Dr. Mason identified no "disavowals" for any of the disclosures between May 19 and June 9. (*See supra* at 3-4.)

*Lastly*, Plaintiffs resort to the fallback argument that Defendants' arguments go to the "weight of [Dr. Mason's] testimony, not admissibility." (Opp. 12 (quoting *Copelan* v. *Techtronics Indus.*, 2015 WL 1886510, at *5-6 (S.D. Cal. Apr. 24, 2015)).) This attempt to salvage Dr. Mason's flawed testimony simply usurps the Court's gatekeeping function under *Daubert*, because "dismissing an argument as 'going to the weight, not admissibility, of [the expert's] testimony' is *not* a reliability determination." *U.S.* v. *Valencia-Lopez*, 971 F.3d 891, 899 (9th Cir. 2020) (citation omitted). All of the issues Defendants have identified in their Motion concern Dr. Mason's failure to conduct an analysis of the relevant facts to support his opinions about what does and does not constitute a corrective disclosure — and this goes directly to whether his opinions are *reliable* enough to pass muster under *Daubert*. *See REMEC*, 702 F. Supp. 2d at 1274 ("[Expert's] failure to consider this additional information demonstrates that his methodology is flawed to the point of being unreliable"). For the reasons above, they are not.

**Plaintiffs cannot point to any basis for Dr. Mason's conclusion that the DOJ investigation disclosure was corrective.** Because Dr. Mason chose not to disaggregate the effect of the DOJ investigation announcement on Wells Fargo's stock price from his event study, he must establish that the investigation announcement too was somehow corrective. (*See* Mot. 13.) But Dr. Mason does not (and could not) seriously conclude that any of the alleged *misstatements* related to a DOJ investigation, or that Wells Fargo could have disclosed such an investigation before it commenced in response to the May 19

*New York Times* article.  Dr. Mason's solution to this problem is to assert without any underlying analysis that the DOJ investigation was a "foreseeable consequence of the alleged omitted information" such that "a severe regulatory or governmental response would have been expected" by Wells Fargo's investors at all times during the entirety of the Class Period.  (Ex. OO ¶ 86; *see also id.* ¶ 60; Ex. UU ¶¶ 11, 17.)  Defendants' rebuttal expert, Professor Gompers, attempted to verify Dr. Mason's conclusion, but found only Dr. Mason's cursory reference to having reviewed unspecified "economic evidence" and his generalized impression that Wells Fargo was dealing with "intense regulatory scrutiny."  (*See* Ex. PP ¶ 35; *see also* Ex. OO ¶ 86.)  Plaintiffs' Opposition now only confirms that Dr. Mason's opinion as to the DOJ investigation announcement is unreliable and unsupported.

*First*, in an effort to buttress Dr. Mason's conclusory opinions, Plaintiffs cite his testimony that the Diverse Slates Guidelines were "put in place to move the bank beyond consent orders" and "to remedy those past wrongs," which means that investors would have anticipated *some* government response to *any* failure by Wells Fargo to adhere to the Guidelines.  (*See* Opp. 13.)  But other than his own say-so, Dr. Mason has not identified any actual evidence that investors specifically connected the Guidelines to any of the past consent orders that he cited in his report.  (*See* Ex. Q at 60:8-11, 69:4-70:7.)

*Second,* Defendants explained that Dr. Mason did not make any effort to corroborate his assertion that *any* governmental investigation, criminal or civil, would have resulted in a share price reaction at all, much less one of the same magnitude as when the criminal DOJ investigation was disclosed on June 9.  (*See* Mot. 15.)  Plaintiffs offer no response.  Dr. Mason easily could have lent some analytical credence to his opinion by assessing whether, for example, there was any stock price reaction following Wells Fargo's disclosure that the SEC had initiated a separate investigation into Wells Fargo's hiring practices.  His failure to do so only underscores the lack of any economic or analytical basis for his opinion.

*Third*, as a matter of law, the disclosure of the DOJ investigation itself cannot be corrective, and thus should have been disaggregated from Dr. Mason's loss causation analysis.  (*See* Mot. 13 (quoting *Lloyd* v. *CVB Fin. Corp.*, 811 F.3d 1200, 1209-10 (9th Cir. 2016)).)  That is because "the announcement of an investigation, standing alone and without any subsequent disclosure of actual wrongdoing, does not

reveal to the market the pertinent truth of anything." *Lloyd*, 811 F.3d at 1209-10 (quotation omitted).[3] In another lengthy footnote (Opp. 15 n.17), Plaintiffs unsuccessfully attempt to distinguish this on-point authority. But in the case law cited by Plaintiffs, the disclosure of government investigations was considered corrective only when *taken together* with other partial corrective disclosures that tended to corroborate the corrective effect of the investigation announcement. *See*, *e.g.*, *Plumbers & Pipefitters Loc. Union #295 Pension Fund* v. *CareDx, Inc.*, 2024 WL 5399664, at *24-25 (N.D. Cal. Sept. 18, 2024) ("When considering *all the disclosures together*, Plaintiffs have sufficiently alleged loss causation.") (emphasis added). Here, Plaintiffs very specifically allege that there was only a single corrective disclosure on June 9, 2022 — and have denied that the May 19, 2022 *New York Times* article (which prompted the DOJ investigation in the first place) or any of the other public disclosures concerning alleged fake interviews prior to June 9 were corrective. Plaintiffs and Dr. Mason cannot have it both ways by disclaiming any corrective effect of these earlier disclosures while relying on case law finding additional disclosures necessary for the announcement of an investigation to be corrective in the first place. Because Dr. Mason failed to disaggregate this news in his loss causation analysis, it renders his methodology and opinions unreliable.

*Finally*, Defendants explained in their Motion that Dr. Mason ignored or misstated evidence that undermined his loss causation analysis, including the absence of analyst commentary about the possibility of a government response to the May 19 article, and the fact that the June 9, 2022 *New York Times* article described the U.S. Attorney's Office for the Southern District of New York's "new willingness" to investigate potential civil rights violations. (Mot. 15.) Plaintiffs fail to respond to any of these issues, instead characterizing them simply as "fact questions for the jury to assess." (Opp. 16 (quotation omitted).) But these issues go directly to the reliability of Dr. Mason's opinion on loss causation, and they illustrate that Dr. Mason simply "rel[ied] on Lead Plaintiff's assumptions to such extrem[e]s" as to merit exclusion. *Strougo* v. *Tivity Health, Inc.*, 2025 WL 1415896, at *5 (M.D. Tenn. May 15, 2025).

### B.  Plaintiffs Fail To Support Dr. Mason's Use of a Two-Day Event Window.

Defendants' Motion showed that Dr. Mason failed to justify a two-day event window in this case for several reasons, including that he previously concluded that Wells Fargo's stock traded in an efficient

---

[3]  The Ninth Circuit's reasoning in *Lloyd* is all the more true here because the DOJ and SEC investigations into Wells Fargo's hiring practices were both closed without any action taken.

market (based on what he called a "*standard* one-day event window"). (Mot. 16-19 (citing *Bricklayers & Trowel Trades Int'l Pension Fund* v. *Credit Suisse Sec. (USA) LLC*, 752 F.3d 82 (1st Cir. 2014)) (affirming district court's exclusion of expert's testimony based on expert's flawed event study); *id*. at 89 ("[O]nce a misstatement or corrective disclosure is publicly known in an efficient market, courts will assume that the stock price reacts immediately.").) In their Opposition, Plaintiffs again improperly attempt to shift the burden of proof to Defendants, arguing that Defendants have no basis to challenge Dr. Mason's two-day window because "their [rebuttal] expert offered no affirmative opinion on what caused the June 9-10 stock decline." (Opp. 17.) Again, it is Plaintiffs' burden to establish the reliability of Dr. Mason's opinions, not Defendants' burden to prove some alternative theory. *See Engilis*, 2025 WL 2315898, at *6. Plaintiffs have not shown that Dr. Mason's reliance on their allegations as to the appropriate length of the event window provide a reliable basis for his opinion. (*See*, *e.g.*, Ex. OO ¶ 80 ("Plaintiffs allege that the June 2022 Curative Event caused Wells Fargo's share price to decline over a two-day period.")); *see also Tivity Health, Inc.*, 2025 WL 1415896, at *8 (excluding expert testimony where it was "evident that [expert] fail[ed] to provide any opinions that reliably support[ed] Lead Plaintiff's theories of loss causation"). And in any event, none of Plaintiffs' cited authorities relate to the admissibility of expert testimony or even discuss the reliability of an expert's opinion. (*See* Opp. 17.) The first decided that defendants can rebut the presumption of reliance at class certification, *Halliburton Co.* v. *Erica P. John Fund, Inc.*, 573 U.S. 258, 284 (2014). And in the second, the Ninth Circuit rejected a "*per se* rule" that "if there [is] no immediate change in the stock price, the alleged misrepresentations or omissions must have been immaterial," *No. 84 Emp.-Teamster Joint Council Pension Tr. Fund* v. *Am. W. Holding Corp.*, 320 F.3d 920, 934 (9th Cir. 2003). Plaintiffs do not explain why either holding is relevant to Dr. Mason's unreliable opinion that a price reaction he opines *did* begin immediately on June 9 somehow *also extended* into a second day on which there was no new news.

Plaintiffs also fall short in defending Dr. Mason's failure to reliably account for the historic inflation news on June 10.[4] (Mot. 18-19.) Plaintiffs claim Dr. Mason conducted a "thorough analysis"

---

[4] Plaintiffs assert that "Defendants raise *no* challenge to Dr. Mason's disaggregation analysis for the June 9 stock price decline, thereby conceding that the information in the June 9 article caused the decline on that date." (Opp. 18.) Setting aside the fact that Defendants cannot concede an element of Plaintiffs' case in chief in a *Daubert* motion, the assertion is false. (*See*, *e.g.*, Mot. 7 (Dr. Mason "makes no effort to disaggregate the specific effect of the DOJ investigation" that was revealed in the June 9 article).)

(Opp. 18), but this purported analysis completely ignores the actual behavior of Wells Fargo's stock price, which ceased reacting after market close on June 9 and only began reacting again on June 10, immediately after the inflation announcement and one hour before market open. (Mot. 18.) In his reply report, Dr. Mason waved away his failure to analyze this data by claiming that "it relies exclusively on . . . investors who do not require substantial liquidity" and fails to reflect trading by "institutions and other large shareholders." (Ex. UU ¶ 31.) But Dr. Mason's report does not cite any sources or support for that claim. (*See id.*) And Plaintiffs elicited testimony from Dr. Gompers that "the academic literature" has answered the question of whether "price formation happen[s] during aftermarket trading" with an unequivocal "yes," and that "70 to 90 percent of aftermarket trading is institutional." (PX 107 at 284:9-20, 285:3-6.) Moreover, courts have recognized that it is appropriate for experts to use "intra-day trading analysis" to appropriately account for "confounding information." *Bricklayers*, 752 F.3d at 95-96. Dr. Mason's failure to apply these readily available analytical tools to exclude obvious alternative explanations for Wells Fargo's stock price decline renders his analysis unreliable. Because Dr. Mason's opinion on loss causation is not based on any reliable analysis of the underlying key facts in this case, the Court should exclude it.

## II. PLAINTIFFS HAVE NOT SHOWN THAT DR. MASON APPLIED A RELIABLE METHODOLOGY TO ESTIMATE STOCK PRICE INFLATION AND DAMAGES.

As explained in the Motion (19-24), Dr. Mason's estimate of out-of-pocket damages is unreliable and inadmissible under *Daubert* because it is based solely on his unsupported *ipse dixit*. Dr. Mason concludes that the artificial inflation in Wells Fargo's stock price was constant at $1.52 throughout the 15-month Class Period. However, (i) Dr. Mason failed to apply any sound methodology to determine whether the 11 alleged misstatements during the Class Period are consistent with his constant dollar inflation theory (*id*. 20-21); (ii) Dr. Mason's opinion conflicts with his own testimony that inflation was not, in fact, constant during the Class Period (*id*. 21-22); and (iii) Dr. Mason assumed that the stock decline corresponding with the DOJ investigation announcement could simply be back-cast to the entire Class Period (*id*. 22-24), including more than a year before the DOJ investigation even began. As explained below, Plaintiffs attempt to rebut these failings by characterizing Dr. Mason's unsupported conclusions as "analysis," but their post-hoc rationalizations are not a substitute for conducting an analysis using an accepted and reliable methodology. (*See* Opp. 21-24.)

*First*, Plaintiffs seek to deflect the deficiencies in Dr. Mason's opinions by arguing that Defendants have not offered expert testimony about whether there was constant dollar inflation during the Class Period. (Opp. 21.) That argument, however, has no bearing on whether Dr. Mason's opinions are reliable and is simply yet another attempt at improper burden-shifting.

*Second*, Plaintiffs implausibly contend that Dr. Mason, in fact, did conduct an analysis of the 11 alleged misstatements during the Class Period that supports his opinion of constant dollar inflation throughout the 15-month Class Period. (Opp. 21-22.) But Plaintiffs do not cite any actual analysis of the alleged misstatements and instead point only to various conclusory statements in Dr. Mason's report or his deposition. (*See id*. 21-22 & n.26 (statements that there were no "differences between [the alleged misstatements] that were relevant to [his] analysis" and "I examined the alleged misrepresentations and found that they did not convey different value-relevant information.").) What is missing is an analysis of the differences in the alleged misstatements and whether those differences are nevertheless consistent with Dr. Mason's constant dollar inflation theory. For example, Dr. Mason failed to analyze Ms. Sanchez's more detailed statements about Wells Fargo's implementation of the Guidelines and focus on sourcing diverse candidates. (Mot. 20.) Similarly, other alleged misstatements that Dr. Mason did not examine disclosed for the first time that the Diverse Slates Guidelines would (i) "define diversity . . . to include the following diversity dimensions: race/ethnicity, gender, LGBTQ, veterans, and people with disabilities" (*see* Compl. ¶ 264), and apply to "95%" of all U.S. roles with total direct compensation greater than $100,000 (*id*. ¶ 265). These are all significant — and previously undisclosed — details about the Diverse Slates Guidelines. Did this new information change whatever importance investors ascribed to the Guidelines, such that the artificial inflation increased (or decreased) as a result? Dr. Mason has no answer, simply concluding without *any* analysis that these statements were functionally identical and did not impact the amount of artificial inflation. That is the definition of improper *ipse dixit* that does not pass muster under *Daubert*.

None of the cases cited by Plaintiffs excuses Dr. Mason's approach. In *Baker* v. *SeaWorld Entertainment, Inc*., the court credited the expert's identification of specific "facts to support his decision to utilize [constant-dollar inflation] in this case," and noted that the focus by market analysts on the subject of the alleged misstatements even before the class period began tended to corroborate the expert's use of

the constant-dollar inflation method.  *See* 423 F. Supp. 3d 878, 908 (S.D. Cal. 2019).  Here, of course, Dr. Mason does not — and indeed, *cannot* — point to any analyst commentary addressing the Guidelines before or during the Class Period.  Similarly, Plaintiffs cite *Homyk* v. *ChemoCentryx, Inc*., which noted that "Defendants have cited no authority requiring plaintiffs in a securities case to calculate the precise amount that each allegedly misleading statement—and there are 140 such statements in this case—had on the stock price during the Class Period."  2025 WL 1547625, at *16 (N.D. Cal. May 30, 2025).  But the issue here is not that Dr. Mason failed to "calculate the precise" impact of each allegedly misleading statement on Wells Fargo's stock price.  Rather, Dr. Mason simply concluded that "they did not convey different value-relevant information," without providing any basis for his conclusion.  (Mot. 20 (citing Ex. UU ¶ 62).)  That lack of analysis is what renders his opinion inadmissible.

*Third*, Plaintiffs fail to defend Dr. Mason's decision to back-cast the stock price decline coinciding with the June 9, 2022 DOJ investigation news at a constant dollar level throughout the 15-month Class Period.  (Opp. 24.)  Unless the DOJ investigation was 100% certain from the very start of the Class Period, Dr. Mason's decision to back-cast the entirety of the price drop associated with the announcement of the DOJ investigation to every day of the Class Period will improperly overstate the classwide damages.  (Mot. 22); *see In re BP p.l.c. Sec. Litig*., 2016 WL 3090779, at *33 (S.D. Tex. May 31, 2016) ("[W]hile it may have been 'highly likely' that the containment dome would fail, even Coffman admits that the chances of failure were less than 100%.  Plaintiffs are consequently not permitted to claim 100% of the stock decline as damages upon the materialization of that understated risk.").  As explained in the Motion (22-23), Dr. Mason fails to support his assumption that the DOJ investigation should be back-cast with 100% certainty throughout the Class Period with any analysis of the facts using a reliable or accepted methodology.

In their Opposition, Plaintiffs nowhere address the on-point holding in *In re BP* and respond only by claiming that Dr. Mason did conduct such an analysis.  (Opp. 24 n.30.)  They point to his deposition testimony that "it was 99.99% or 100% certain that a revelation of widespread fake interviews would result in a serious regulatory response like the DOJ investigation" "based on his review of Wells Fargo's regulatory history . . . government scrutiny of Wells Fargo throughout the Class Period, the seriousness of another process failure . . . and his experience in the banking and regulatory industry." (*Id.* at 24.)  But

that testimony is simply a set of conclusory statements and speculation without any reliable supporting economic analysis. Indeed, when asked if investors would have expected the DOJ investigation "with 100 percent probability," Dr. Mason offered only speculation and conclusory reasoning: "I think it's entirely reasonable to think that if it even crossed an investor's mind that for some reason Wells Fargo would mess this one up, it would not be accompanied by further regulatory or governmental attention"; "I don't see any problem with that proposition, given Wells Fargo's position in the markets at the time and all of their aggregated regulatory difficulties"; "[M]aybe I'll say 99.9999. I think you'd be very surprised if accompanying this disclosure was silence, no attention whatsoever." (PX 110 at 143:5-145:6.) The other deposition testimony to which Plaintiffs point is equally conclusory and speculative. (*See*, *e.g.*, PX 110 at 137:8-12 ("I would find it absurd to think that finding the Diverse Search Requirement wasn't being applied would not lead to more government and regulatory attention.").) Similarly, the sections of Dr. Mason's Expert Reply Report to which Plaintiffs cite are mere conclusions based on Dr. Mason's speculation and reliance on Plaintiffs' allegations — not any analysis of the facts or application of a reliable methodology. (*See*, *e.g.*, DX UU ¶ 13 ("There is no reason to suppose . . . that the allegedly concealed information would not have resulted in a similar adverse governmental and regulatory response if it had been revealed earlier in the Class Period"); *id*. n.29 ("Plaintiffs contend that the DOJ investigation and other governmental responses were foreseeable consequences of the alleged conduct.").)

Dr. Mason's various conclusory statements also refer only to the likelihood of some general undefined "regulatory and/or governmental attention" — not specifically a *criminal* DOJ investigation. (Opp. 11.) Because he does not purport to offer any analysis about whether a criminal DOJ investigation was foreseeable (as opposed to, for instance, a civil investigation), at a minimum, Dr. Mason also would have needed to conduct an analysis of whether another type of government investigation would have caused the same stock price drop in order to support his decision to back-cast 100% of the price impact of the DOJ investigation announcement to the entirety of the Class Period. Plaintiffs have failed entirely to respond to this argument in their Opposition.

### III. PLAINTIFFS HAVE NOT SHOWN THAT DR. MASON'S OPINIONS ON MATERIALITY ARE RELIABLE.

As Defendants argued in their Motion (24-25), Dr. Mason's materiality opinion is unreliable for two reasons: (i) because he does not define the materiality standard he is testing, it is impossible to test

-13-

whether his conclusions on this element of Plaintiffs' case are reliable, and (ii) his materiality opinion rests on his circular assertion that it "is a natural economic conclusion based on" his "loss causation and inflation analyses." (Ex. UU ¶ 80).  His opinion should be excluded on both of those bases.

*First*, Plaintiffs contend that Dr. Mason offered a relevant definition of materiality, even though they cannot indicate where he did.  (Opp. 25.)  Instead, they point to his *conclusion* that "had the true nature of Wells Fargo's Diverse Search Requirement been known at an earlier time in the Class Period, market participants would have altered their expectations and risk perceptions[.]'" (*See* Opp. 25 (citing Ex. OO ¶ 91).)  And Dr. Mason refused to provide a testable definition when pressed on this point at his deposition.  (*See* PX 110 at 46:19-49:23 (declining to define "materiality" and instead defining "economically important" as "valuable").)  These various assertions are completely untethered from the relevant standard to evaluate whether the alleged misstatements were material to investors when made, which is whether there was "'a substantial likelihood that [the statements] would have been viewed by the reasonable investor as having significantly altered the total mix of information made available' for the purpose of decisionmaking by stockholders concerning their investments." *Retail Wholesale & Dep't Store Union Local 338 Ret. Fund* v. *Hewlett-Packard Co.*, 845 F.3d 1268, 1274 (9th Cir. 2017) (quoting *Basic Inc.* v. *Levinson*, 485 U.S. 224, 231-32 (1988)).

*Second*, Plaintiffs fail to justify their own admission that Dr. Mason's materiality opinion is entirely derivative of his unreliable opinions on loss causation and damages.  Dr. Mason opines that the alleged misrepresentations were "material to investors, from an economic perspective," simply because the share price impact he observes on June 9 and 10, 2022 purportedly established that "investors adjusted their expectations to reflect elevated levels of risk and lower growth prospects, which was reflected in the lower share price."  (Ex. OO ¶¶ 91, 93.)  Plaintiffs claim that this opinion is properly supported because it is apparently based "on all of the materials and analysis set forth in his report."  (Opp. 25.)  But they do not explain why this attempted incorporation by reference in place of actual analysis is sufficient.  And Defendants explained in the Motion that materiality cannot be determined based on stock price reaction alone, which is the only actual analysis cited in Dr. Mason's report.  *See*, *e.g.*, *No. 84 Emp.-Teamster Joint Council Pens. Tr. Fund*, 320 F.3d at 934.

*Third*, Plaintiffs fail to defend Dr. Mason's unreasoned and unsupported assumption that investors necessarily would have reacted in the same way to the alleged misstatements during the Class Period. Dr. Mason makes no attempt to explain how the earlier disclosures in the May 19 article and after, or the absence of any stock price reaction when the alleged misstatements were made, affect his analysis. *See Retail Wholesale*, 845 F.3d at 1247 (whether information is material depends on the "'total mix' of information made available"). Likewise, Plaintiffs do not address Dr. Mason's own claim that investors may have been skeptical of representations about the Guidelines earlier in the class period in light of Wells Fargo's "scandals" (Ex. UU ¶ 54), which contradicts and calls into doubt his conclusory assertion that investors would have "adjusted their expectations" at all times throughout the Class Period (Ex. OO ¶ 93).

## CONCLUSION

For the foregoing reasons, Dr. Mason's testimony should be excluded.

Dated:   August 25, 2025

/s/ *Brendan P. Cullen*
Brendan P. Cullen (SBN 194057)
(cullenb@sullcrom.com)
Sverker K. Hogberg (SBN 244640)
(hogbergs@sullcrom.com)
Alexis C. Holmes (SBN 321393)
(holmesa@sullcrom.com)
SULLIVAN & CROMWELL LLP
550 Hamilton Avenue
Palo Alto, CA 94301
Telephone: (650) 461-5600
Fax: (650) 461-5700

Christopher M. Viapiano (*pro hac vice*)
(viapianoc@sullcrom.com)
SULLIVAN & CROMWELL LLP
1700 New York Avenue N.W., Suite 700
Washington, DC 20006
Telephone: (202) 956-7500
Fax: (202) 956-7056

Leonid Traps (*pro hac vice*)
(trapsl@sullcrom.com)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004
Telephone: (212) 558-4000
Fax: (212) 558-3588

*Counsel for Defendants Wells Fargo & Company, Charles W. Scharf, Kleber R. Santos, and Carly Sanchez*

SULLIVAN & CROMWELL LLP

-16-

DEFENDANTS' *DAUBERT* REPLY
CASE NO. 3:22-CV-03811-TLT